JOSÉ GRANADOS NAVEDO, peticionario, *v.* MARCOS A. RO-
DRÍGUEZ ESTRADA, en su calidad de PRESIDENTE de la
COMISIÓN ESTATAL DE ELECCIONES y OTROS, recu-
rridos.

*Números:* CE-89-30 *Resueltos:* 29 de septiembre de 1989
RE-89-67
RE-89-88

594

*Carlos Canals Mora*, abogado del peticionario; *David Rivé Rivera, Julia M. Santiago De la Cruz* y *Mariano Canales Delgado*, abogados del Presidente de la Comisión Estatal de Elecciones, recurrido; *Melva Quintana*, de *Saldaña, Rey, Morán & Alvarado*, abogada de Eudaldo Báez Galib, recurrido.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

## I

Mediante moción en auxilio de jurisdicción, el Sr. José Granados Navedo solicita que revoquemos la Resolución de 14 de agosto de 1989 del Tribunal Superior que ordena que se acumule como parte a un grupo de electores de San Juan cuyos votos no fueron adjudicados por la Comisión Estatal de Elecciones (C.E.E.). También solicita que ordenemos al tribunal *a quo* "que se permita la presentación de la prueba de los electores añadidos a mano que ha anunciado el peticionario sin necesidad de que los mismos sean part[e] en el pre-

sente pleito" de impugnación. Moción urgente en auxilio de la jurisdicción, pág. 5.

La orden recurrida se emite mientras se dilucidan los méritos de la impugnación de la certificación emitida por la C.E.E. en los comicios electorales del Municipio de San Juan. Véase *Granados v. Rodríguez Estrada I*, 124 D.P.R. 1 (1989). La orden dispone, *inter alia*:

> De la prueba desfilada en la primera etapa de este caso se desprende que no se adjudicaron alrededor de 1[,]280 votos correspondientes a ciudadanos cuyos nombres fueron añadidos a mano a las listas oficiales. De esos, la parte demandante ha anunciado como testigos [a] 48 y la demandada [a] 15 testigos adicionales.

> El pasado 21 de diciembre dictamos orden concediendo a un grupo de ciudadanos demandantes ante la Corte de Distrito Federal para el Distrito de Puerto Rico plazo para intervenir en este procedimiento. Todos se negaron. Con el propósito de poder resolver la totalidad de la controversia, de conceder un remedio completo, y en vista de lo dispuesto por la Regla 16 [de Procedimiento Civil, 32 L.P.R.A. Ap. III] (*Martin* v. *Wilks*, [490 U.S. 755 (1989)]) se ordena la acumulación y emplazamiento como demandados a las personas enumeradas en el Anejo I.

> Se ordena la expedición de emplazamientos que deberán ser diligenciados por la parte demandante con copia de la demanda y de la presente orden *dentro del plazo de 5 días de su expedición.*

> Las personas así emplazadas y acumuladas en este caso deberán radicar alegaciones expresando los hechos que dan base a su reclamación de que se adjudique su voto. En el caso de electores añadidos a mano deberán someter copia de cualquier prueba documental que se proponga utilizar para acreditar su [*status*] como elector.

> Para informar a los demás ciudadanos de su derecho a intervenir o ser acumulados en este caso, se publicarán avisos dirigidos a los electores añadidos a mano y los que hayan puesto sus iniciales al dorso de la papeleta municipal cuyos votos no fueron adjudicados por la Comisión Estatal de Elecciones. (Véanse Anejos II y III).

La publicación de los avisos se hará tres veces durante una semana en por lo menos dos periódicos diarios de circulación general en la isla de Puerto Rico. (Énfasis suplido, en el original y escolio omitido.) *Exhibit* 1, págs. 2–3.

Al acoger la moción en auxilio de jurisdicción como una petición de *certiorari*, y por la naturaleza de la controversia, oportunamente concedimos a las partes recurridas un término corto para exponer su posición sobre la petición presentada. La C.E.E., el Partido Popular Democrático y el Lic. Héctor Luis Acevedo han comparecido.

Evaluado cuidadosamente el recurso y las comparecencias de las partes, consideramos que la acumulación ordenada constituye un ejercicio válido de la discreción del Tribunal Superior bajo la Regla 16.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III, según avalada por la jurisprudencia aplicable. Sin embargo, procede la modificación de la orden de modo que la acumulación de las partes se lleve a cabo en el caso de la Sra. Francisca Luzgarda González Suárez contra la C.E.E., y que se disponga de una notificación efectiva por parte de la C.E.E. a todos los electores acumulados. Así, evitamos proliferación de pleitos de electores excluidos e imprimimos finalidad a unos litigios sumamente complejos, y logramos que "a fin de cuentas, se haga una determinación correcta que refleje fiel y finalmente la intención y votación de todo el electorado del Municipio de San Juan". *Granados v. Rodríguez Estrada I*, supra, pág. 63.

En las circunstancias particulares de estos casos previamente consolidados que versan sobre la elección municipal capitalina, donde la diferencia entre el total de votos emitidos por cada candidato es tan pequeña, la acumulación de los electores imparte finalidad a la impugnación. Ésta también asegura que tanto los aspirantes principales como los votantes tengan la oportunidad de presentar su prueba en el foro que tendrá que determinar simultáneamente la validez

de la certificación y adjudicar la reclamación de los electores excluidos.

## II

En la vista oral celebrada en *Granados v. Rodríguez Estrada I*, supra, a preguntas del Tribunal, las partes argumentaron sobre la posible acumulación de los electores; el tribunal en su opinión no se pronunció sobre el particular. Sin embargo, es ahora, en esta ocasión, donde por primera vez se plantea directamente ante nos la aplicación de esta regla y emitimos los pronunciamientos correspondientes. La resolución de la controversia planteada requiere que, al interpretar y aplicar la Regla 16.2 de Procedimiento Civil, *supra*, a los hechos específicos de este caso, establezcamos un delicado balance entre dos (2) importantes principios procesales: rapidez y finalidad en la adjudicación de derechos.

En la medida en que se logre dar finalidad al pleito, los derechos de los electores cuyos votos no fueron adjudicados, así como los de los candidatos, habrán quedado definidos sin la incertidumbre de que la decisión del Tribunal pueda ser atacada colateralmente por otros cuyos derechos permanezcan latentes y/o contingentes al resultado final del pleito. Precisamente por la importancia y alto interés público de los derechos involucrados, la rapidez en la dilucidación del pleito no puede sacrificar la definición y certeza en la resolución final de la controversia.

No permitir la acumulación ordenada por el juez de instancia, con la notificación adecuada y efectiva que hemos requerido, podría tener el efecto inicial de contribuir a la rapidez en la adjudicación de la reclamación. Sin embargo, su efecto real sería crear una incertidumbre, ya que deja abierta la posibilidad de otros pleitos que colateralmente tengan la consecuencia de afectar los resultados de esta elección. De esta manera se proveerá de mayor celeridad a la solución final de la controversia para subsanar su posible

efecto inicial retardador. En el balance de estos principios procesales debe prevalecer la finalidad sobre la rapidez.

## III

El candidato impugnador expone que la orden recurrida le impide presentar el testimonio y la prueba documental necesaria para demostrar que estos electores que votaron a su favor fueron impropiamente excluidos. Una lectura de la orden reproducida anteriormente nos convence que el foro de instancia partió de la premisa que el peticionario puede, en virtud de su legitimación activa, presentar toda aquella prueba que estime necesaria y pertinente para sostener sus alegaciones. La decisión del foro de instancia no constituye una desviación de nuestro dictamen anterior, donde reconocimos que el señor Granados Navedo tenía legitimación activa para reclamar "*su derecho* a que se le adjudique los votos de [esos] electores a su favor" (énfasis suplido) y para presentar el testimonio de esos electores. *Granados v. Rodríguez Estrada I*, supra, pág. 24.

El objetivo de la orden recurrida no es impedir que el candidato impugnador presente la prueba para sostener sus alegaciones, *pues en todo caso puede hacerlo*, incluso el testimonio de los electores que se ha ordenado acumular independientemente de que comparezcan como parte. Su propósito es evitar la proliferación de pleitos que puedan afectar el remedio a concederse en este caso.

Para entender el alcance de la orden hay que examinar la Regla 16 de Procedimiento Civil, 32 L.P.R.A. Ap. III, la cual provee:

16.1. *Acumulación indispensable*

Las personas que tuvieren un interés común sin cuya presencia no pueda adjudicarse la controversia, se harán partes y se acumularán como demandantes o demandadas según corresponda. Cuando una persona que deba unirse como demandante rehusare hacerlo, podrá unirse como demandada.

16.2. *Acumulación no indispensable*

El tribunal podrá ordenar la comparecencia de aquellas personas sujetas a su jurisdicción, que a pesar de no ser partes indispensables, deban ser acumuladas si se ha de conceder un remedio completo a las personas que ya sean partes en el pleito.

La Regla 16.1 de Procedimiento Civil, *supra*, dispone la acumulación mandatoria de partes bajo el título de "partes indispensables". Tiene su origen en la Regla 19 de Procedimiento Civil federal, 28 U.S.C., pero actualmente los textos de ambas reglas no coinciden, ya que en la jurisdicción federal se enmendó sustancialmente su contenido en 1966. En *Hernández Agosto v. López Nieves*, 114 D.P.R. 601, 606 (1983), acogimos un enfoque interpretativo práctico de nuestra regla a la luz de la más reciente doctrina y jurisprudencia norteamericana, y señalamos que "[l]a acumulación obligatoria de partes ahora debe ser el resultado tan sólo de consideraciones pragmáticas, de la evaluación de los intereses envueltos, lo que exige distinguir entre diversos géneros de casos".

La Regla 16.1 de Procedimiento Civil, *supra*, define escuetamente "parte indispensable" como aquella persona que tiene "un interés común sin cuya presencia no pueda adjudicarse la controversia . . .". En *Hernández Agosto v. López Nieves*, supra, pág. 607, tratamos de precisar dicho término y señalamos que el interés requerido debe ser "de tal orden que impida la confección de un decreto sin afectarlo". La persona que reúna dichos criterios tiene que ser traída al pleito, porque de lo contrario la sentencia que se dicte no sería válida. "Parte indispensable" es un concepto que "entronca con la cláusula constitucional sobre el debido proceso de ley". J.A. Cuevas Segarra, *Práctica Procesal Puertorriqueña: Procedimiento Civil*, San Juan, Pubs. J.T.S., 1984, Vol. II, pág. 91. Véase 7 *Wright, Miller and*

*Kane, Federal Practice and Procedure: Civil 2d* Sec. 1602 (1986). Su propósito primordial es "proteger a las personas ausentes de los efectos perjudiciales que pudiera tener la resolución del caso sin la presencia de ellos y evitar la multiplicidad de pleitos mediante un remedio efectivo y completo". *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407, 412–413 (1982).

■ De otra parte, aun cuando técnicamente el tercero ausente no reúna todos los atributos de una "parte indispensable", la Regla 16.2 de Procedimiento Civil, *supra*, autoriza a los tribunales de instancia a acumularlo para conceder un remedio completo y final a las personas que ya son partes en el pleito. Esta facultad es discrecional e igualmente está guiada por el mismo enfoque pragmático que prevalece en la jurisdicción federal.(1) Véase Cuevas Segarra, *op. cit.*, pág. 94. En el ejercicio de su discreción, el tribunal debe considerar, entre otras cosas, si la sentencia a dictarse en su momento le pondría punto final a la controversia entre aquellos que ya son partes antes de la acumulación prevista.

■ Debe tomarse en consideración que cuando por iniciativa de las partes no se le ha brindado la oportunidad a personas ausentes del pleito a salvaguardar unos derechos, para imprimirle finalidad a la adjudicación de la controversia medular, esas personas deben ser acumuladas como partes. No es suficiente que el ausente haya sido informado de su oportunidad de intervenir en el pleito; mientras no se le haya

---

(1) En el foro federal no existe una distinción a priori entre lo que es una parte indispensable y una no indispensable pero acumulable a discreción del tribunal. Al contrario, si el tercero ausente cumple con alguno de los criterios tiene que acumularse, a menos que no sea factible por problemas de jurisdicción sobre la persona o por obstáculos procesales propios del foro federal, como falta de jurisdicción sobre la materia o ausencia de competencia (*venue*). 7 *Wright, Miller and Kane, Federal Practice and Procedure: Civil 2d* Sec. 1607 (1986).

hecho parte, no se le puede privar de sus derechos mediante sentencia. *Martin v. Wilks*, 490 U.S. 755 (1989).

Al igual que en el ámbito federal, nuestra Regla 16 de Procedimiento Civil, *supra*, garantiza los valores siguientes: evitar multiplicidad de litigios, proveer a las partes un remedio final, completo y efectivo en el mismo pleito, y proteger a los ausentes de los efectos nocivos de una decisión sin su presencia. *Wright, Miller and Kane*, supra, Sec. 1604, pág. 40.[2]

Finalmente, la determinación de si una parte debe o no acumularse dependerá de los hechos específicos de cada caso. *Wright, Miller and Kane*, supra, Sec. 1604, pág. 40. Exige, además, una evaluación jurídica "en virtud de factores particulares en el contexto de cada caso, tales como tiempo, lugar, modo, alegaciones, prueba, clase de derechos, intereses en conflicto, resultado y finalidad". *Hernández Agosto v. López Nieves*, supra, pág. 627, opinión disidente del Juez Asociado Señor Negrón García.

El hecho de que se trate de un procedimiento especial no impide la consolidación con un caso civil ni la acumulación dispuesta por la Regla 16.2 de Procedimiento Civil, *supra*. Este hecho constituye un factor adicional a considerar en el ejercicio de la discreción del juez. De hecho, la acumulación de procedimientos especiales con acciones civiles no es extraña en nuestra jurisdicción. Por ejemplo, adviértase la práctica en los tribunales de instancia de la acumulación de partes y consolidación de acciones en el procedi-

---

[2] Los tribunales locales tienen mayor flexibilidad en esta materia que los federales, pues no confrontan los problemas procesales que a éstos les impone el hecho de tener jurisdicción limitada sobre la materia, la doctrina de competencia (*venue*) y la confusión que la multiplicidad de partes puede ocasionarle a un Jurado.

miento especial de reclamación por servicios prestados. 32 L.P.R.A. sec. 3114 *et seq.*

■ Hoy reiteramos la norma adoptada en *Hernández Agosto v. López Nieves*, supra, de que la Regla 16 de Procedimiento Civil, *supra*, ha de interpretarse de forma pragmática para salvaguardar no sólo el interés de las partes en el litigio, sino también para vindicar el interés público de conservar los escasos recursos judiciales, evitar la multiplicidad de acciones y la posibilidad de adjudicaciones incompatibles.

Examinemos la acumulación ordenada en el caso de autos al amparo de este marco doctrinal.

## IV

Según consta de la propia orden recurrida, la prueba desfilada demostró que en las pasadas elecciones municipales de San Juan no se adjudicaron aproximadamente mil doscientos ochenta (1,280) votos de electores cuyos nombres fueron añadidos a mano en las listas oficiales a tenor con el procedimiento adoptado por la C.E.E, y que refrendamos en *P.N.P. y P.I.P. v. Rodríguez Estrada*, 122 D.P.R. 490 (1988).

■ Estos electores no fueron notificados por la C.E.E. de que su voto no había sido adjudicado, aun cuando se conocían sus nombres y direcciones. No obstante, nuestro Derecho le concede a estos electores un remedio judicial para hacer valer su "derecho a la libre emisión del voto y a que éste se cuente y se adjudique de la manera en que el elector lo emita". Art. 2.001 de la Ley Electoral de Puerto Rico (Ley Electoral), 16 L.P.R.A. sec. 3051(10).[3]

---

[3] Cabe señalar que ni en estos momentos ni en nuestra decisión de 22 de junio de 1989 hemos decidido que la Comisión Estatal de Elecciones (C.E.E.) les violó a los electores derecho constitucional o estatutario alguno al no haberles notificado sobre la no adjudicación de sus votos. Mediante la presente opinión

La Ley Electoral específicamente le concede a los electores legitimación activa para defender judicialmente sus derechos: "A tal fin, se concede por este Subtítulo a los electores la capacidad para iniciar o promover cualesquiera acciones legales al amparo de esta Declaración de Derechos y Prerrogativas de los Electores ante el Tribunal de Primera Instancia que corresponda." 16 L.P.R.A. sec. 3051. El derecho al voto igualmente podría ser defendido a través de una acción al amparo de nuestra Constitución. Si los electores que entiendan que se les ha privado de su derecho a la adjudicación de su voto pueden instar acciones independientes y obtener un remedio que afecte los resultados de esta elección, ¿por qué no acumularlos ahora como partes en el caso de la señora González Suárez y permitirles reclamar sus prerrogativas? Ante la viabilidad de las acciones posteriores, de no acumularlos ahora como parte las decisiones en los casos de autos carecerán de finalidad. Después de todo, una pronta solución judicial sujeta a un ataque colateral por parte de los electores podría resultar en una victoria pírrica.

La probabilidad de que estas acciones se presenten no es hipotética ni especulativa. Cuarenta y ocho (48) electores han acudido al foro federal con una acción por violación a sus derechos civiles. De estos cuarenta y ocho (48), la electora Francisca Luzgarda González Suárez también instó una acción en el Tribunal Superior de Puerto Rico a tenor con la Declaración de Derechos y Prerrogativas de los Electores. Art. 2.001 de la Ley Electoral, *supra*. Esta acción fue propiamente consolidada con el presente pleito de impugnación por existir cuestiones comunes de hecho y de de-

---

sólo decidimos que se les debe acumular, para así permitirles presentar las alegaciones sobre aquellas violaciones constitucionales relacionadas con la adjudicación de su voto en la elección para Alcalde de la Ciudad Capital que estimen pertinente. Si se les ha violado o no algún derecho constitucional, será algo que el tribunal determinará luego de evaluar la prueba.

recho. Regla 38.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III. *Ninguna de las partes ha objetado esta consolidación. Los mecanismos procesales de acumulación de partes y acciones y la consolidación de pleitos tienen la misma finalidad de evitar la proliferación de acciones, lograr la economía procesal y evitar la indeseable probabilidad de que surjan fallos incompatibles relacionados con un mismo incidente.*

■ Es evidente que tanto el caso de la señora González Suárez como el de la impugnación por el señor Granados Navedo tienen el mismo objetivo —cuestionar el resultado electoral para el cargo de Alcalde de San Juan— y participan de un alto interés público que trasciende el de los litigantes propiamente. La conclusión de estos pleitos debería ponerle punto final a la controversia, al menos en nuestros tribunales. Sin embargo, entendemos que sin la acumulación como parte de los electores cuyos votos no fueron adjudicados, el remedio que podrían obtener los demandantes estaría incompleto y trunco. De no permitirse la acumulación, la sentencia en este caso no podría oponérsele a los electores que posteriormente cuestionen la privación de su derecho al voto, ya que no fueron partes en el mismo. *Martin v. Wilks*, supra. Nos preguntamos, *¿qué clase de remedio completo se le puede ofrecer al peticionario Granados Navedo si estaría expuesto a múltiples litigios posteriores que podrían afectar un fallo favorable en la presente acción?*

Por otro lado, si aceptamos la tesis de que dichos electores no tendrían un remedio posterior disponible, entonces el debido proceso de ley exigiría que fuesen acumulados como partes en cualquiera de los casos. De lo contrario, la sentencia los podría estar privando de sus derechos sin haberles otorgado la oportunidad de ser oídos.

## V

La orden recurrida provee el emplazamiento personal de treinta y nueve (39) de los cuarenta y ocho (48) electores que reclamaron su derecho en el foro federal, y ordena la publicación de unos avisos para darle oportunidad de intervenir en el pleito a alrededor de mil doscientas ochenta (1,280) personas que no han sido notificadas formalmente de que su voto no ha sido adjudicado. Uno de los reclamantes en la corte federal, la Sra. Francisca Luzgarda González Suárez, ya se encuentra en el presente pleito porque su acción fue consolidada con el pleito de impugnación.

En vista de que las acciones de los electores acumulados son más afines con la de la Sra. Francisca Luzgarda González Suárez, se modifica la resolución recurrida para que la acumulación sea efectuada en ese pleito. También, por la naturaleza y circunstancias particulares de este caso, es que se ordena que sea la C.E.E. la que acumule a estos electores con la mayor diligencia y celeridad posible, y a que sufrague los gastos correspondientes que acarrea la notificación ordenada.

▬▬▬ En vista de que la acción incoada en el caso de autos es bajo una ley especial, y considerando que el foro de instancia la consolidó con un pleito civil y que por la cantidad de partes que se acumularán éste se ha convertido en un pleito complejo, el Tribunal Superior —al amparo de la Regla 71 de Procedimiento Civil, 32 L.P.R.A. Ap. III, y su poder inherente de reglamentar los procedimientos en su sala— debe creativamente pautar las reglas procesales que permitan la resolución más rápida posible de esta controversia. Estamos ante un pleito *sui géneris* y *complejo* que necesita un tratamiento *excepcional*, ya que su resolución trasciende el interés particular de los litigantes e impacta al pueblo en general.

■ Con relación al emplazamiento de los numerosos electores que se acumularán y por la naturaleza de este caso en particular, que requiere la resolución más rápida posible sin afectar adversamente los derechos de las partes, el tribunal deberá asegurarse de que haya una notificación razonable dirigida a enterar a éstos del pleito incoado y brindar así la oportunidad de comparecer y alegar lo que tuvieran a bien. Véanse: *Mullane v. Central Hanover Tr. Co.*, 339 U.S. 306, 313 (1950); *Mennonite Board of Mission v. Adams*, 462 U.S. 791 (1983); *Rodríguez v. Nasrallah*, 118 D.P.R. 93 (1986).

■ El requisito fundamental de debido procedimiento de ley es la oportunidad de ser oído. Aunque el diligenciamiento personal del emplazamiento debe ser el mecanismo preferido, éste no es considerado como indispensable cuando existen circunstancias que dificulten su utilización. *Mullane v. Central Hanover Tr. Co.*, supra, pág. 313. En relación con este particular, expresamos en *Rodríguez v. Nasrallah*, supra, pág. 99, que "[e]n cuanto a la manera de emplazar, es indiscutible que el emplazamiento diligenciado personalmente es el más apropiado. No obstante, se pueden utilizar otros medios para diligenciar el emplazamiento sin violar las limitaciones del debido procedimiento de ley".

■ En este caso existen mil doscientos treinta y dos (1,232) electores cuyos votos no fueron adjudicados y que no han instado reclamación judicial alguna. Emplazar personalmente a tantos electores dilataría de forma adversa este proceso. Se hace necesario recurrir a la vía más rápida de la notificación mediante edictos y por correo certificado. De esta forma se cumple con el requisito de la notificación sin violar el debido procedimiento de ley.

El mecanismo de notificación mediante edicto titulado *Aviso* adoptado por el Tribunal Superior no cumple con los

criterios de notificación razonable y oportunidad de comparecer. En su lugar, el foro de instancia deberá ordenar a la C.E.E. el envío por correo certificado a la dirección, según consta en los registros electorales del elector a ser acumulado como parte, de una copia de la demanda según ésta sea enmendada por la acumulación aquí ordenada, y de la resolución que ordena la acumulación y notificación. Simultáneamente, el tribunal ordenará también la publicación de edictos que notifiquen a estos electores de la demanda incoada, su acumulación como partes y que en virtud de ello se han de adjudicar sus derechos en este asunto. Estos edictos deberán tener los nombres y las direcciones de los electores acumulados. Su formato será uno que facilite la lectura.

El tribunal mantendrá en vigor el dictamen de emplazar personalmente a treinta y nueve (39) electores. Los ocho (8) electores adicionales, quienes con la ya demandante señora González Suárez completarían los cuarenta y ocho (48) reclamantes en la corte federal, deben ser emplazados personalmente de la misma forma. La orden del tribunal de instancia deberá modificarse para incluirlos.[4]

Lo expuesto anteriormente no impide que el tribunal, de estimarlo necesario, pueda acumular a otros electores. El tribunal *a quo* tiene discreción para modificar los términos procesales a la luz de las circunstancias presentes e incluir, entre otros, aquellos de los emplazamientos y notificaciones

---

[4] No todos los mil doscientos ochenta (1,280) electores añadidos a mano cuyos votos no fueron adjudicados se encuentran en igual posición. Los cuarenta y ocho (48) electores demandantes en el foro federal obviamente conocen de la posible privación de su alegado derecho al voto, lo han reclamado judicialmente y han rechazado la oportunidad que se les dio de intervenir en el presente pleito. Por lo tanto, procede que se les traiga involuntariamente como parte mediante emplazamiento personal. Los quince (15) electores que son testigos del demandado en este incidente todavía no han tenido expresamente la oportunidad de intervenir. Éstos estarán incluidos entre aquellos electores que serán notificados del pleito a través de los edictos y del emplazamiento por correo certificado según aquí se dispone.

aquí provistas. También deberá asegurarse que las alegaciones se adapten a la naturaleza del procedimiento especial ordenado. De igual forma, la utilización de los mecanismos de descubrimiento de prueba debe ser estrictamente reglamentada por el tribunal de instancia para aprovechar al máximo la prueba previamente admitida. Para ello, el magistrado cuenta con la flexibilidad de los recursos procesales que ofrecen las Reglas de Procedimiento Civil para los pleitos complejos, incluso la forma y manera en que verá y resolverá las distintas acciones y controversias que presenta este caso. Véanse: *Vellón v. Squibb Mfg., Inc.*, 117 D.P.R. 838 (1986), y la Resolución de 3 de mayo de 1988 relativa a las *Guías propuestas para dirigir la fase del descubrimiento de prueba en casos complejos* de mayo de 1988.

Ya en *Vellón v. Squibb Mfg., Inc.*, supra, y en *Lluch v. España Service Sta.*, 117 D.P.R. 729 (1986), indicamos que los jueces no deben convertirse en meros observadores del proceso. Éstos son llamados a intervenir activamente para manejarlo y dirigirlo de forma tal que se logre una solución justa, rápida y económica del caso. Véase Regla 1 de Procedimiento Civil, 32 L.P.R.A. Ap. III. *La orden recurrida representa una iniciativa válida en el manejo. de un caso complejo y de gran interés público, y el foro de instancia mantiene la discreción necesaria para establecer el orden de la prueba y resolver las distintas acciones según mejor convenga a su más pronta dilucidación de este caso.*

## VI

En cuanto al "potencial conflicto jurisdiccional", entendemos que en este caso tanto el foro federal como el estatal han mostrado una prudencia ejemplarizante que fomenta la mejor comprensión del ámbito de acción de cada uno de ellos. Al invocar la norma de abstención pautada en *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496 (1941), la Corte de

Distrito de Estados Unidos para el Distrito de Puerto Rico señaló que el peticionario simultáneamente incoó acciones en ambos foros judiciales y que había una buena posibilidad de que la controversia se resolviera en su totalidad bajo las leyes de Puerto Rico. En esas circunstancias, el tribunal federal concluyó que los principios básicos del federalismo y la economía judicial aconsejaban la abstención. *Granados-Navedo v. Acevedo*, 703 F. Supp. 170 (D. P.R. 1988).

Con relación a los cuarenta y ocho (48) electores que reclamaron ante el foro federal, y que ahora se acumulan en el presente pleito, éstos presentaron una moción informativa en este caso en la cual, sin someterse a la jurisdicción, "solicitan que [el] Honorable Tribunal [Superior] adjudique sus derechos bajo las leyes de Puerto Rico, según alegados por el [señor] Granados Naved[o] en la presente acción civil, *a la luz* de sus derechos bajo la Constitución de los Estados Unidos de América . . .". (Énfasis en el original.) En la misma, también expresaron que se reservan el derecho de litigar sus derechos emanantes de la Constitución federal para que sean adjudicados por la Corte de Distrito de Estados Unidos para el Distrito de Puerto Rico, según lo resuelto en *England v. Medical Examiners*, 375 U.S. 411 (1964).

Si los reclamantes efectuaron una correcta reserva de derechos federales(5) en nuestros tribunales, no se podría levantar válidamente la defensa de cosa juzgada en el foro federal en relación con la posible violación de derechos constitucionales federales. *England v. Medical Examiners*, supra; 18 *Wright, Miller and Cooper, Federal Practice and Procedure: Jurisdiction and Related Matters* Sec. 4471, pág. 716 (Supl. 1990).

---

(5) Sobre la corrección de la expresión de las reservas, no nos corresponde pasar juicio.

Si bien es cierto que un atraso significativo en el trámite de este caso puede provocar la continuación del pleito paralizado en el foro federal, no creemos que la acumulación de estos electores vaya a tener ese resultado. Aunque ciertamente la acumulación conlleva trabajo adicional, no creemos que desate el cuadro procesal desolador que tanto preocupa a algunos de nuestros compañeros en sus disensos.(6) *En todo caso, corresponde inicialmente al foro de instancia tomar las medidas pertinentes para resolver cualquier problema de esa naturaleza que pueda surgir.*(7) Después de todo, no podemos presumir que somos los únicos iluminados.

---

(6) Anteponiendo los mejores intereses del Tribunal, ignoramos la diatriba de la opinión disidente del compañero Juez Asociado Señor Rebollo López. Sobre estos extremos, la perspectiva del gran jurista Roscoe Pound es particularmente orientadora:

"'[T]here is a responsibility in writing dissenting opinions. . . . *The opinions of the judge of the highest court of a state are no place for intemperate denunciation of the judge's colleagues, violent invective, attributings of bad motives to the majority of the court, and insinuations of incompetence, negligence, prejudice, or obtuseness of fellow members of the court.* . . . To justify an elaborate dissenting opinion the question of law should be one of at least considerable importance. To justify a denunciatory dissenting opinion, if denunciation of his colleagues by a judge can be justified at all, the question of law should be one of exceptional importance and the errors pointed out should be of the gravest nature. . . . *[T]he opinion of the judge of the highest court should express his reason, not his feelings.*' R. Pound, *Cacoethes Dissentiendi: The Heated Judicial Dissent*, 39 A.B.A. J. 794, 795 (1953)." (Énfasis suplido.) *Granados v. Rodríguez Estrada I*, 124 D.P.R. 1, 73–74 esc. 3 (1989), opinión concurrente y de conformidad de la Juez Asociada Señora Naveira de Rodón.

(7) Por la naturaleza tanto del procedimiento de revisión de la impugnación denegada por la C.E.E. como de las posibles reclamaciones de los electores, la evidencia a ser presentada por los candidatos para defender sus respectivas alegaciones y la de los distintos electores para sostener las suyas, será sustancialmente la misma. El tribunal deberá tomar las medidas necesarias para aprovechar al máximo la prueba previamente admitida en el proceso judicial. Creemos que una vez superadas las posibles complicaciones que puedan suscitar los procedimientos iniciales de emplazamientos y alegaciones, bajo el control eficaz del juez de instancia y con la cooperación de las partes, el proceso no debe tornarse en uno innecesariamente prolongado ni convertirse en "un monstruo procesal incapaz de ser regulado".

## VII

 Finalmente, reafirmamos nuestros anteriores pronunciamientos en *Granados v. Rodríguez Estrada I*, supra, de que para juzgar la validez de la certificación las partes deben tener una oportunidad de presentar su prueba. En esta etapa de los procedimientos, ordenar una nueva elección realmente significa una abdicación de nuestra responsabilidad judicial. El remitir el asunto al foro político para la celebración de una nueva elección, parcial o general, es la alternativa más drástica. No puede concederse prematuramente; el Tribunal tiene que estar firmemente convencido de que no puede decidir cuál de los candidatos resultó electo antes de otorgar este remedio. 16 L.P.R.A. sec. 3275. Después de todo, si el asunto es justiciable, nos corresponde aceptar la responsabilidad y resolver prontamente sobre la marcha los problemas procesales que surjan.

Si aceptamos que en este caso los electores excluidos podrían reclamar que se les adjudique su voto y que sus derechos están directamente relacionados con los resultados de esta impugnación, ¿por qué no tomar las medidas cautelares necesarias para que sea en este caso que se ventile toda la prueba pertinente? Así aseguramos que el foro de instancia realmente tenga todos los elementos de juicio para determinar la validez de la elección con la finalidad que requiere un caso de tanto interés público. *Entendemos que la denegación de la acumulación de partes privaría de finalidad a la adjudicación del foro de instancia. Este resultado es totalmente inaceptable.*

Por las razones expuestas anteriormente, *se expedirá el auto y se modificará la orden recurrida dictada por el Tribunal Superior, Sala de San Juan, para que la acumulación de los electores excluidos se realice en el caso de Francisca Luzgarda González Suárez v. Marcos A. Rodríguez Estrada*

*y otros, KPE 89-0274, se disponga de una notificación efec-*
*tiva a todas las partes acumuladas mediante el procedi-*
*miento aquí provisto y se emplace personalmente a todos*
*aquellos electores que reclamaron su derecho al voto en el*
*tribunal federal. Así modificada se confirmará.*

La Juez Asociada Señora Naveira de Rodón emitió opi-
nión concurrente y de conformidad. Los Jueces Asociados
Señores Negrón García, Rebollo López y Ortiz emitieron
opiniones disidentes.

—O—

Opinión concurrente y de conformidad emitida por la Juez
 Asociada Señora Naveira de Rodón.

Sin restarle importancia a la controversia central de este
caso ni al impacto que sobre el Pueblo de Puerto Rico en
general tendrá su resolución final, quisiéramos señalar que
lo que está hoy ante el Tribunal es una sencilla cuestión pro-
cesal discrecional que, aunque presente alguna complejidad
en su implantación, no deja de ser sólo una cuestión técnica
procesal. No podemos ni debemos sacar fuera de perspectiva
el asunto planteado insuflándole dimensiones que no tiene.[1]

Por entender que la opinión mayoritaria suscrita por el
Juez Asociado Señor Ortiz el 22 de junio de 1989 en forma
alguna resulta incompatible con la posición que adoptara en
mi voto concurrente —al cual se unió el Juez Asociado Señor
Hernández Denton— y con la determinación que hoy toma la
mayoría del Tribunal, le he dado mi conformidad a ambas.

En aquella ocasión no hubo necesidad de discutir el punto
procesal específico que hoy se trae ante el Tribunal, ya que

---

[1] Otros podrían discrepar de este enfoque, sin embargo, cuando para soste-
ner su posición tienen que recurrir a la táctica de desviar la atención mediante el
ataque personal y claramente denotan la falta de argumentos válidos para avalar
la misma o una falta de conocimiento o dominio sobre la materia.

no estaba planteado. La opinión mayoritaria no se pronunció sobre este asunto. Fue en la vista oral y en la opinión concurrente que suscribiéramos que sugerimos que el tribunal de instancia auscultara la deseabilidad de adoptar un curso de acción similar que ahora revisamos.

Entendemos que los compañeros Jueces Asociados Señores Negrón García y Rebollo López han interpretado equivocadamente tanto la opinión de la mayoría de 22 de junio de 1989 como la determinación que hoy se ha tomado.

Los puntos de vista de los Jueces Asociados Señores Negrón García y Rebollo López no obtuvieron la acogida de la mayoría del Tribunal cuando fueron planteados directamente en el recurso original, y no pueden ahora los compañeros, al traerlos a colación de forma forzada, pretender lograr lo que entonces no les fue posible.[2]

—O—

Opinión disidente del Juez Asociado Señor Negrón García.

I

*Introducción*

Por *cuarta* vez, con razón, toca las puertas de este foro apelativo[1] José Granados Navedo, candidato a la alcaldía de

---

[2] Cabe señalar que ninguna de las partes solicitó la reconsideración de nuestra opinión de 22 de junio de 1989.

[1] Las anteriores instancias fueron resueltas en la opinión mayoritaria emitida por el Juez Asociado Señor Ortiz el 22 de junio de 1989 en los recursos consolidados CE-89-30, RE-89-67 y RE-89-88 (*Granados v. Rodríguez Estrada I*, 124 D.P.R. 1 (1989)). En todos se revocó al Tribunal Superior (Hon. Carlos E. Polo, Juez) y se le ordenó que recibiera la prueba que tuvieran a bien presentar las partes con sujeción a varias normas. El Juez Presidente Señor Pons Núñez emitió opinión concurrente y de conformidad, a la cual se unió el Juez Asociado Señor Hernández Denton. La Juez Asociada Señora Naveira de Rodón emitió opinión concurrente y de conformidad, a la cual se unió también el Juez Asociado Señor Hernández Denton. El Juez Asociado Señor Alonso Alonso emitió opinión

San Juan por el Partido Nuevo Progresista (P.N.P.), en su demanda de impugnación de la certificación expedida a favor de Héctor L. Acevedo Pérez, candidato del Partido Popular Democrático (P.P.D.), el 7 de diciembre de 1988 por la Comisión Estatal de Elecciones (en adelante Comisión Estatal). En esta ocasión cuestiona la juridicidad, corrección y procedencia de una orden emitida por el Tribunal Superior, Sala de San Juan (Hon. Carlos E. Polo, Juez), el 14 de agosto de 1989.

En síntesis, *¿qué resolvió el Tribunal Superior?* Consolidó una acción separada e independiente de *mandamus y daños y perjuicios* comenzada en *Francisca Luzgarda González Suárez v. Marcos A. Rodríguez Estrada y otros* (KPE 89-0274), con el *pleito especial de impugnación* de Granados Navedo contra Acevedo Pérez. Decretó equivocadamente la acumulación como *partes* en el *pleito de impugnación* de mil ochocientos cuarenta y cinco (1,845) electores marginados por la Comisión Estatal. Le ordenó injustamente a Granados Navedo que emplazara, a su costo, a los electores reclamantes ante el foro federal anunciados como sus testigos. Para fines de adquirir jurisdicción sobre esos numerosos electores, dispuso erróneamente que fueran notificados mediante unos simples *Avisos*. Y por último, a pesar de las objeciones de la Comisión Estatal—parte *nominal* en ese proceso— le instruyó que sufragara los gastos de esos avisos.

*¿Qué hace hoy la mayoría de este Tribunal por votación cerrada? Revoca* una vez más al Tribunal Superior, pero eufemísticamente caracteriza el mandato como una mera *"modificación"*. Opinión mayoritaria, pág. 600. Esa *"modificación"*, a su vez, fuerza una decisión de emitir un decreto en el caso *distinto* de *mandamus y daños y perjuicios* sin darle

concurrente y de conformidad y endosó las expresiones de la Juez Asociada Señora Naveira de Rodón. El Juez Asociado Señor Rebollo López emitió opinión concurrente y disidente, y el que suscribe, opinión disidente.

ninguna oportunidad y sin observar el debido proceso de ley hacia las partes originales en *ese proceso* que aprisiona, en particular, a la litigante más afectada, la demandante González Suárez. De los escombros del dictamen del Tribunal Superior *crean instantánea y artificialmente un peculiar y extraño pleito de clase* que no cumple los trámites más elementales prescritos. Luego echan a un lado y mutilan toda la normativa y jurisprudencia —civil y electoral vigente— sobre el emplazamiento *personal* requerido para que un tribunal adquiera válidamente jurisdicción sobre una parte, citando aisladamente y atribuyendo unos efectos que no tiene a unas expresiones vertidas en *Rodríguez v. Nasrallah*, 118 D.P.R. 93 (1986). Por último, improvisada, arbitraria e inconstitucionalmente sustituyen la notificación *personal* de mil ochocientos cuarenta y cinco (1,845) electores por una sencilla notificación por *correo certificado*.

*Con respeto para todos*, ese dictamen es una "caja de Pandora" de frágil hechura judicial que no debió abrirse. Entre sus males brota bruscamente no ya una transformación procesal, sino la *desfiguración*, por el tribunal de instancia, del pleito de *impugnación* entre Granados Navedo y Acevedo Pérez en trámite desde el 19 de diciembre de 1988, y la *fea deformación en apelación*, por la mayoría de este Tribunal, de la acción de *mandamus y daños y perjuicios* iniciada separada e independientemente por la electora González Suárez el 17 de febrero de 1989, sin brindar a ella y a todas las partes involucradas la oportunidad de una comparecencia.

*Coincidentalmente, ambos decretos confunden principios y mecanismos procesales elementales, inyectan unas variantes impermisibles que trastocan el esquema legislativo especial y ordinario pautado, son contrarios a la solución lógica y ordenada visualizada en las reglas vigentes y no solucionan —sino que agudizan— las infracciones al debido proceso de ley constitucional. Sobre todo complican*

*y atrasan la adjudicación del pleito de impugnación e, in-*
*necesariamente, proyectan un conflicto jurisdiccional con*
*la Corte de Distrito Federal para el Distrito de Puerto Rico.*

Sin embargo, tienen el *mérito* que nos permite, una vez
más, abogar fundadamente por el único remedio disponible
para despejar toda esta madeja electoral y procesal intermi-
nable que tiene visos de no ser adjudicable: *la descertifica-*
*ción de Acevedo Pérez y el decreto de una nueva elección.*

Por su importancia, transcribimos totalmente la aludida
orden:

Mediante nuestra orden número 36 del 21 de julio de 1989
concedimos plazo de diez (10) días a las partes para aclarar
sus respectivas posiciones en cuanto à si los ciudadanos cuya
franquicia electoral puede afectarse en este procedimiento de-
ben ser acumulados como partes en virtud de las disposiciones
de la Regla 16 de Procedimiento Civil.[1]

En vista de que no radicaron memorandos, decidimos escu-
char a los abogados en corte abierta sin el beneficio de los
mismos.

Expresó la parte demandante que *en este caso* solamente
puede resolverse la impugnación de certificación como alcalde
electo que expidirera la Comisión Estatal de Elecciones al de-
mandado Lic. Héctor Luis Acevedo *con la prueba anunciada*
*por las partes originales. Dicho de otro modo, se deben contar*
*todos los votos, pero únicamente los emitidos por los testigos*
*anunciados.*

De la prueba desfilada en la primera etapa de este caso se
desprende que no se adjudicaron alrededor de 1[,]280 votos
correspondientes a ciudadanos cuyos nombres fueron aña-
didos a mano a las listas oficiales. *De esos, la parte deman-*
*dante ha anunciado como testigos [a] 48 y la demandada [a]*
*15 testigos adicionales.*

El pasado 21 de diciembre dictamos orden concediendo a un
grupo de ciudadanos demandantes ante la Corte de Distrito
Federal para el Distrito de Puerto Rico plazo para intervenir
en este procedimiento. *Todos se negaron. Con el propósito de*
*poder resolver la totalidad de la controversia, de conceder un*
*remedio completo, y en vista de lo dispuesto por la Regla 16*

*[de Procedimiento Civil, 32 L.P.R.A. Ap. III] (Martin v. Wilks, [490 U.S. 755 (1989)]) se ordena la acumulación y emplazamiento como demandados a las personas enumeradas en el Anejo I.*[2]

Se ordena la expedición de emplazamientos que *deberán ser diligenciados por la parte demandante* con copia de la demanda y de la presente orden *dentro del plazo de 5 días* de su expedición.

Las personas así *emplazadas y acumuladas* en este caso *deberán radicar alegaciones expresando* los hechos que dan base a su reclamación de que se adjudique su voto. En el caso de electores añadidos a mano deberán someter copia de cualquier prueba documental que se proponga utilizar para acreditar su [*status*] como elector.

Para informar a los demás ciudadanos de su derecho a *intervenir o ser acumulados* en este caso, se publicarán avisos dirigidos a los electores añadidos a mano y los que hayan puesto sus iniciales al dorso de la papeleta municipal cuyos votos no fueron adjudicados por la Comisión Estatal de Elecciones. (Véanse Anejos II y III).

La publicación de los avisos se hará tres veces durante una semana en por lo menos dos periódicos diarios de circulación general en la isla de Puerto Rico.

---

[1] Las personas que tuvieren un interés común sin cuya presencia no pueda adjudicarse la controversia, se harán partes y se acumularán como demandantes o demandadas según corresponda. *Cuando una persona que deba unirse como demandante rehusare hacerlo, podrá unirse como demandada.*

El Tribunal podrá ordenar la comparecencia de [a]quellas personas sujetas a su jurisdicción, que a pesar de no ser partes indispensables, deban ser acumuladas si se ha de conceder un *remedio completo* a las personas que ya sean partes en el pleito.

[2] Nos anima, además, la intención de evitar la posible proliferación de pleitos por parte de ciudadanos cuyos votos no se han adjudicado. Cf. Civil Núm. 88-2023 (JAF), 88-2024 (JAF) y 88-2025 (JAF)– Casos radicados ante la [C]orte de Distrito Federal para el Distrito de Puerto Rico[,] y

KPE 89-0274[,] caso de mandamus ante esta sala cuya vista ordenamos fuera consolidado con el presente caso. (Énfasis suplido y en el original.) *Exhibit* 1.

El contenido de los anejos relacionados dispone así:

ANEJO 1

SALICHS MARTINEZ, FRANCISCO J.
VERA VELEZ, MARTA
DEFILLO NASSAR, HEIDI
SIMOUNET, KETTY
RIVERA TORRES, ELOISA
MORALES RODRIGUEZ, ANGEL JAVIER
MALDONADO VELEZ, GEORGINA
BENITEZ RIVERA, EMILIO
*GONZALEZ SUAREZ, FRANCISCA*
LOPEZ HERNANDEZ, MARIA E.
AZCUY DIAZ, CIRILA
LORENZO ALONSO, MARIA ARACELIS
HERNANDEZ ROMAN, JESUS
COTTO RIVERA, FRANCISCA
ROSARIO VELEZ, LUIS
NAZARIO SANTIAGO, JOSE A.
HERNANDEZ ORTIZ, JESUS
HERNANDEZ BATISTA, JOSE ROBERTO
AYUSO WALKER, LUIS E.
GARCIA ROJAS, IRIS M.
DIAZ DEL TORO, GUSTAVO E.
RAMOS AMARO, FELICITA .
VECCHINI LUGO, MARIA
MEDINA PELLICIER, NORBERTO
CARABALLO REYES, DANIEL
ALVAREZ SANTIAGO, RAMON O.
RIVERA JUARBE, MARIA E.
AVILES, NILDA
OTERO CORTES, WILLIAM
GUZMAN OCASIO, ENRIQUE
CARMONA O'NEILL, GEORGINA
VELEZ CABRERA, NOEL
VELEZ CABRERA, ANTONIO
TRELLES PERALTA, VICENTE M.

TIRADO TIRADO, LUIS A.
OSORIO VELEZ, CARMEN D.
ORTIZ[,] JOSE A.
DIAZ DELGADO, JOSE
RAMOS[,] GENERA

ANEJO 2

*AVISO*

A los siguientes ciudadanos que votaron añadidos a mano en el Municipio de San Juan en las elecciones generales del 8 de noviembre de 1988 para el cargo de Alcalde de San Juan:

(Aquí se incluirán los nombres y demás circunstancias de los 1,280 electores añadidos a mano cuyos votos fueron anulados en San Juan, y de los 207 electores cuyos votos fueron arrestados)

Se [les] notifica que el Tribunal Superior de Puerto Rico, Sala de San Juan, celebrará audiencias conducentes a determinar si dichos ciudadanos tienen derecho a que se adjudique el voto que emitieron para el cargo de Alcalde de San Juan en dichas elecciones.

Las personas interesadas en intervenir en este procedimiento *deberán radicar sus alegaciones* dentro del plazo de 10 días a partir de la última publicación de este aviso que se publicará tres veces durante una semana. *De no hacerlo se les acumulará como partes demandadas.*

. . . . . . . .

[ANEJO 3]

*AVISO*

A todos aquellos electores que votaron en las elecciones generales del 8 de noviembre de 1988 en los colegios más adelante enumerados en el Municipio de San Juan, y para el cargo de Alcalde de San Juan y pusieron letras o iniciales al dorso de la papeleta municipal, se les notifica por la presente que aunque su voto no fue adjudicado por la Comisión Estatal de Elecciones, el Tribunal Superior de Puerto Rico, Sala de San Juan[,] está celebrando audiencias conducentes a determinar si existen motivos que justifiquen la adjudicación de los votos de aquellos entre ustedes que habiendo puesto sus iniciales al dorso de la papeleta municipal, comparezcan ante dicho Tribu-

nal y muestren causa suficiente para determinar la validez de su voto.

Los electores interesados en *intervenir* en este procedimiento deberán *radicar sus alegaciones dentro del plazo de diez (10) días* a partir de la última publicación de este aviso que se publicará tres veces durante una semana. *De no hacerlo se les acumulará como partes demandadas.* (Énfasis suplido.)

Para comprender la *magnitud del error* del ilustrado foro de instancia, *refrendado y agravado* por la vía decisoria seguida por la mayoría, es preciso hacer una breve referencia al trasfondo procesal pertinente al caso, esbozar la normativa adjetival y sustantiva aplicable y, finalmente, analizar y exponer detenidamente los fundamentos que avalan su *total revocación*. De ese modo evitamos nuevamente que subsista un frustrante estado de indefensión electoral por razón de una desacertada indefinición judicial. Para que nuestros dictámenes sean respetados no podemos "destejer en la noche lo que cuidadosamente tejimos ayer". *Granados v. Rodríguez Estrada I*, 124 D.P.R. 1, 293 (1989), opinión disidente. A fin de cuentas, la "vigencia y no erosión de la doctrina del precedente (*stare decisis*), en su proyección prospectiva, inexorablemente depende de la estima valorativa que individual y colectivamente le imprimamos los Jueces a nuestras decisiones previas". *Rexach Benítez v. Gobernador*, 119 D.P.R. 521, 536 (1987), opinión disidente.

II

*Trasfondo procesal*

El 17 de febrero de 1989 —pendiente de solución ante este Foro los Recursos CE-89-30, RE-89-67 y RE-89-88, *Granados v. Rodríguez Estrada I*, supra— la señora González Suárez, por conducto de su abogado Lcdo. Francisco Quiñones Vizcarrondo, presentó ante el Tribunal Superior, Sala de San Juan, demanda de *mandamus y daños y perjuicios*

(KPE 89-0274) contra el Presidente de la Comisión Estatal de Elecciones, Lcdo. Marcos A. Rodríguez Estrada, los miembros de la Comisión Estatal, el Estado Libre Asociado de Puerto Rico y sus aseguradoras identificadas como John Doe 1, 2 y 3.

En síntesis, alegó bajo *juramento* ser residente del Municipio de San Juan y electora legalmente inscrita con tarjeta electoral, que había participado en las últimas siete (7) elecciones, que sin fundamento ni recusación válida fue obligada "a votar con voto abierto", y que hasta el presente su voto no se había adjudicado y ello constituía una violación al deber ministerial de los demandados y una infracción a sus derechos constitucionales. Invocó expresamente el Art. 2.001 de la Ley Electoral de Puerto Rico (Ley Electoral), 16 L.P.R.A. sec. 3051 —declaración de Derechos y Prerrogativas de los Electores— para instar la acción. Reclamó la suma de $1,500,000 en daños y perjuicios.

Expedidos y diligenciados los emplazamientos, previa prórroga, comparecieron los demandados por mediación del Secretario de Justicia y solicitaron la desestimación sumaria de la demanda. Adujeron como fundamentos que el recurso de *mandamus* no procedía "debido a la naturaleza discrecional" del deber de la Comisión Estatal de adjudicar o no un voto, y que la señora González Suárez estaba impedida de acudir al Tribunal Superior en reclamo alguno, pues era una de las demandantes en el foro federal que había declinado intervenir cuando el Tribunal Superior dio esa oportunidad en el caso de impugnación. Finalmente, plantearon que la Comisión Estatal era "el organismo con jurisdicción primaria exclusiva para entender" en este tipo de reclamación.

Subsiguientemente se suscitaron varios trámites. El Secretario de Justicia renunció a la representación del Presidente de la Comisión Estatal y de los comisionados. El tribunal les concedió un plazo para que comparecieran. Por el Presidente de la Comisión Estatal se unieron la Lcda. Julia

M. Santiago de la Cruz y los Lcdos. Mariano Canales y David Rivé Rivera. El Lcdo. Eudaldo Báez Galib, Comisionado Electoral del P.P.D., compareció por derecho propio e hizo suyas "las alegaciones efectuadas *y que en el futuro efectú[e] el Presidente de la Comisión Estatal*". (Énfasis suplido.) Igual posición asumió en su contestación el Comisionado Electoral Interino del Partido Independentista Puertorriqueño (P.I.P.), Lcdo. Fernando A. Colón Serbiá. El Comisionado Electoral del P.N.P., Francisco González, Jr., compareció por conducto de los abogados Miguel Pagán y Eliezer Aldarondo. En su contestación negó, por falta de información, algunas alegaciones y levantó varias defensas especiales. Posteriormente enmendó esa contestación, admitió y negó algunos hechos; sin embargo, aceptó que se adjudicara el voto de la señora González Suárez y aludió al pleito de impugnación.

Así las cosas, el 29 de junio de 1989 el Juez Polo resolvió denegar la solicitud de desestimación y sentencia sumaria. Consignó:

> Basta un somero examen de la opinión del Tribunal Supremo de Puerto Rico emitida el 22 de junio, certificada el 23 de junio del año en curso, en *Granados Navedo v. Rodríguez Estrada* [*I*, 124 D.P.R. 1 (1989)], *para concluir que en el presente caso no debe dictarse sentencia desestimando sin conceder a la demandante la oportunidad de desfilar su prueba en apoyo a sus alegaciones y reclamos constitucionales.* (Énfasis suplido.)

Mientras tanto, los procedimientos se reiniciaron en el pleito de *impugnación* entre Granados Navedo y Acevedo Pérez, y continuó el desfile de prueba. Según la Minuta de 31 de julio de 1989, pág. 3:

> . . .[l]as partes sometieron en corte abierta dos proyectos de edictos en cuanto a los votos añadidos a mano y las papeletas inicialadas para ser revisados por el Tribunal. Además sometieron listados con los nombres y números de electores añadidos a mano.

El Tribunal ordenó que los sobres de aproximadamente 1,280 electores añadidos a mano que se encuentran en la CEE sean traídos al Tribunal para ser marcados como identificaciones, anticipando la posibilidad de que algunas de las personas sean notificadas por *edictos y comparezcan a proteger su franquicia electoral.*

Señaló la vista en su fondo para el 4 de agosto de 1989. En esa fecha se inició el desfile de prueba en cuanto a la controversia sobre las papeletas con *dobles marcas.* Según la minuta:

> . . . *ambas partes acordaron e informaron al Tribunal que entienden que los electores no pueden ser partes indispensables en el presente caso como cuestión de derecho.*
>
> *El Tribunal entiende que los electores cuyos votos no hayan sido adjudicados tienen derecho a comparecer ante éste sin término de caducidad, ya que la CEE no ha emitido una resolución ni se le ha notificado a los electores que su voto no se ha adjudicado.*
>
> Luego de haber sido escuchados los argumentos presentados por las partes, el Tribunal dispuso que resolverá por escrito en cuanto a los electores cuya franquicia electoral pueda verse afectada por la decisión de éste. (Énfasis suplido.) Minuta de 7 de agosto de 1989, pág. 3.

Paralelamente, conforme la Minuta de 15 de agosto de 1989 —a raíz de una conferencia con antelación al juicio en la acción de *mandamus y daños y perjuicios* (KPE 89-0274) de la señora González Suárez— el tribunal, por voz del mismo Juez Polo, ordenó la *consolidación* de esa acción con la de impugnación. Actuó así en vista de que ella figuraba como *testigo* en el pleito de impugnación. *La consolidación sería únicamente a los fines del desfile de la prueba en torno a su status de electora.* Sobre la reclamación de daños, dispuso que se vería "posteriormente por separado para no interrumpir las labores en el caso de impugnación". Aparece, además de esa minuta, que los abogados de las partes anunciaron la prueba a utilizarse. Entre la prueba documental

admitida figuran varios documentos oficiales de la Comisión Estatal, previamente en *exhibits* o identificados en el pleito de impugnación.[2]

En conclusión, según expuesto, la acción de *mandamus y daños y perjuicios* (KPE 89-0274) promovida por la señora González Suárez estaba, al momento de ser consolidada, en una *etapa procesal avanzada*. Todos los demandados fueron emplazados, comparecieron y contestaron la demanda a través de sus abogados o por derecho propio. Así trabadas las controversias, se había celebrado una conferencia con antelación a juicio. En síntesis, esa acción maduró bastante en siete (7) meses. *Su consolidación en esa etapa, aunque en cierto modo atrasó su disposición final, no interrumpió el pleito de impugnación entre Granados Navedo y Acevedo Pérez. Esa no es la situación paralizante que se cierne ahora sobre ambos casos con la opinión mayoritaria.*

En cuanto a la orden objeto del recurso, la Transcripción de Evidencia de 7 de agosto de 1989 refleja la legítima preocupación del ilustrado Juez Polo y la posición de Granados Navedo y Acevedo Pérez en el pleito de impugnación. Hagamos una incursión en la misma. Dicho récord revela que la cuestión en torno a la deseabilidad y aplicabilidad de la Regla 16 de Procedimiento Civil, 32 L.P.R.A. Ap. III, fue suscitada, *sua sponte*, por el propio magistrado. T.E., pág. 65.

El Lcdo. Carlos Canals Mora, abogado de Granados Navedo, informó al tribunal —luego de conversar con el Lcdo. José Angel Rey, representante legal del Comisionado Electoral del P.P.D., Lcdo. Eudaldo Báez Galib, y Acevedo Pérez (T.E. Superior, pág. 3)— que *todos* entendían, como cuestión de derecho, que los electores *no* eran parte indispensable en

---

[2] A base de esos documentos, y en virtud de los principios constitucionales y evidenciarios recogidos en el análisis de nuestro disenso en *Granados v. Rodríguez Estrada I*, supra, acápite XI, pág. 163, reconocimos a la Sra. Francisca Luzgarda González Suárez —identificada entonces como *F.L.G.S.*— su condición de electora cualificada.

el pleito. Íd., págs. 65–66. Ante esa posición, el Juez Polo pidió que le ilustraran sobre la acumulación de estos electores, por *conveniencia procesal*, bajo la Regla 16.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Íd., pág. 66.

Así requerido, el licenciado Canals argumentó que los electores no eran parte indispensable ni necesaria conforme los incisos de la mencionada Regla 16; que la cuestión no era nueva y había sido previamente planteada ante este Tribunal apelativo y resuelta en contra. T.E. Superior, págs. 67–73. En su apoyo citó varios extractos de la opinión mayoritaria emitida por el Juez Asociado Señor Ortiz.

Ante esa posición, el Juez Polo expresó que no albergaba dudas del derecho de Granados Navedo a producir la prueba anunciada de cuarenta y ocho (48) testigos para hacer valer sus reclamos. *Su preocupación iba dirigida a aquellos mil doscientos (1,200) ciudadanos que habían votado bajo el sistema de añadidos a mano*, al igual que los trescientos cincuenta y siete (357) electores cuyas papeletas no se habían adjudicado porque tenían iniciales, que la Comisión Estatal les había negado ese derecho sin una debida notificación. T.E. Superior, págs. 73–74. Específicamente, se refirió a la acción de la electora antes aludida (*Francisca Luzgarda González Suárez v. Marcos A. Rodríguez Estrada y otros*, supra) que reclamaba su derecho constitucional a que se le contara su voto y que, además, era *una de los testigos* anunciados por Granados Navedo. Manifestó, además, dos (2) inquietudes: la primera, que al igual que ese caso pudieran instarse un *sinnúmero* de pleitos más por electores que *desconocían que no se les había adjudicado su voto*, y la segunda, la posibilidad de que por ausencia de trámite, aun cuando tales electores comparecieron como testigos, el dictamen que oportunamente él emitiera sobre el *status* electoral y derecho al voto de esos *electores-testigos no constituyera cosa juzgada*, y esos electores pudieran, al otro día, presentar múltiples acciones para que así se reconociera. Dicho ma-

gistrado coincidió en que, por disposición de ley, las partes indispensables en el caso de la *impugnación* eran únicamente los dos (2) candidatos, *y que el Presidente de la Comisión Estatal de Elecciones y los comisionados no eran partes indispensables.* Íd., págs. 75–77. Aceptó la posibilidad de que los electores que se convirtieran en *parte* tendrían derecho a estar representados por abogados, pero indicó que él limitaría ese aspecto para que el caso de impugnación no se retrasara. Íd., pág. 77. Reiteró sus inquietudes aludiendo en ese momento —y subsiguientemente— al criterio expresado por la Juez Asociada Señora Naveira de Rodón en su *opinión concurrente y de conformidad* a los efectos de que debería auscultarse la deseabilidad de que los electores que de alguna forma pudiera afectárseles su derecho al voto fueran unidos como parte. Íd., págs. 81 y 101.

Finalmente, el Magistrado Polo reconoció que en cuanto a ese número de electores no había una resolución del Presidente de la Comisión Estatal de Elecciones *ni se les había notificado sobre el particular.* T.E. Superior, pág. 82. Ante esa situación señaló que, a su juicio, *no había plazo prescriptivo ni término alguno para que esos electores pudieran reclamar sus derechos en los tribunales.* Íd.

Por su parte, el licenciado Canals se reafirmó en que los electores no deberían ser parte. T.E. Superior, pág. 84. Frente a esa postura, el Juez Polo sostuvo que como la electora González Suárez había reclamado separadamente el derecho a que se le adjudicara su voto, a la par que estaba anunciada como testigo de Granados Navedo, había cuestiones *comunes* de hecho y de derecho. Expuso así su sentir: *"Es inconcebible, que estando la Regla de Consolidación, se celebren dos juicios separados para determinar sobre lo mismo. Mire, independientemente de qui[é]n sea el demandante,* lo único que se va a determinar es si esa persona tenía o no derecho a votar." (Énfasis suplido.) Íd., pág. 86.

Subsiguientemente, el Magistrado Polo y el licenciado Canals intercambiaron sus puntos de vista en cuanto a las cuestiones comunes de hecho y de derecho que esa situación presentaba. Dicho magistrado coincidió en que *las causas de acción eran distintas*, pero se reafirmó en que habían cuestiones comunes de hecho. T.E. Superior, págs. 87–93.

Posteriormente, intervino el licenciado González, Jr., también abogado de Granados Navedo. Expuso que la prueba y los testigos en el caso de impugnación eran los anunciados por las partes y que, aun cuando a otros electores —no testigos— se les notificara y comparecieran, no tenían que contarse en el pleito de impugnación. T.E. Superior, págs. 93–96.

Ante ese señalamiento, el Magistrado Polo destacó la facultad que le es concedida por la Regla 43 de Evidencia, 32 L.P.R.A. Ap. IV, para a iniciativa propia o a petición de partes llamar a esos electores a declarar como testigos. T.E. Superior, pág. 97. *Acto seguido, el licenciado González, Jr. argumentó que la falta de notificación a los electores y la no adjudicación de sus votos por la Comisión Estatal conllevaba descertificar al candidato Acevedo Pérez, pues la ausencia de ese trámite por la Comisión Estatal significaba que había sido certificado prematuramente.* El Juez Polo rechazó ese planteamiento, el cual antes le había sido formulado por el licenciado González, Jr. T.E. Superior, pág. 99.

El Lcdo. José A. Rey expresó estar de acuerdo con que los electores no deberían unirse como parte indispensable, pero sí como "partes con derecho a intervenir[;] que estas personas sí serían personas con derecho a intervenir". T.E. Superior, pág. 103. Para salvaguardar los intereses de las partes, expuso su criterio de que el mejor mecanismo era el *edicto* y señaló *que las partes se habían puesto de acuerdo en cuanto a su texto para el caso de que el tribunal decidiera qué se debería publicar.* Expresó que a "[l]as personas se les notificaría por la prensa, acudirían ante la Secretaría

del Tribunal y aquellos que en efecto interesen comparecer a defender su derecho al voto, pues, incluso, pueden canalizar su interés a través de los partidos y de los candidatos que están aquí representados". Íd.

Reiteró que el mecanismo de intervenir mediante convocatoria por *edicto* podría *agilizar* ese proceso de intervención, aunque reconoció que:

> ... sería *ciertamente gravoso para las partes, tener que acumular como part[e] indispensabl[e] y emplazar a todas estas personas,* cuando a mi juicio, la sentencia que se pudiera hacer efectiva sin ellos, *va a ser una sentencia que los obligue.*
>
> Sin embargo, creo también, que son personas con derecho a intervenir y que se les debe de dar esa oportunidad, mediante una convocatoria general, para aquellos que así lo deseen, ya sea a través de los partidos políticos o de los candidatos que están aquí representados, lo hagan y los que no lo deseen, pues, naturalmente, no se considera su derecho. (Énfasis suplido.) T.E., pág. 104.

Frente a este señalamiento, el licenciado González, Jr. intervino nuevamente e indicó que Acevedo Pérez sólo había hecho un ofrecimiento de catorce (14) testigos y que no podía, a través de la comparecencia que produjera ese edicto, adicionar testigos. T.E. Superior, págs. 104–106. *El Magistrado Polo indicó nuevamente su preocupación de la ausencia de notificación a los ciudadanos que no se les adjudicó el voto y de que su decisión no constituyera cosa juzgada.* Íd., pág. 109.

Por último, el licenciado Rey indicó que en los tres (3) casos ante el foro federal *estaba pendiente una moción de los demandados para que dicho foro obligara a los allí reclamantes a intervenir en este caso.* T.E. Superior, pág. 112. El licenciado González, Jr. entonces señaló que el pleito de *clase era el del foro federal y no el de impugnación.* Dicho pleito era de clase, pero de los electores que se les negó el voto emitido *a favor de Granados Navedo. Fue certificado*

*preliminarmente como de clase*, pero todavía no se .había realizado la notificación. Íd., págs. 112–114. El Juez Polo se reafirmó en la *consolidación* del caso de la señora González Suárez. Íd., pág. 114.

Para el 23 de agosto, *en el caso de impugnación* en instancia, había terminado el desfile de la prueba relativa a las causas de acción de Granados Navedo correspondientes a las papeletas de *doble marca*, las *iniciadas* y las contaminadas *arrestadas* y *no arrestadas*. Faltaba la prueba de Acevedo Pérez y la de ambos litigantes relacionada con los electores rechazados que votaron bajo el sistema de añadidos a mano a las listas electorales y cuyos votos tampoco fueron adjudicados por la Comisión Estatal. Tomamos conocimiento judicial —*Clavell v. El Vocero de P.R.*, 115 D.P.R. 685, 694 (1984); *Ind. Siderúrgica v. Thyssen Steel Caribbean*, 114 D.P.R. 548, 552 (1983); Regla 11 de Evidencia, 32 L.P.R.A. Ap. IV— de que la presentación de la prueba *ha continuado y que a esta fecha los trámites han seguido ininterrumpidamente*.

### III

*Ámbito adjudicativo*

La queja de Granados Navedo se centra solamente en la determinación que le obliga a emplazar como demandados a treinta y nueve (39) electores —reclamantes en la corte federal— que votaron bajo el sistema de añadidos a mano y que ya había anunciado como sus testigos. Argumenta que ello es contrario a la decisión del Tribunal de 22 de junio de 1989, y conlleva razonablemente —de no emplazarlos como parte— no poder presentar sus testimonios ni la prueba documental correspondiente.

Por su parte, Acevedo Pérez y Báez Galib circunscriben la controversia a si los electores-testigos de Granados Navedo, reclamantes ante la corte federal, "podían *ser acumu-*

*lados como partes en el presente* [caso de impugnación]". Aducen que la orden es producto del "*ejercicio de una función judicial seria y responsable, que es consciente de la configuración total de las cuestiones suscitadas en un pleito de tanto interés público,* [y] descansa en los preceptos que informan la Regla 16 [de Procedimiento Civil, *supra*]". (Énfasis suplido.) Moción en oposición, págs. 1 y 3. La situación que nos ocupa encaja perfectamente en el mandato contenido en la referida regla. A juicio de ellos:

Lo imperativo se traduce en necesario. Ello es así por cuanto el dejar de adjudicar los casos de dichos electores permitiría reclamar y alegar, con probabilidad de éxito, que los tribunales estatales no han resuelto *la totalidad de las controversias* abriendo así las puertas para permitir que el foro federal haga su incursión en cuestiones de derecho estatal. El grado de *previsión* del Honorable Juez de Instancia va dirigido a impedir lo anteriormente señalado. Basta señalar que el Tribunal de Distrito Federal para el Distrito de Puerto Rico decretó la abstención en los casos civiles presentados por los demandantes incluidos en el Anejo I de la orden del Tribunal de Instancia, basándose en la doctrina establecida en *Railroad Comm['n] v. Pullman Co.*, 312 U.S. 496 (1941). *Constituye la actuación del juzgador una legítima preocupación respecto a todas las cuestiones y controversias que encierra el presente litigio, particularmente, el impacto de su decisión sobre el derecho estatal.* (Énfasis suplido.) Moción en oposición, págs. 3–4.

Como aplicable invocan la reciente decisión del Tribunal Supremo federal de *Martin v. Wilks*, 490 U.S 755 (1989).

La otra comparecencia, la del Presidente de la Comisión Estatal de Elecciones, nada ilustra. Se reduce a exponer lacónicamente "que no tiene ninguna expresión que hacer en este momento respecto al asunto ahora en controversia[,] salvo que este Honorable Tribunal interese su expresión sobre este asunto". Moción en cumplimiento de orden, pág. 1.

Antes de concentrarnos en la solución del caso, es menester una aclaración. *Nuestro horizonte decisorio tiene que ser*

*más amplio.* La importancia del caso, el interés público que reviste y la necesidad de que no se demoren más los procedimientos nos obligan a explorar no sólo el señalamiento específico de Granados Navedo, sino aquellos otros aspectos *inmersos* en el trámite pautado por el foro de instancia —según "modificados" hoy por este Tribunal— *y sus consecuencias prácticas, jurídicas y constitucionales.*

Las preocupaciones que animaron la *iniciativa* del Juez Polo a emitir la Orden de 14 de agosto no son de su exclusiva competencia. Al igual que los foros de instancia, los jueces de tribunales apelativos también tomamos muy en serio la responsabilidad de nuestro ministerio y somos celosos guardianes de nuestra Constitución. *Zachry International v. Tribunal Superior,* 104 D.P.R. 267, 269 (1975).

La adjudicación integral y no fraccionada del planteamiento directo de Granados Navedo —y aquellos colaterales, intrínsecamente unidos— justifica el ejercicio cabal de nuestra jurisdicción apelativa. "El principio de eficacia en la ley exige, en su primera aproximación, que nuestras decisiones sean coherentes y adecuadas a los fines del entorno social y objetivos de la Constitución. De ahí que rechazamos, por insuficiente, cualquier técnica jurídica, criterio interpretativo o curso de acción que propicie actuaciones administrativas *o judiciales conculcadoras de esos derechos."* (Énfasis suplido.) *Granados v. Rodríguez Estrada I,* supra, pág. 292.

## IV

*Acción de impugnación; su carácter estatutario especial; quiénes son las partes y efectos*

El Art. 6.014 de la Ley Electoral, 16 L.P.R.A. sec. 3274, autoriza *la acción especial de impugnación únicamente* al candidato derrotado contra el candidato certificado. Los electores no son acumulables como parte indispensable ni necesaria. Así lo decidió expresamente la anterior opinión mayoritaria del Tribunal.

Ese pronunciamiento no fue un simple *dictum*. Respondió a los planteamientos directos suscitados en su alegato y en la vista oral por Acevedo Pérez y Báez Galib en torno a la capacidad de Granados Navedo para representar a los electores, y que desde el 21 de diciembre había sido objeto de resolución por el tribunal de instancia. Específicamente, del alegato común de Acevedo Pérez y Báez Galib copiamos *in extenso*:

> El derecho de impugnar una elección, según lo dispuesto en el Art. 6.014 de la Ley Electoral, 16 L.P.R.A. [sec.] 3274, *se concede al candidato derrotado*. Los electores tienen, sin embargo, una amplia gama de derechos y prerrogativas que garantizan el libre ejercicio de la franquicia electoral. Art. 2.001 [de la Ley Electoral], 16 L.P.R.A. [sec.] 3051. Entre éstos se encuentra la garantía del derecho al voto y a la libre emisión del mismo y a que éste se cuente y se adjudique de la manera en que el elector lo emita. Por otro lado, el último párrafo del referido artículo concede a los electores ". . . la capacidad para iniciar o promover cualesquiera acciones legales al amparo de esta declaración de [D]erechos y [P]rerrogativas de los [E]lectores ante el [T]ribunal de [P]rimera [I]nstancia que corresponda." *Es indudable, por tanto, que la Ley Electoral le reconoce a cada elector la capacidad para instar ante el tribunal de primera instancia una acción legal para defender su voto particular*. El derecho al voto del elector puertorriqueño está también, por supuesto, garantizado por la Constitución de Puerto Rico y por la Constitución federal. En su demanda el recurrente reclama que se violaron los derechos constitucionales de por lo menos 30 electores de los añadidos a mano (acápite VI), que en el día de hoy son, según él, 53. Estos electores fueron los que se unieron a Granados para radicar ante la Corte de Distrito Federal tres demandas que fueron paralizadas con el propósito de que pudieran acudir ante el Tribunal Superior a reclamar los derechos que ahora reclama el recurrente por ellos. A esto se negaron expresamente dichos electores, a pesar de que el Tribunal Superior les invitó expresamente a comparecer y a defender sus derechos. En dos mociones radicadas ante el Tribunal Superior, los propios

electores alegan que ["]los intereses de los votantes . . . y los candidatos envueltos, no son idénticos", de cuyo tenor se deduce que no interesan la representación del candidato derrotado Granados en el caso de autos. *El Tribunal Superior, claro está, en todo momento dejó a salvo los derechos constitucionales y estatutarios de estos electores.*

En vista de ello no hay razón alguna para reconocer al recurrente el *ius tertii* para hacer valer los derechos de electores que votaron añadidos a mano. *Este Tribunal debe respetar, igual que lo hizo el Tribunal Superior, el criterio de los electores que se negaron a comparecer en el pleito de impugnación de elección reconociendo así que los derechos de estos terceros están mejor representados cuando ellos mismos los reclaman y los defienden,* y evitando así también dictar decisiones innecesarias o prematuras sobre los derechos estatutarios y constitucionales de dichos electores *dentro del presente pleito de impugnación de elección. Obviamente los electores que votaron añadidos a mano pueden hacer valer en forma efectiva todos sus derechos estatutarios y constitucionales en una acción independiente.*

El derecho estatutario invocado por el recurrente en el pleito de impugnación es *de naturaleza muy distinta al derecho que podrían reclamar electores añadidos a mano en una acción independiente.* Los [*issues*] que el Tribunal tendría que resolver en una y otra acción [independiente] serían distintos. Los intereses que tendrían que ser evaluados también serían diferentes. (Énfasis suplido.) Alegato de los recurridos, págs. 42–44.

Se desprende, pues, que la compulsoria acumulación como partes de los electores que reclamaron en el foro federal fue examinada y desechada en instancia hace casi nueve (9) meses, con el beneplácito de *todos los litigantes y sus abogados.* En sus escritos ante este Foro, ellos partieron del supuesto de que las únicas *partes* en la acción de impugnación eran Granados Navedo y Acevedo Pérez, y *no los electores.* Precisamente, Báez Galib y Acevedo Pérez *nos pidieron* que *respetáramos,* como "*lo hizo el Tribunal Superior, el criterio de los electores que se negaron a comparecer en el*

*pleito de impugnación de elección reconociendo así que los derechos de estos terceros están mejor representados cuando ellos mismos los reclaman y defienden . . .".* (Énfasis suplido.) Alegato de los recurridos, pág. 43. Esa solicitud encontró eco en este Tribunal. Así, bajo el acápite IV, el ponente del sentir mayoritario, Juez Asociado Señor Ortiz, expuso:

El tribunal le negó capacidad al señor Granados Navedo para reclamar derechos de electores al resolver que solamente los ciudadanos que emitieron votos no adjudicados pueden recurrir a los tribunales a reclamar la vindicación de sus derechos. Además, razonó *el magistrado que como los electores que eran parte en el litigio pendiente en el foro federal rehusaron ser partes en este pleito, el candidato no los podía representar.*

*El enfoque del tribunal es erróneo. Lo que el impugnador solicita es que se le reconozca su derecho a que se le adjudique los votos de estos electores a su favor. Es sólo para esos fines que el tribunal tiene que pasar juicio sobre si los electores individuales fueron indebidamente excluidos o no.* Ese fue precisamente el mecanismo que aprobamos en *P.P.D. v. Admor. Gen. de Elecciones,* 111 D.P.R. 199 (1981). Allí, a los fines de adjudicar los derechos de los candidatos, fuimos caso por caso a examinar la situación particular de cada elector.

Aunque, ante planteamientos constitucionales, hemos permitido que una parte invoque derechos de terceros ausentes —*Noriega v. Gobernador,* 122 D.P.R. 650 (1988); *Pueblo v. Hernández Colón,* 119 D.P.R. 891 (1987); *E.L.A. v. P.R. Tel. Co.,* 114 D.P.R. 394 (1983); *Zachry International v. Tribunal Superior,* 104 D.P.R. 267 (1975)— en este caso no es necesario resolver este punto. *El propio candidato ha manifestado que no interesa representar a los electores.* (Énfasis suplido y escolio omitido.) *Granados v. Rodríguez Estrada I,* supra, págs. 23–24.

Se advierte, pues, que la cuestión fue expresamente considerada y resuelta. Las expresiones vertidas por la Juez Asociada Señora Naveira de Rodón en su *opinión concurrente y de conformidad* en torno a "la deseabilidad de que a los electores que de alguna forma se le pudiera afectar su

derecho al voto sean unidos como partes" (*Granados v. Rodríguez Estrada I*, supra, pág. 72), *sólo* tuvieron el endoso de los Jueces Asociados Señores Hernández Denton y Alonso Alonso. *Ni el ponente de la opinión mayoritaria del Tribunal, Juez Asociado Señor Ortiz, como tampoco el Juez Presidente Señor Pons Núñez, las suscribieron.* Así descartadas, lo único que la mayoría se abstuvo de considerar fue si Granados Navedo podía invocar los derechos de terceros ausentes (*ius tertii*) bajo la norma de *Zachry International v. Tribunal Superior*, supra.

El dictamen del Tribunal Superior y el de la mayoría de este Foro —con los disensos de los Jueces Asociados Señores Rebollo López, Ortiz y este suscriptor— nos obliga a *revisitarla*.

## V

*Premisa del Tribunal Superior: reconocimiento de una violación del debido proceso de ley por la Comisión Estatal*

A poco examinamos, notamos que las preocupaciones que movieron al tribunal de instancia en su decreto estuvieron fundamentadas en la realidad de que los electores que votaron bajo el sistema de añadidos a mano, aquellos cuyas papeletas fueron anuladas por haberlas iniciado o los que pertenecen al grupo de las papeletas arrestadas, nunca fueron notificados de la determinación de la Comisión Estatal que se negó a adjudicar sus votos. En consecuencia, dicho foro concluyó que a esos tres (3) grupos de electores les asistía *el derecho potencial de cuestionar esa determinación administrativa en cualquier momento.* Con el objetivo de evitar la repetición y proliferación de casos análogos al de la señora González Suárez, y oportunamente poder aplicarle a todos esos electores —incluso a los reclamantes en la corte federal— la norma de cosa juzgada o impedimento colateral de sentencia, concluyó que era menester su citación compulso-

ria bajo la tesis de que eran partes acumulables al amparo de la Regla 16.2 de Procedimiento Civil, *supra.*

*El propósito es laudable; el mecanismo incorrecto y trunco. La zigzagueante opinión mayoritaria no subsana esos defectos, sino que constitucionalmente los agrava de manera sensible.* Veamos.

*No se cuestiona seriamente que esos electores no eran ni son partes indispensables bajo la Regla 16.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III.* Por ende, la cuestión de si procedía la acumulación sólo sería factible bajo la citada Regla 16.2. Ello exige explorar si el *remedio completo* solicitado por Granados Navedo —o que pudiera invocar Acevedo Pérez— puede concederse sin que esos electores sean partes. La contestación es en la *afirmativa. Nada impide que ambos litigantes produzcan, en calidad de testigos —como lo han hecho hasta ahora— la prueba referente a las cualificaciones de aquellos electores que los endosaron en las urnas comprendidos en los tres (3) grupos mencionados.*

La columna vertebral en que se apuntala la orden del tribunal de instancia —y obviamente ahora acepta la mayoría de este Tribunal— *es la ausencia total del debido proceso de ley ante la Comisión Estatal.* De ello no cabe duda. A ninguno de esos mil ochocientos cuarenta y cinco (1,845) electores se les notificó que sus votos no habían sido adjudicados, "aun cuando se conocían sus nombres y direcciones". Opinión mayoritaria, pág. 606). Así lo reconoce expresamente la mayoría del Tribunal para seguidamente invocar el Art. 2.001 de la Ley Electoral, *supra,* en su inciso (10), y la legitimación activa de ellos. Íd. Aunque en el esc. 3, en abrupto viraje, la mayoría inmediatamente niega que así lo decidan, esa es la única conclusión lógica que cabe. *Solamente así puede elaborarse, sostenerse y justificarse la errónea tesis de que son partes necesarias acumulables en la acción de*

*"mandamus y daños y perjuicios" formulada por la señora González Suárez.*

Al fin y al cabo, la procedencia o no de acumular unas partes —para proteger sus derechos y colateralmente poner fin a un litigio— no es materia de derecho *abstracto ni esotérico*. Como admite la propia opinión mayoritaria, "dependerá de los hechos específicos de cada caso". Opinión mayoritaria, pág. 605. Y el elemento común básico y fuerza motora que individual, jurídica y lógicamente une a los mil ochocientos cuarenta y cuatro (1,844) electores con la señora González Suárez no es otro que la innegable realidad de que sus votos no fueron adjudicados por la Comisión Estatal y nunca fueron notificados de esa actuación. Si esa omisión no es una violación al debido proceso de ley —bajo la Constitución y la Ley Electoral— ¿qué necesidad habría entonces de forzar su *masiva acumulación* como parte en la acción de *mandamus y daños y perjuicios* de la señora González Suárez? "Para contestar estas interrogantes, el retruécano no es permisible." *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, 123 D.P.R. 1, 52 (1988), opinión disidente. *La infracción al debido proceso de ley es patente.* Al hacerlo, aunque tardíamente y con unas consecuencias negativas que luego expondremos, *por fin* la mayoría del Tribunal reconoce la validez y virtualidad de nuestros disensos en *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, supra, y en *Granados v. Rodríguez Estrada I*, supra. *En ambos abogamos vehementemente por ese derecho.*

En el *primero*, con referencia a los electores a quienes se les anuló el voto por haber iniciado las papeletas, la mayoría, por voz del Juez Presidente Señor Pons Núñez, *negó* expresamente "la concesión de unas garantías procesales previas al elector cuyo voto fuera a anularse, tales como *citación, oportunidad de ser oído*, pruebas caligráficas, etc. . . .". (Én-

fasis suplido.) *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, supra, pág. 28.

Frente a ese razonamiento, a título de interrogantes, sostuvimos que la remota posibilidad de que un trámite ante la Comisión Estatal "implicara descorrer el velo de secretividad de aquellos electores —cuyas iniciales en la papeleta son compatibles a otras iniciales— . . . *sería igual en un procedimiento judicial*" —(énfasis suplido), *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, supra, pág. 51, opinión disidente— y, además, que lo "más importante [era] el derecho al voto [aun cuando] por razones de peso y necesidad —al igual que con las recusaciones— se levant[ara] el manto de la secretivida[d]". Íd., págs. 51–52. Propusimos entonces —recuérdese que ello fue el 21 de diciembre— un procedimiento sencillo, económico y administrativamente viable que brindara el debido proceso de ley y la citación *de esos electores* mediante una convocatoria general a publicarse en los periódicos del país. Íd., págs. 52–53.

Repetimos, ese método o uno análogo que hubiese a *nivel administrativo* cumplido con el debido proceso de ley fue descartado. *Nuestro llamado a que no se estimase renunciado el derecho constitucional a ejercer el voto por "ignorancia", fue una prédica en el desierto. Ante esa interpretación mayoritaria sentenciamos: "Se han anulado y confiscado votos sin brindarle a los electores un mínimo de debido proceso de ley. Ha prevalecido la forma sobre la sustancia; lo injusto sobre lo justo."*

Y en el *segundo* caso, *Granados v. Rodríguez Estrada I*, supra —con referencia a los electores añadidos a mano rechazados por la Comisión Estatal y aquellos cuyas papeletas fueron arrestadas y anuladas— nuevamente prevaleció un enfoque mayoritario restrictivo y violatorio del debido proceso de ley. Con oportunidad, la mayoría *acogió* los argumentos del alegato de Acevedo Pérez y Báez Galib de que no era "'necesario un proceso de índole adversativo para adju-

dicar y contar las papeletas de los añadidos a mano'". *Granados v. Rodríguez Estrada I*, supra, pág. 29. A título de "sentar algunas directrices" (íd.) para el foro de instancia y las partes, resolvieron que "en ningún momento se consideró concederle a estos electores la gama de derechos estatutarios y jurisprudenciales *antes señalados*". (Énfasis suplido.) Íd., pág. 30. La mayoría bautizó ese procedimiento como sui géneris, y dispuso que:

No hay que devolver el caso a la Comisión Estatal para que inicie un procedimiento de notificación, vista y decisión en los mil doscientos (1,200) casos individuales. Los derechos se dilucidarán en el tribunal donde las *partes deben establecer*, por la preponderancia de la prueba, la capacidad de los electores para votar y que las decisiones de no adjudicar estos votos fueron erróneas. (Énfasis suplido.) *Granados v. Rodríguez Estrada I*, supra, pág. 31.

Ello motivó que en nuestro *disenso* apuntáramos:

Este razonamiento es circularmente erróneo. ¿Cómo podían comparecer esos electores si nunca se les notificó el rechazo y la anulación de sus votos por la Junta Especial o Comisión Estatal? ¿Cómo, si ignoraban ese hecho, puede pretenderse que acudieran a la Comisión Estatal a reclamarlo? Más aún, con respecto a las doscientas siete (207) papeletas llamadas *arrestadas*, ¿en qué momento pudieron haberlo hecho los electores si precisamente fue el mismo 7 de diciembre —horas antes de que Acevedo Pérez fuera certificado— que el Presidente de la Comisión, licenciado Rodríguez Estrada, a ruego del Comisionado Electoral Báez Galib (P.P.D.), decidió anularlas? Estas interrogantes nos suplen la contestación. Explican satisfactoriamente las razones para que ni uno solo de los electores cuyas papeletas y votos fueron arrestados y anulados —y otros votos que Granados Navedo reclamó— no acudieran antes a la Comisión Estatal a vindicar sus derechos. *Simplemente nunca fueron notificados. Desconocían que habían sido despojados de sus votos. ¿Desde cuándo el derecho al voto es renunciable por ignorancia?*

Más grave aún, tampoco el propio tribunal de instancia notificó *mediante edictos u otro medio análogo eficaz* a los elec-

tores sobre el procedimiento judicial, aun cuando determinó que Granados Navedo no tenía capacidad para invocar sus derechos. Sólo hizo un *novel* llamado a través de sus abogados a unos electores que habían acudido al foro federal. *Ello no es suficiente ni subsana las infracciones al debido proceso de ley*. (Énfasis suplido y en el original.) *Granados v. Rodríguez Estrada I*, supra, págs. 148–149.

Más adelante dijimos:

Coincidimos en que la Comisión Estatal podía delegar en una junta especial la misión de determinar la cualificación de los electores añadidos a mano. De hecho, nuestro mandato judicial requería la revisión minuciosa de todos los documentos de la Comisión Estatal antes de determinar si más de dieciocho mil (18,000) electores cualificaban para votar bajo ese sistema. Sin embargo, esa delegación no podía ser ilimitada *ni el proceso concluir ahí. A todos los electores rechazados, aunque su impugnación fuese unánime, debió notificárseles dicha determinación en algún momento posterior para que tuvieran la oportunidad de defender sus votos*. Repetimos, como expresáramos en *Molina v. Barreto Pérez*, [110 D.P.R. 513, 516–517 (1980)] "la adjudicación sustantiva o en su fondo de una papeleta recusada es un proceso por naturaleza distinto al trámite ordinario y normal seguido durante el escrutinio eleccionario. Exige la existencia de una mecánica de adjudicación plenaria que trasciende la faz de la papeleta, de índole adversativa, *rodeada de las garantías mínimas del debido proceso de ley tales como notificación al elector, citación de testigos y desfile y apreciación de prueba, ante la Comisión Electoral o su examinador*".

*No podemos ahora exigir menos*. (Énfasis suplido y en el original.) *Granados v. Rodríguez Estrada I*, supra, pág. 158.

Y finalmente, en cuanto a este crucial extremo, concluimos:

*Esta mixtificación de conceptos es una inconcebible y evidente regresión en la escala de valores y trato igual a los derechos ciudadanos*. Al así hacerlo, la mayoría del Tribunal ha creado electores de *primera clase* —por estar en las listas— y otros de *segunda clase* —omitidos de las mismas—

por razón de los errores en la maquinaria electoral. *Constitucionalmente el enfoque es impermisible.* Bajo esas categorías, no podemos establecer limitaciones y resolver que los electores de *primera clase son acreedores a mayores oportunidades y a un debido proceso de ley distinto al que se le concede a los electores de segunda clase.* Si en *P.N.P. y P.I.P. v. Rodríguez Estrada,* [122 D.P.R. 490 (1988)], rehusamos a priori esa dicotomía, menos podemos establecerla a posteriori. T.E. Supremo, págs. 77–78. De prevalecer ese enfoque restrictivo, tendríamos que *anular todos los votos de los electores añadidos a mano.* Íd., págs. 83–90.

Un examen minucioso de la prueba desfilada refleja que a alrededor de mil doscientos ochenta (1,280) electores se les rechazó el voto. La Junta Especial determinó que su exclusión de las listas estuvo conforme con lo establecido en la Ley Electoral de Puerto Rico, o por estar clasificados como inactivos, *sin que se les notificara tal determinación. Así lo aceptan las partes.* T.E. Supremo, págs. 9 y 91. *En ausencia de esfuerzo alguno para que esos electores tuvieran conocimiento de la anulación de su voto, tenemos que concluir que la actuación de la Comisión Estatal —o de la Junta Especial— fue de naturaleza confiscatoria y que les privó de la oportunidad y debido proceso de ley para probar la legalidad de sus actos. No puede prevalecer.* (Énfasis suplido y en el original.) *Granados v. Rodríguez Estrada I,* supra, págs. 161–162.

En síntesis, del análisis inteligente de la opinión mayoritaria de hoy cristalizan dos (2) pronunciamientos de gran trascendencia: *el primero, que le sirve de ancla, que la Comisión Estatal tenía la obligación de notificar su determinación a los electores a los que les rechazó y no adjudicó sus papeletas, y el segundo, que al no hacerlo les violó el debido proceso de ley.* Exploremos sus ramificaciones procesales, sustantivas y constitucionales.

## VI

*Perfiles procesales; distinción entre "consolidación" y "acumulación"; causas de acción diferentes*

La errática trayectoria que ha seguido este caso y las controversias e incidentes procesales suscitados nos obligan a repasar principios básicos configurativos de un marco conceptual que sirva de norte adjudicativo. *Sólo así esclareceremos el nebuloso prisma decisorio mayoritario.*

La "acción", tanto en su concepto como en su taxonomía, ha sido objeto de un largo e intenso debate entre los procesalistas. El antiguo derecho romano la definía como "el derecho a perseguir en juicio lo que nos es debido o lo que nos pertenece". Hoy día los términos "acción procesal", "causa de acción" y "reclamo" (*claim*) —y como le llama el procesalista español Jaime Guasp, "pretensión"— han tenido acogida en distintos contextos jurídicos. Véanse: *Ramos Rivera v. E.L.A.*, 90 D.P.R. 817 (1964); *A & P Gen. Contractors v. Asoc. Caná*, 110 D.P.R. 753 (1981).

Independientemente de las cuestiones semánticas, hay consenso respecto de que determinadas personas pueden accionar en los tribunales aquellos derechos que les son conferidos por la Constitución, la ley, los reglamentos y la propia jurisprudencia. Es por esta razón que para descubrir el origen de una "acción" hay que recurrir a los distintos campos del derecho (constitucional, civil, penal y administrativo), claro está, sin dejar a un lado el ámbito procesal en el que tendrán importantes repercusiones. Es el derecho procesal el que esencialmente gobierna el ejercicio de una acción en los tribunales, y este asunto, sin lugar a dudas, no deja de tener sus complicaciones.

Como afirma José Guerra San Martín:

> El concepto de la acción procesal es —al igual que todos los conceptos claves del proceso— uno de los más debatidos, difíciles y oscuros de la ciencia jurídica. El problema radica, fun-

damentalmente, en explicar jurídicamente el paso del derecho subjetivo al proceso. Es indudable que el proceso es un instrumento al servicio del derecho objetivo sustantivo. También sabemos que este derecho objetivo reconoce a los sujetos derechos y potestades. ¿Pero, qué ocurre en el mundo del derecho, cuando el derecho subjetivo (o el que se afirma que se tiene) se ejercita en el proceso? ¿Sigue siendo el mismo derecho, o se transforma en otro derecho distinto? ¿Puede construirse el proceso con total independencia de los derechos subjetivos reconocidos por el derecho objetivo? En otras palabras ¿Puede darse al proceso un contenido distinto del derecho subjetivo que se reclama?. Estas y otras preguntas son las que plantea la determinación del objeto del proceso y por ende la teoría sobre el concepto de la acción procesal. J. Guerra San Martín, *Lecciones de derecho procesal civil*, Bilbao, Publicaciones de la Universidad de Deusto, 1978, págs. 177–178.

En lo que atañe al recurso, su aclaración nos lleva a examinar con algún detenimiento dos (2) de los elementos de la relación jurídico-procesal: *el objeto y los sujetos*. Comencemos con el elemento *objetivo*. En primer lugar, la regla general es que cada acción da lugar a un proceso distinto. Sin embargo, nuestro ordenamiento procesal recogido en las Reglas de Procedimiento Civil permite que, en determinadas ocasiones y circunstancias, varias reclamaciones se acumulen en un mismo proceso y se resuelvan conjuntamente en una sola sentencia. La razón que inspira esta nueva medida es solamente conveniencia y economía procesal. *P.R. Prod. Credit Assoc. v. Registrador*, 123 D.P.R. 231 (1989); *Calo Rivera v. Reyes*, 115 D.P.R. 123, 127 (1984).

Así, vemos que la Regla 14 de Procedimiento Civil, 32 L.P.R.A. Ap. III, regula la acumulación *objetiva* cuando dispone:

*REGLA 14. ACUMULACION DE RECLAMACIONES*

*14.1. Acumulación de reclamaciones*

Cualquier parte que deduzca una reclamación mediante demanda, reconvención, demanda contra coparte, o demanda

contra tercero podrá acumular como independientes o alternativas tantas reclamaciones como tuviere contra la parte adversa.

### 14.2. Acumulación de reclamaciones contingentes

Cuando se tratare de una reclamación que dependa para su ejercicio de que otra reclamación sea proseguida hasta su terminación, dichas dos reclamaciones podrán acumularse en el mismo pleito. El tribunal no resolverá la reclamación contingente hasta tanto se resuelva la reclamación principal.

Otra vía que permite la acumulación de acciones o reclamaciones, además de la que ocurre en virtud de la clásica reconvención, es la *consolidación* que regula la Regla 38.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III:

### 38.1. Consolidación

Cuando *estén pendientes* ante el tribunal pleitos que envuelvan *cuestiones comunes de hechos o de derecho*, éste podrá ordenar la celebración de una sola vista o juicio de cualquiera o de todas las cuestiones litigiosas envueltas en dichos pleitos; podrá ordenar que todos los pleitos sean consolidados; y podrá, a este respecto, *dictar aquellas órdenes que tiendan a evitar gastos innecesarios o dilación.* (Énfasis suplido.)

Se colige, pues, que la *consolidación* no es otra cosa que un mecanismo más de economía procesal con miras a dilucidar en una sola vista o juicio las cuestiones comunes de hecho o de derecho. La *consolidación no significa* que se funden las distintas causas de acción ni pierden su identidad ni su naturaleza propia y separada. La personalidad de las partes permanece intacta. 9 *Wright and Miller, Federal Practice and Procedure: Civil* Sec. 2382 (1971); *Klager v. Inland Power & Light Co.*, 1 F.R.D. 114 (1939); *Red Lake & Pembina Bands v. Turtle Mt. Band of Chippewa Ind.*, 355 F.2d 936, 942 (1965). Como resolvió hace años el Tribunal Supremo federal en *Johnson v. Manhattan Ry. Co.*, 289 U.S. 479, 496–497 (1933): "[L]a *consolidación* se permite como un asunto de conveniencia y economía en la administración [de la justicia], *pero no funde los pleitos en una sola causa, o*

*cambia los derechos de las partes, o convierte a aquellos que eran partes en un pleito en partes en otros [pleitos]."* (Énfasis y traducción nuestros.)

La verdadera esencia del mecanismo de *consolidación* queda descrita con mayor precisión en la expresión —según se denomina en España— de "acumulación de autos", entendiéndose por esto el conjunto de piezas de determinado procedimiento judicial. *La puntualización es necesaria. Una de las múltiples fallas básicas en el discurrir de la posición mayoritaria es que mezcla indistintivamente este mecanismo de "consolidación" con el de "acumulación de partes".* Opinión mayoritaria, pág. 608. *El inventario procesal neto es la génesis de un pleito bastardo —que degenera su naturaleza— de dudosa filiación legal y constitucional.*

Por otro lado, el elemento *subjetivo* de todo proceso judicial —además del tribunal, que es órgano imparcial e independiente— lo integra una parte (demandante) que pretende un remedio y una parte (demandada) frente a la cual se ejecuta la acción remedial. Estos sujetos contendientes, con pretensiones opuestas, se conocen como las *partes procesales*. Y es norma universalmente aceptada que los resultados de un proceso determinado sólo afectan a los que han figurado como partes debidamente emplazadas. *Martin v. Wilks*, supra.

Ahora bien, aunque de ordinario la parte demandante es la que decide y designa quiénes serán las partes procesales, cabe la posibilidad que de manera excepcional sujetos distintos a los originalmente señalados y acumulados por ese actor figuren como partes. Entre las situaciones vislumbradas por el ordenamiento procesal caben mencionarse la sumisión voluntaria, la intervención obligada o provocada a instancias del demandado o del demandante, y la sustitución de las partes. Por su relevancia al caso que nos ocupa, merece particular atención la modalidad de la intervención *obligada* conocida como la "acumulación de partes".

Las Reglas 16, 17, 18, 19 y 20 de Procedimiento Civil, 32 L.P.R.A. Ap. III, regulan situaciones procesales en las que la pluralidad de actores exigen la acumulación subjetiva. Así, la Regla 16, *supra*, atiende el asunto de la indispensabilidad de la acumulación de partes:

### 16.1. Acumulación indispensable

Las personas que tuvieren un interés común sin cuya presencia no pueda adjudicarse la controversia, se harán partes y se acumularán como demandantes o demandadas según corresponda. Cuando una persona que deba unirse como demandante rehusare hacerlo, podrá unirse como demandada.

### 16.2. Acumulación no indispensable

El tribunal podrá ordenar la comparecencia de aquellas personas sujetas a su jurisdicción, que a pesar de no ser partes indispensables, deban ser acumuladas si se ha de conceder un remedio completo a las personas que ya sean partes en el pleito.

Sobre el particular, en nuestra opinión *disidente* emitida en *Hernández Agosto v. López Nieves*, 114 D.P.R. 601, 627 (1983), sostuvimos:

El precepto reglamentario aspira a proteger a la persona ausente de los efectos perjudiciales de un dictamen judicial y evitar la multiplicidad de litigios. *Exige un enfoque jurídico consistente con la equidad y conciencia de índole circunstancial o pragmática, aspecto que configura su existencia y sustancia propia en virtud de factores particulares en el contexto de cada caso, tales como tiempo, lugar, modo, alegaciones, prueba, clase de derechos, intereses en conflicto, resultado y finalidad.* "Esta regla entronca con la cláusula constitucional sobre debido procedimiento de ley." II *Práctica Procesal Puertorriqueña*, Publicaciones JTS (1979), pág. 212. A tal efecto, en *Carrero Suárez v. Sánchez López*, 103 D.P.R. 77, 78 (1974), reiteramos que "[e]sencia del debido proceso de ley es que nadie sea privado de su propiedad sin darle oportunidad de ser oído". Proceder de manera contraria, ofende principios elementales y choca con el instinto de justicia que todos albergamos en nuestro espíritu. Por ende, el juzgador no puede circunscribir su decisión a un simple análisis literal

de las alegaciones de la parte actora, o a quién éste, unilateralmente, escogió demandar o cómo intituló la acción. Para una adjudicación legítima debe auscultar y detectar en su íntima sensibilidad judicial si se han traído correctamente ante el foro todos los titulares indispensables. Con visión integral y clarividencia profunda, debe ir más allá de su faz y evaluar el contenido y valor sustantivo de tales alegaciones, su suficiencia, los derechos en controversia y la naturaleza y pluralidad del remedio final a proveerse. (Énfasis suplido.)

Más adelante, la Regla 17.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III, autoriza a acumular partes en determinadas circunstancias.[3] En *Meléndez v. Levitt & Sons of P.R., Inc.*, 106 D.P.R. 437, 439 (1977), resolvimos que una vez cumplidos sus requisitos es *discreción* del tribunal de instancia permitir la acumulación. Allí añadimos que este Tribunal no intervendría con tal discreción, salvo en *casos de craso abuso*. La Regla 18, *supra*, atiende el aspecto de la indebida acumulación de partes y la Regla 19, *supra*, suplementa el principio de acumulación de partes permisible al instituir procedimientos para obligar a reclamantes adversos a litigar entre sí. Por último, cuando los reclamantes son tan numerosos que la acumulación de todos resulta imposible, se puede recurrir al mecanismo *de pleito de clase* consagrado en la Regla 20, *supra*.

*Es claro, pues, que según nuestro diseño estatutario y jurisprudencial la acción de impugnación se dilucida exclusivamente entre el candidato derrotado y el candidato certificado. Ello es aceptado por todos.*

---

(3) "*17.1. Acumulación permisible*

"Cualquier número de personas podrá acumularse en un pleito, como demandantes o como demandados, si reclamaren o se reclamare contra ellas conjunta, separadamente, o en la alternativa, cualquier derecho a un remedio relacionado con, o que surja del mismo acto, omisión, evento, o serie de actos, omisiones o eventos siempre que cualquier cuestión de hecho o de derecho, común a todas, hubiere de surgir en el pleito. No será requisito que un demandante o demandado tenga interés en obtener o defenderse de todo el remedio solicitado. Podrá dictarse sentencia a favor de uno o más demandantes de acuerdo con sus respectivos derechos a un remedio y contra uno o más demandados de acuerdo con sus respectivas responsabilidades." 32 L.P.R.A. Ap. III, R. 17.1.

## VII

*Improcedencia de la acumulación decretada por el Tribunal Superior en el pleito de impugnación*

El esquema legislativo *especial* persigue que el pleito se resuelva *prontamente*. Tiene perfiles propios. *Los electores no son partes indispensables ni necesarias.* Estos tienen el derecho a instar una *acción legal separada e independiente* —individual o de clase— para reclamar sus votos particulares. *Esa causa de acción va dirigida contra la Comisión Estatal, quien por ley es la parte demandada, por ser el organismo que adjudica o no tales votos.* El tribunal ante quien se ventile la acción de impugnación —paralelamente con una o varias acciones preexistentes de electores— puede *consolidar* las vistas en aras de la economía procesal *si con ello no atrasa una o la otra. Pero, ciertamente, la acción de impugnación no puede convertirse en una acción de reclamo de los electores ni ser demorada con una consolidación*; tampoco atribuirle a esa consolidación unos efectos ajenos a su naturaleza. Incluir a los electores, bajo la Regla 16.2 de Procedimiento Civil, *supra*, y exigir a cualesquiera de los contendientes principales el emplazamiento de esos o cualesquiera otros equivale erróneamente a convertirlos de forma indirecta en *partes indispensables* bajo la Regla 16.1 de Procedimiento Civil, *supra. Incidió, pues, el foro de instancia.*

## VIII

*Improcedencia de la acumulación decretada por la opinión mayoritaria*

Una vez aceptado que el Tribunal Superior erró, es obvio que no procede en derecho la acumulación de los electores como partes en la acción de *mandamus y daños y perjuicios* de la señora González Suárez contra la Comisión Estatal y otros. *El dictamen equivocado del foro de instancia no puede ser resucitado ni adquirir validez con una mera*

*transpolación, como pretende la mayoría, mediante una circunvalación de esa realidad y hacer lo que antes ha rechazado: acumular como partes a esos electores en el pleito de impugnación.*

Bajo los parámetros que informa la Regla 16 de Procedimiento Civil, *supra*, sobre acumulación, el transplante es impermisible. La acción de *mandamus y daños y perjuicios* de la señora González Suárez puede ser satisfactoriamente adjudicada sin que ninguno de esos mil ochocientos cuarenta y cuatro (1,844) electores sean partes. Su acumulación no es necesaria para "adjudicarse la controversia", 32 L.P.R.A. Ap. III, R. 16.1, como tampoco para "conceder un remedio completo a las personas que ya [son] partes en el pleito" (32 L.P.R.A. Ap. III, R. 16.2) a saber, ella, la Comisión Estatal y otros. No podemos olvidar que la frase

"Interés común" *no es cualquier interés en el pleito.* Tiene que ser un interés de tal orden que *impida la confección* de un decreto sin afectarlo.

"Remedio completo" también tiene un *significado especial.* El remedio completo a que se refiere la Regla 16 alude al remedio entre las personas y entidades *que ya son partes en el pleito y no al obtenible entre una parte y el ausente.* (Énfasis suplido y en el original.) *Hernández Agosto v. López Nieves,* supra, pág. 607.

El enredo de la opinión mayoritaria es transparente. Funde causas de acciones diferentes y confunde los efectos del mecanismo de la consolidación con el de acumulación. *En movimiento de traslación llega al extremo de mudar de lugar* a uno de los litigantes principales, al concluir que la acción de *mandamus y daños y perjuicios* de la señora González Suárez y el pleito de "impugnación por el señor Granados Navedo *tienen el mismo objetivo —cuestionar el resultado electoral para el cargo de Alcalde de San Juan . . .".* (Énfasis suplido.) Opinión mayoritaria, pág. 608. La mutación procesal culmina cuando astutamente en dicha opinión se formula

la pregunta siguiente: "¿qué clase de *remedio completo* se le puede ofrecer al peticionario Granados Navedo . . .?" (Énfasis en el original suprimido y énfasis suplido.) Íd. En otras palabras, aun cuando la mayoría reconoce que los electores no son acumulables como partes en el *pleito de impugnación*, continúan girando descontroladamente en torno a Granados Navedo —y también, sin mencionarlo, alrededor de Acevedo Pérez— y, atraídos fatalmente por ese polo magnético o centro de gravedad, enrevesadamente y *sin fundamentos jurídicos los acumulan en la acción independiente de la señora González Suárez*. El tambaleante puente que sirve de sostén a ese gigantesco paso e inesperado tránsito sustantivo y procesal es una sencilla *consolidación*.

## IX

*Diferencias entre partes y testigos; derechos, remedios e impacto en los procedimientos*

*En el caso de autos, la diferenciación entre partes y testigos es esencial por razón de los efectos procesales y evidenciarios, y su impacto paralizante pro tempore sobre los actuales procedimientos que se llevan a cabo ante el foro de instancia.*

En lo *procesal civil*, las partes están sujetas a todos los mecanismos de prueba —interrogatorios, requerimientos de admisiones, deposiciones, examen y producción de documentos, y otros efectos pertinentes— y al pago de las costas y honorarios de abogado. Un testigo puede ser sometido a una deposición. También es acreedor a que se le satisfaga los gastos de transportación y otros necesarios y razonables por su comparecencia al tribunal, oportunamente a ser reembolsados a la parte victoriosa en concepto de costas bajo la Regla 44 de Procedimiento Civil, 32 L.P.R.A. Ap. III.

En lo *evidenciario*, resalta la Regla 43(E) de Evidencia, 32 L.P.R.A. Ap. IV, que consagra el derecho de una parte a

permanecer en sala durante el juicio, en contraste con la exclusión de los testigos, y a ejercer el derecho al *contrainterrogatorio*, objetar y presentar prueba oportunamente. También —como excepción a la regla de prueba de referencia— cabe mencionar la Regla 62 de Evidencia, 32 L.P.R.A. Ap. IV, sobre *admisiones de parte* y la Regla 64(B)(3) de Evidencia, 32 L.P.R.A. Ap. IV, bajo el concepto de indisponibilidad de testigo, modalidad que exige que la declaración sea contra interés al momento de ser hecha.

*Bajo esta perspectiva, el trámite originalmente pautado por el tribunal de instancia y según "modificado" por la mayoría es un raro injerto desconocido en nuestro derecho vigente. Su asimilación ha requerido que la mayoría recurra a la inventiva y técnica de crear nuevamente un pleito sui géneris, pero esta vez "complejo" que —como paciente comatoso en intensivo— "necesita un tratamiento excepcional".* (Énfasis suplido y en el original.) Opinión mayoritaria, pág. 609. Conlleva en esta etapa, temporeramente, la *suspensión inmediata* del pleito de impugnación. Cuánto tiempo exactamente estará paralizado, lo desconocemos. Sí podemos prever que será un término mayor que el permitido por las circunstancias.

Las complicaciones dimanantes de la acumulación a la acción de *mandamus y daños y perjuicios* de la señora González Suárez, como *nuevas partes*, de mil ochocientos cuarenta y cuatro (1,844) electores marginados hasta ahora por la Comisión Estatal —conforme se expone en las disidencias de los Jueces Asociados Señores Rebollo López (págs. 692–695) y Ortiz (págs. 704–706)— así lo requiere. Estos electores, al convertirse en parte —una vez emplazados eficazmente y transcurrido el término para contestar— son acreedores a invocar el uso de todos los procedimientos de descubrimiento de prueba. En los extremos pertinentes —relacionados con sus causas de acción individuales— tienen derecho a presentar su propia prueba, incluso citar, interrogar y contrainte-

rrogar a los funcionarios de colegio que ya prestaron testimonio, examinar y objetar prueba documental, y suscribir o no las estipulaciones previamente acordadas por Granados Navedo y Acevedo Pérez. Aunque el foro de instancia está facultado para reglamentar razonablemente esos derechos, el precio no podría ser convertir el proceso en uno *ficticio* y *proforma*, y por ende, *inconstitucional*. No podría negarles los trámites mínimos ya reconocidos a la señora González Suárez, los cuales tomaron siete (7) meses en madurar.

## X

*Improcedencia e injusticia de la orden que obliga a Granados Navedo a emplazar*

En el caso de autos, indiscutiblemente, el agravio de los electores fue causado por la Comisión Estatal y no por Granados Navedo o Acevedo Pérez. En consecuencia, el desagravio correspondería remediarlo el tribunal *contra dicha Comisión Estatal*. Procesal y sustantivamente, esa es la *verdadera parte* en un pleito incoado por los electores. *En el de autos —impugnación— la Comisión Estatal sólo ha sido y es parte nominal.*

Al tribunal de instancia imponerle a Granados Navedo el deber de emplazar —por el solo hecho de que son *sus* testigos— ha *menoscabado directamente la capacidad que antes le reconocimos. Incurrió en un craso error.* Nos explicamos.

Las únicas diferencias detectables en el binomio de estos *electores-testigos*, aparte de la matemática —Granados Navedo cuenta con cuarenta y ocho (48) y Acevedo Pérez cuenta con sólo quince (15)— y claro está, de la ideológica, es que la orden le requiere al primero que emplace treinta y nueve (39) de esos *testigos-electores* que reclamaron en la corte federal y que se han negado a intervenir o demandar —ex-

cepto la señora González Suárez— en nuestros foros judiciales. Por lo demás, tanto los *electores-testigos* anunciados por Granados Navedo como por Acevedo Pérez presentan las características siguientes: (1) son electores a quienes la Comisión Estatal no les adjudicó sus votos; (2) no fueron formalmente notificados de esa determinación; (3) la Comisión Estatal les privó del debido proceso de ley a que eran acreedores; (4) de algún modo advinieron en conocimiento de ese hecho; (5) no han instado acción ni han comparecido —individual o colectivamente— como *partes* al Tribunal Superior a reclamar la reivindicación de sus derechos, y (6) se han ofrecido voluntariamente y están disponibles para comparecer como *testigos* y declarar a favor de uno u otro de esos dos (2) litigantes.

*La disponibilidad de todos ellos como testigos de Granados Navedo y Acevedo Pérez —únicas partes en el pleito de impugnación— sólo tiene un significado: entienden que son electores cualificados y que sus votos se deben adjudicar.* En estas circunstancias, en buena juridicidad y justicia —por no decir lógica— la orden dirigida *únicamente* a Granados Navedo no podía prevalecer. Si la diferencia esencial es que sus *electores-testigos* son también reclamantes en la corte federal —en contraste con los de Acevedo Pérez— *no hay justificación para sostener esa disimilitud en el trato. La acción del foro de instancia tiene características de una penalidad contra Granados Navedo por el simple hecho de que sus testigos reclamaron separadamente en el foro federal.* Repetimos, *todos* esos *electores-testigos* —al igual que los otros— tienen como denominador común que la Comisión Estatal no les adjudicó sus votos ni fueron notificados de ello. Por esto, *es contra la Comisión Estatal que debe dirigirse la acción.*

Por ser así, ¿por qué imponerle a Granados Navedo la obligación de emplazarlos? ¿no está el tribunal de instancia trastocando los intereses y el espíritu que anima la Regla

16.2 de Procedimiento Civil, *supra*? *El desbalance es patente. Los quince (15) electores-testigos anunciados por Acevedo Pérez tienen conocimiento real de que sus votos no fueron adjudicados por la Comisión Estatal. Su disponibilidad para prestar testimonio a favor de Acevedo Pérez implica también que el Tribunal Superior habrá de reconocerles o denegarles ese derecho. Sin embargo, hasta el momento no lo han reclamado judicialmente en nuestros tribunales. Situados básicamente en iguales posiciones, ¿por qué razón el tribunal de instancia no ordenó que también fueran acumulados como partes demandantes —o demandadas— y no requirió que Acevedo Pérez los emplazara?*

Del análisis que precede e interrogantes formuladas aflora la innegable realidad procesal de que *todos los electores* —hayan sido o no anunciados como testigos por ambas partes— *tienen una causa de acción separada e independiente contra la Comisión Estatal.* Constituyó, pues, un craso error y abuso de discreción del tribunal de instancia ordenar en la acción de impugnación que los *electores-testigos* de Granados Navedo fueran unidos como parte. Dicho foro no podía imponerle ese deber, como tampoco podría compeler a Acevedo Pérez a que lo hiciera. La orden recurrida confundió los mecanismos procesales sobre *consolidación de pleitos* y *acumulación de partes.* Entremezcló las causas de acción distintas y separadas que poseen todos los electores, incluso los *electores-testigos*, con la causa de acción de impugnación que es un contienda exclusiva entre Granados Navedo y Acevedo Pérez.

Esclarecida así la situación, *en último análisis correspondería a la Comisión Estatal el deber de emplazarlos, y no a Granados Navedo. Y aquélla, repetimos, no es parte en el litigio de impugnación.*

La interpretación de los pronunciamientos en *Martin v. Wilks*, supra, demuestra su inaplicabilidad al caso de autos.

Allí se trataba de una acción ordinaria y *no especial*, como es la *demanda de impugnación* electoral.

En cuanto a la acumulación de partes bajo la Regla 19 de Procedimiento Civil federal, 28 U.S.C. —con equivalencia conceptual a la Regla 16 de Procedimiento Civil nuestra, *supra, pues no son idénticas*— el Tribunal Supremo federal explicó:

> . . . Más que el conocimiento del pleito y la oportunidad de intervenir [unirlos como partes] es el método mediante el cual partes potenciales están sujetas a la jurisdicción de la corte y atadas por la sentencia o decreto. En un litigio, *presumiblemente son las partes quienes mejor que nadie conocen la naturaleza y el alcance del remedio solicitado, y contra quien dicho remedio puede ser concedido.* Por lo tanto, *cuando ese paso sea el indicado* es sensato imponerle a las partes en litigio la carga de incorporar al pleito a esas partes potenciales adicionales, en lugar de imponerle a éstas el deber de intervenir cuando advienen en conocimiento del litigio. (Traducción y énfasis nuestros.) *Martin v. Wilks*, supra, pág. 765.

Las palabras enfatizadas son claves y nos ofrecen la solución. La razón nos dicta que presumiblemente *Granados Navedo y Acevedo Pérez saben* que los electores rechazados por la Junta Especial de Añadidos a Mano, los de las papeletas anuladas por iniciales y los de las arrestadas, *nunca tuvieron ante la Comisión Estatal un debido proceso de ley*. También, que conocen que estos tienen una *causa de acción separada e independiente* y que el remedio bajo la Constitución y la Ley Electoral —probable adjudicación de sus votos— *únicamente procede contra dicho organismo. Era la Comisión Estatal y no los candidatos quien tenía el deber ministerial de adjudicar tales votos.* Y esta innegable realidad sustantiva y procesal explica la verdadera razón por la cual Granados Navedo y Acevedo Pérez —en ningún momento durante los diez (10) meses que lleva el litigio— no *pidieron formalmente* que esos electores marginados por la Comisión Estatal fueran acumulados como partes.

*En conclusión, erró el tribunal de instancia al compeler
a Granados Navedo a emplazar los treinta y ocho (38) tes-
tigos que, por su condición de electores, tienen una causa de
acción separada y distinta a la suya y han reclamado en la
corte federal. Ese dictamen menoscabó la capacidad que le
fue antes reconocida y le impuso un gravamen procesal,
costoso e injusto.*

## XI

*Insuficiencia constitucional de los avisos del Tribunal Su-
perior para fines jurisdiccionales; necesidad de notificación
"in personam"*

Los fundamentos expuestos, aunque suficientes para re-
vocar la *orden*, no agotan el ejercicio cabal de nuestra inter-
vención apelativa. El mandato estaría incompleto si nos abs-
tenemos de dirigirnos a la cuestión cardinal que animó al
tribunal de instancia: la ausencia de *notificación a los elec-
tores marginados por la Comisión Estatal y la culminación
del proceso judicial.* Nuestra misión básica es impartir justi-
cia. Si al estudiar un caso nos percatamos de un error de
importancia, para evitar injusticias y demoras debemos sin
vacilación corregirlo. *Dávila v. Valdejully*, 84 D.P.R. 101,
103–104 (1961). Tal es la situación ante nos.

Según expuesto, el tribunal de instancia —con miras a
suplir tardíamente la inobservancia del debido proceso de
ley ante la Comisión Estatal— le impuso a dicho organismo
la obligación de publicar y sufragar el costo de los *avisos*.
Anejos 2 y 3, págs. 623–624.

Ello motivó una comparecencia del Presidente de la Co-
misión Estatal de Elecciones, Lcdo. Marcos A. Rodríguez
Estrada —fechada 17 de agosto de 1989— en que levantaba
la ilegalidad de esa orden y pedía su aclaración y reconside-
ración por los fundamentos siguientes: (1) que la Comisión
Estatal *"nunca ha sido parte en este proceso"*; (2) que

"[e]ste es un proceso que *inicia* el candidato derrotado que impugna la certificación del candidato certificado como electo. Es norma fundamental de nuestro proceso que todos los gastos necesarios para el litigio corren por cuenta de la parte actora, quien si prevalece al final tiene derecho a recobrarlos como costas del proceso, de conformidad con las disposiciones de la Regla 44.3 [de] Procedimiento Civil, 32 LPRA Ap. [III] R. 43.3", y (3) que la "Comisión Estatal de Elecciones estaría, posiblemente, incurriendo en una erogación ilegal si le adelantara gastos que por ley le corresponde a *una parte privada en un procedimiento*. Además, en este momento la Comisión carece de dinero en su presupuesto para tal erogación." (Énfasis suplido.)

El tribunal se negó a reconsiderar. El incidente y planteamiento es importante y revelador en dos (2) vertientes. La primera, de índole *adjetival* ya que, según resuelto en la opinión mayoritaria de *Granados v. Rodríguez Estrada I*, supra, pág. 63 esc. 24, es "*obvio* . . . [que el] Presidente de la Comisión Estatal es mayormente una *parte nominal. . .*". (Énfasis suplido.) La comparecencia del Presidente de la Comisión Estatal de Elecciones de 17 de agosto despeja cualesquiera dudas de que la Comisión Estatal y él no son parte en el pleito de impugnación. *Sólo son partes Granados Navedo y Acevedo Pérez*. Y la segunda, en lo *sustantivo*, porque la única razón para imponer esa obligación no puede ser otra que una manifestación más del convencimiento íntimo y genuino del Magistrado Polo de que la Comisión Estatal debió notificar con anterioridad a esos electores de la no adjudicación de sus votos, y que al no hacerlo incurrió en una violación al debido proceso de ley.

Aparte de que el trámite *desnaturaliza* el pleito de impugnación, los *avisos* (Anejos 2 y 3, *supra*) sólo son susceptibles de interpretarse simplemente como una notificación de carácter *preliminar* a esos cientos de electores. Informarían que el Tribunal Superior está en disposición de celebrar au-

diencias para vindicar los derechos constitucionales de aquellos a los que la Comisión Estatal, sin debido proceso de ley, les confiscó los votos.

Bajo esta perspectiva, los *avisos* no pueden pretender el sometimiento de esos electores a la jurisdicción del tribunal. Aspiran, a través de comparecencias y sumisiones voluntarias, a servir de cedazo inicial *para luego cumplirse con los requisitos del emplazamiento personal, en los casos apropiados, o mediante edictos.*

En su proyección prospectiva, una vez publicados los *avisos* y transcurrido el término concedido, el tribunal acumularía como *partes demandantes* a aquellos electores que solicitaren intervenir. Claro está, surgiría de inmediato la anomalía de que figurarían en calidad de demandantes no sólo los electores que votaron por Granados Navedo, sino los que apoyaron a Acevedo Pérez; además, que la Comisión Estatal no es parte. *Y aquí comienza la complicación.* Estos electores, nuevos demandantes, tendrían derecho a sus propios abogados si no desean ser representados —al decir del licenciado Rey— por los abogados de los partidos políticos o los candidatos. T.E. Superior, pág. 104. Los electores que no comparecieren, según los *avisos* —que pueden ser unos pocos o cientos— se acumularían como demandados con igual complicación. *Y todos serían acreedores a invocar la gama de derechos procesales y evidenciarios que la metamorfosis de testigo a parte genera.*

En la medida en que el tribunal de instancia les concedió *únicamente diez (10) días* para comparecer y "radicar *sus alegaciones*" bajo apercibimiento de que de "no hacerlo se les acumulará como partes demandadas", no es suficiente para adquirir jurisdicción *in personam* a través de tales *avisos. Para esos fines, los avisos no cumplen con el debido proceso de ley ni subsanan la violación habida en la Comisión Estatal.*

Hemos visto que el tribunal de instancia expresamente reconoció que este grupo de electores —al igual que la señora González Suárez— bajo la Constitución y la Ley Electoral, podían reclamar sin límite de tiempo el derecho a que sus votos fueran adjudicados. También, que los *avisos* ordenados por el Tribunal Superior —*más allá de lo estipulado y contenido en los Proyectos de Avisos sometidos por las partes*— conllevaban que, de no comparecer como *demandantes*, se les acumularía como *demandados* y, como consecuencia, estarían vinculados al fallo final en virtud de las doctrinas de cosa juzgada e impedimento colateral por sentencia. La conclusión es evidente: estos *avisos* tenían a *largo plazo* el propósito de conferir *jurisdicción* al Tribunal Superior sobre todos esos electores y obligarlos a comparecer, bajo apercibimiento de convertirlos en partes atadas al decreto final.

*El trámite solo de avisos fijado por el Tribunal Superior es incompleto y no cumple con los requisitos mínimos procesales y jurisprudenciales del debido proceso de ley. Igual infracción tiene el pautado por la mayoría del Tribunal.*

## XII

*Insuficiencia constitucional de las notificaciones por correo certificado decretada por la opinión mayoritaria para fines jurisdiccionales; necesidad de notificación "in personam"*

*Para subsanar esta grave deficiencia, la mayoría del Tribunal incurre en y repite el mismo error del foro de instancia. Bajo el palio de la Regla 71 de Procedimiento Civil, 32 L.P.R.A. Ap. III, establece un trámite de notificación, de su faz defectuoso e inconstitucional, que lesiona el debido proceso de ley y se aparta de todos los sanos precedentes jurisprudenciales aplicables. Además, como veremos, crea un pleito de clase sin cumplirse los requisitos.* Concentrémonos primero en el aspecto de la Regla 71, *supra*, en el de la notificación después y, finalmente, en el pleito de clase.

La Regla 71 de Procedimiento Civil, *supra*, dispone: "Cuando *no se hubiere previsto un procedimiento específico en estas reglas* [de Procedimiento Civil], el Tribunal podrá reglamentar su práctica en cualquier forma *que no sea inconsistente con las mismas o con cualquier disposición de ley aplicable*." (Énfasis suplido.) La claridad de su texto no requiere interpretación.

Hay una insalvable diferencia entre economía y abstracción procesal.

Como apuntáramos anteriormente la autonomía del juez bajo la Regla 71 para originar procedimiento toma'vida únicamente cuando no hubiere adecuada provisión en las Reglas de Procedimiento Civil. La acción del magistrado en tal caso es de prótesis, no de creación. *Sucn. Carderaros v. Tribunal Superior*, 103 D.P.R. 721, 723 (1975). Véase J.A. Cuevas Segarra, *Práctica Procesal Puertorriqueña: Procedimiento Civil*, San Juan, Pubs. J.T.S., 1983, Vol. II, págs. 6–7.

¿Cómo entonces es posible que la mayoría haya activado la Regla 71 de Procedimiento Civil, *supra*, únicamente disponible "cuando no se hubiere previsto un procedimiento específico"? ¿Es que no cuenta para nada el pleito especial de impugnación? Además, ¿no se han percatado de que el diseño pautado es "inconsistente" con las reglas específicas sobre emplazamiento *in personam*? En definitiva, ninguna de las circunstancias visualizadas en la Regla 71, *supra*, están presentes en el caso de autos.

Lo que sí resalta a la vista es que estamos en un procedimiento ante el foro judicial y no administrativo en la Comisión Estatal. *Por ende, las garantías han de ser mayores o al menos iguales*. El hecho de que esté en juego el derecho al voto —como valor individual y comunitario constitucional de donde arranca nuestro sistema democrático— da lugar a que se fortalezcan —no relajen— las normas aplicables en cuanto a la *citación personal* de esos electores. Del caso *Partido Popular v. Junta Insular Elecciones*, 63 D.P.R. 296, 334 (1944), rescatamos el pensamiento siguiente:

Rechazamos la afirmación de que constituya una "frívola contención" sostener que esa clase de notificación no imponga al ciudadano "una obligación que él no viene obligado a cumplir". *¿Qué ley le impone ese deber?* ¿Qué precepto de ley establece esta *novel* forma de notificar a un ciudadano a quien se le priva de su derecho al voto sin haberlo oído siquiera? *En cuanto a los avisos o notificaciones por medio de la prensa también es necesario para que sean válidos que un estatuto los autorice. La Ley Electoral nada dispone.* (Énfasis suplido.)

Desde principios de siglo nuestra doctrina jurisprudencial ha sido clara y continua. *Giménez et al. v. Brenes*, 10 D.P.R. 128, 144–146 (1906); *Guerra v. Comisión de Indemnizaciones a Obreros*, 29 D.P.R. 507, 512 (1921); *Pueblo v. Sierra*, 44 D.P.R. 81, 82 (1932); *Tesorero v. Tribl. Contrib. y B. Suárez, Inc.*, 74 D.P.R. 274, 284 (1953); *Santiago v. Jones*, 74 D.P.R. 617, 622 (1953); *Comisionado de Seguros v. Bradley*, 98 D.P.R. 21, 27 (1969). Toda esta casuística está resumida así: "*Dar a la parte demandada la oportunidad de ser oída es principio esencial de nuestro procedimiento con honda raíz constitucional. Jacob v. Roberts*, 223 U.S. 261 (1912). Para que pueda hacer valer esa oportunidad *es preciso notificarla personalmente que se le ha demandado.* 'Una sentencia dictada sin tal notificación y oportunidad *carece de todos los atributos de una determinación judicial*; es una usurpación y opresión judicial y *nunca puede ser sostenida* donde la justicia se administra justicieramente'." (Énfasis suplido.) *Mundo v. Fúster*, 87 D.P.R. 363, 365 (1963). Véanse: *Hach Co. v. Pure Water Systems, Inc.*, 114 D.P.R. 58, 63 (1983); *Caguas Federal v. Martínez*, 112 D.P.R. 851, 854 (1982).

En la *panorámica electoral* prevalece un enfoque idénticamente riguroso y meticuloso de estricta observancia del debido proceso de ley en cuanto a la *notificación personal.* A tal efecto, en el caso rector de *P.P.D. v. Admor. Gen. de Elecciones*, 111 D.P.R. 199, 232–233 (1981) —en que declaramos con lugar y favorecimos la impugnación del candidato del

P.P.D., Sr. Samuel Cepeda— expusimos con nitidez los parámetros aplicables. *Primero*, que un elector impugnado por una recusación, "en armonía con el mandato constitucional . . . debe tener derecho a contradecir la recusación, Art. 5.03[1] (16 L.P.R.A. sec. 3234), y *a comparecer y ser oído en la vista en que se examine y pueda adjudicarse la procedencia de la recusación*. A ese fin, debe ser citado con suficiente antelación y *de manera efectiva. No debe bastar, a este efecto, un mero diligenciamiento negativo de una citación. Debe quedar demostrado que se hicieron esfuerzos razonables para notificarle. El valor de un voto no puede hacerse depender de unas diligencias incompletas que en ocasiones son hechas por personas que pudieran tener mucho interés en que dicho voto no se cuente*". (Énfasis suplido.) *Segundo*, la "Ley Electoral nada dispone sobre la manera de diligenciar una citación de un elector. Pero su Art. 6.014 (16 L.P.R.A. sec. 3274), que trata del diligenciamiento de una citación a una persona cuya elección a un cargo sea impugnada, *ofrece una pauta que debe ser aceptable para casos como el que nos ocupa*. Dice:

'La notificación, escrito y contestación prescritas en esta sección podrán ser diligenciadas por cualquier persona competente para testificar, y se diligenciarán entregándolas *personalmente a las respectivas partes*, a sus representantes electorales, o *dejándoles con alguna persona mayor de dieciséis años, en la residencia u oficina de la persona a quien fueren dirigidas*. A los fines de esta sección, el representante electoral de un candidato será el miembro de la Comisión Local de precinto de su residencia que represente su partido o su candidatura.'" (Énfasis suplido y en el original.) *P.P.D. v. Admor. Gen. de Elecciones*, supra, pág. 271.

*Tercero*, "[l]a citación a un elector no puede depender de que el elector rehúse ser citado. El diligenciamiento 'personal' no significa entrega en la mano. Basta que se identifique debidamente el elector y que éste tenga suficiente aviso de lo

que se trate y la *citación se le haga disponible*. Al dejarla en la casa [del elector que impide la entrega personal,] en las circunstancias en que lo hizo el diligenciante, se cumplió el requisito de diligenciamiento personal". (Énfasis suplido.) *P.P.D. v. Admor. Gen. de Elecciones*, supra, pág. 271. Y *cuarto*, la suficiencia del diligenciamiento *negativo* requiere que se haga un *esfuerzo razonable para hacer llegar la citación al elector* y éste pueda defender su voto antes de su emplazamiento mediante edictos. Este lineamiento fue esbozado así:

El Partido Popular impugna la citación por ser *insuficiente. Estamos de acuerdo. No puede bastar un diligenciamiento negativo para privar a una persona del derecho a vista y de ser oída, cuando se trata de anularle un derecho fundamental. Si no pudo localizarse a la persona en la dirección en que se esperaba que estuviese, deben hacerse diligencias para averiguar el sitio donde puede ser citada y demostrarse satisfactoriamente que se ha hecho un esfuerzo por localizarla. En caso negativo, la citación mediante edicto no puede descartarse.* . . . En el caso que ahora consideramos, la prueba transcrita no revela esfuerzo alguno por localizar y notificar de la citación a la electora, *aparte de un diligenciamiento negativo.* Al ser informado el diligenciante de la citación, que la electora "vive en Puerto Rico", según hizo constar en la citación, no especificó qué gestiones realizó para informarse de en qué dirección en Puerto Rico se le podía localizar.

*Las gestiones mínimas hechas en este caso no cumplen con el debido proceso de ley. Al no dar una notificación adecuada, se privó a la electora de su oportunidad de comparecer y defender su voto.* (Énfasis suplido.) *P.P.D. v. Admor. Gen. de Elecciones*, supra, págs. 293–294.

Para conferir jurisdicción al Tribunal Superior sobre un elector prevalece, pues, la norma general de que es menester se expida un emplazamiento y *personalmente* se diligencie con la demanda. *A.F.F. v. Tribunal Superior*, 99 D.P.R. 310, 316 (1970). No es suficiente que el elector demandado se entere de la existencia del pleito por otros medios ni aun que

comparezca físicamente al recinto judicial. *Claudio v. Casillas Mojica*, 100 D.P.R. 761, 772 (1972); Cuevas Segarra, *op. cit.*, págs. 176–177.

*Estos requisitos jurisdiccionales son de estirpe constitucional e inexorables para la aplicación de la doctrina de cosa juzgada e impedimento colateral por sentencia.* Nuestras decisiones exigen que: (1) la notificación al elector sea personal (esta notificación personal se satisface cuando éste expresamente ha rehusado recibir la notificación e impedido la entrega física de la citación) y (2) únicamente se puede acudir al método supletorio de edictos y a la remisión por correo certificado si se han realizado previamente y se han consignado así en declaración jurada —la Regla 4.5 de Procedimiento Civil de 1979 (32 L.P.R.A. Ap. III) *eliminó* el requisito de diligenciamiento negativo— las gestiones para localizar al elector en Puerto Rico.

La importancia y recta observancia de este trámite no puede subestimarse. La Comisión Estatal posee en sus récord las direcciones de todos esos electores. Esos archivos, las declaraciones juradas suscritas al votar y las fotografías en las tarjetas de identificación electoral son los documentos para constatar las direcciones e identificar apropiadamente a esos electores y así, *como primer paso*, intentar *emplazarlos personalmente. Diez (10) meses después de las elecciones no son válidas unas notificaciones por correo certificado y unos simples avisos caracterizados como edictos.*

Pero hay más. El trámite pautado de manera deficiente por la mayoría es *significativamente menor* que el fijado por la propia Comisión Estatal en su *Reglamento de Recusaciones y Exclusiones*, aprobado el 11 de diciembre de 1987. Su Sec. 2.5 establece la *necesidad* de notificación *personal* de aquellos electores —sean pocos, cientos o miles— a quienes se les pretenda recusar. Únicamente autoriza la citación mediante edictos después de haberse gestionado infructuosa-

mente la notificación personal y así se acredite mediante diligenciamiento negativo.

La única ocasión en que nuestro ordenamiento autoriza la notificación *inicial* por *correo certificado* es la acción en cobro de dinero bajo la Regla 60 de Procedimiento Civil, 32 L.P.R.A. Ap. III, en pleitos de menor cuantía. ¿Cómo puede entonces la mayoría de un plumazo tachar y hacer caso omiso a la jurisprudencia que invariablemente exige la notificación personal en casos electorales, y equiparar el derecho al voto con una acción en cobro de poca monta económica? Para superar estos principios de debido proceso de ley, la mayoría se ha visto compelida a derogar y reescribir la normativa vigente sobre diligenciamiento personal antes reseñada. A partir de hoy, el diligenciamiento personal de emplazamientos sólo es un "mecanismo preferido" (opinión mayoritaria, pág. 610) y no de "estricto cumplimiento", tal y como reiteráramos en *Rodríguez v. Nasrallah*, 118 D.P.R. 93, 98 (1986). El lenguaje específico que la mayoría cita para apoyar esta nueva doctrina —ad hoc— es aislado y fuera de contexto. Con respeto, estamos ante un mal ejemplo de técnica adjudicativa judicial y un nefasto precedente. En vano hemos tratado de disuadir a la mayoría. Ningún argumento ha sido convincente. Ante esa inflexible postura mayoritaria, no nos queda otra opción que invitar a los miembros de la Judicatura, clase togada y otros lectores —y electores— a una somera, desapasionada e *integral* lectura del caso de *Rodríguez v. Nasrallah*, supra, como único medio para que puedan arribar a sus propias conclusiones. De ese modo corroborarán que dicha decisión *no resuelve* que el emplazamiento personal es cuestión de preferencias y, menos, que haya sido sustituido por meras conveniencias procesales. *Todo lo contrario*. Dicha opinión —al igual que la casuística allí incorporada del Tribunal Supremo federal y otros foros estatales— se afianza en que el debido proceso de ley exige el emplazamiento *in personam*, y que la notificación por correo

o mediante edictos sólo procede después de efectuadas dichas diligencias en situaciones extremas.

Curiosamente, el caso de *Martin v. Wilks*, 490 U.S. 755 (1989) —que usa la opinión mayoritaria para concluir que los electores marginados son acumulables como parte (opinión mayoritaria, págs. 604–605)— de repente es olvidado en lo verdaderamente fundamental: la reafirmación del "'principio general prevaleciente en la jurisprudencia angloamericana de que una sentencia no obliga *in personam* en un litigio en que no ha sido designado parte *o hecho parte mediante un emplazamiento*'". (Énfasis suplido y traducción nuestra.) *Martin v. Wilks*, supra, pág. 761. Como excepción a la norma *in personam*, dicho Foro federal reiteró sólo dos (2) tipos de pleitos: los de *clase* o los de *representación. Estos dos (2) procedimientos son también —o al menos eran hasta hoy— las únicas exclusiones reconocidas en nuestro derecho vigente.*

La decisión mayoritaria es un retroceso constitucional. No sólo es contraria a las más elementales reglas de debido proceso de ley, sino que deja en *total desamparo* a aquellos electores que por diversas razones no están *ahora* en Puerto Rico. A fin de cuentas, la "ausencia temporal del domicilio, para propósitos de empleo, sin la intención de abandonar su pueblo natal y de adquirir otro permanentemente o por tiempo indefinido, *no puede ser considerada como la decisiva para negar el derecho al sufragio"*. (Énfasis suplido.) *P.P.D. v. Admor. Gen. de Elecciones*, supra, págs. 260–261. "O hay que notificar a las partes, o no hay que hacer notificación. Si lo primero, la forma acordada no es la legal; si lo segundo, lo hecho no pasa de ser una redundancia." *Márquez v. Junta Insular de Elecciones*, 41 D.P.R. 1, 7 (1930).

¿Es que las Reglas de Procedimiento Civil —sobre acumulación de partes y consolidación— se van a aplicar con rigor —*aunque discrecionalmente de manera errónea*— y, sin embargo, las imprescindibles para adquirir jurisdicción

*in personam* se van a descartar? Es una paradoja invocar la Regla 16 de Procedimiento Civil, *supra*, con miras a remediar una violación al debido proceso de ley de esos electores marginados por tantos meses, y negarse simultáneamente a aplicar y exigir los requisitos reglamentarios y jurisprudenciales reconocidos que rigen la expedición de emplazamiento, diligenciamiento personal y edictos, incluso los términos de veinte (20) y treinta (30) días, respectivamente, prescritos en la Regla 10.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III, para los electores demandados formular sus contestaciones. *O las cosas se hacen bien y se adquiere jurisdicción a los fines visualizados, o no se hacen y no se adquiere.* Sinceramente, la laxitud de la opinión mayoritaria y su diseño inconstitucional es prueba fehaciente de que subsisten todavía *las categorías inconstitucionales* de electores de *primera* y de *segunda* clase.

Si aspirábamos a que las preocupaciones del tribunal de instancia fueran atendidas y canalizadas correctamente —vincular a los electores marginados a su futura sentencia por cosa juzgada e impedimento colateral— desde el punto de vista teórico y práctico había sólo dos (2) alternativas procesales: examinar si la acción de *mandamus y daños y perjuicios* de la señora González Suárez era susceptible de convertirse en un *pleito de clase* y allí obligar a la Comisión Estatal a hacer partes demandantes —o demandadas— a todos esos electores, o confiar en que una vez publicados los *avisos* uno o un grupo de electores instaran una acción de clase que cumpla con los requisitos de la Regla 20 de Procedimiento Civil, *supra*. La criatura siamesa que ha procreado la opinión mayoritaria nos mueve a analizar brevemente esas opciones y contrastarlas con las características particulares de un *pleito de clase*.

## XIII

*Pleitos de clase*

Nuestra Regla 20 de Procedimiento Civil, *supra*, informa los requisitos mínimos procesales que deben concurrir para que se certifique un pleito de *clase* y, como resultado, *los miembros que no pidan su exclusión* —Regla 20.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III— queden obligados por sentencia. Cuevas Segarra, *op. cit.*, 1984, pág. 105. A tal efecto, en el caso de *Cuadrado Carrión v. Romero Barceló*, 120 D.P.R. 434 (1988), se analizó la dinámica procesal y las complejidades de un pleito de esta naturaleza en cuanto a los aspectos de numerosidad, comunidad, tipicidad y adecuada representación. Recuperemos algunas de esas expresiones.[4]

### 1. *Numerosidad*

Esta cuestión depende de las circunstancias de cada caso. Además del factor numérico que imposibilita la acumulación y presenta unos serios inconvenientes en la tramitación, han de considerar otros factores como la disposición geográfica, la posibilidad de que los miembros de la clase puedan ser identificados para propósitos de la acumulación, la naturaleza del pleito, la cuantía de la reclamación y la habilidad de cada miembro para hacer valer sus derechos de forma individual.

---

[4] Es limitada nuestra jurisprudencia en que se ha permitido la acumulación de numerosos electores. En *Ortiz v. Corte de Paz*, 53 D.P.R. 38, 47 (1938) —*que no era uno de impugnación*— a base de "que la misión fundamental de los tribunales es administrar justicia rápida, prescindiendo de tecnicismos legales invocados con el solo propósito de obstaculizar el libre ejercicio del sufragio . . .". En *contra*, véase *Partido Popular v. Junta Insular de Elecciones*, 63 D.P.R. 296, 313 (1944).

## 2. *Comunidad*

Es requisito que exista una cuestión de hecho o de derecho común a la clase, aunque no surjan del mismo acto, omisión o evento.

## 3. *Tipicidad*

Debe existir una relación entre las reclamaciones de los demandantes y los de las clase que se intenta representar. De esta manera, cuando el representante defiende un interés, adelanta los intereses de toda la clase.

## 4. *Adecuada representación*

El que pretende representar a una clase debe garantizar que lo hará adecuadamente. Revisten principal importancia: (a) la ausencia de conflicto y (b) las garantías de litigación agresiva y vigorosa. Estos requisitos nos permiten formular siete (7) razones contra la interrogante —que nunca es contestada— expuesta así en la opinión mayoritaria: "¿por qué no acumularlos *ahora* como partes en el caso de la señora González Suárez y permitirles reclamar sus prerrogativas?" (Énfasis suplido.) Opinión mayoritaria, pág. 607. Veamos.

La *primera*, la causa de acción de *mandamus y daños y perjuicios* iniciada por la señora González Suárez es *individual y personal*. Reclama que la Comisión Estatal reconozca sus cualificaciones como electora y, para sí sola, la adjudicación de su voto. Pide, además, compensación en daños y perjuicios. *Su acción puede adjudicarse sin que sea necesaria la acumulación de los electores como partes. No están presentes los requisitos de la Regla 16 de Procedimiento Civil,* supra.

La *segunda*, esa acción *tampoco es un pleito de clase.* Aunque potencialmente sería susceptible de así convertirse, *mediante unas enmiendas sustanciales a las alegaciones* —y claro está, de concurrir otros requisitos— *tal y como*

*está redactada la demanda al presente es imposible. Ella no ha alegado ni solicitado ser representante de clase alguna. Regla 20.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Ni el tribunal de instancia, como tampoco este Foro apelativo —por buenas que sean las intenciones— pueden enmendar esas alegaciones, como tampoco así ordenarlo. La conversión sui géneris que a esos fines hace la mayoría plantea de inmediato serios obstáculos.*

La *tercera,* conversión originada hoy *sua sponte* en este Foro *apelativo,* constituye una flagrante e inexcusable violación al debido proceso de ley. La señora González Suárez *nunca* ha tenido ni se le ha brindado la oportunidad de exponer, *en foro judicial alguno,* su posición respecto a la presente decisión de añadir a su caso —por vía de acumulación— mil ochocientos cuarenta y cuatro (1,844) *nuevas partes.* Cabe recordar de nuevo las siguientes palabras iluminadoras del Juez Frankfurter, citadas en el análisis del profesor Tribe en su obra *American Constitucional Law,* Mineola, Ed. Foundation Press, 1978, Sec. 10-7, pág. 503: "'la validez y autoridad moral de una conclusión depende en gran medida de la manera en que se llegó a ella. . . . Ningún instrumento mejor ha sido diseñado para arribar a la verdad que el ofrecer a una persona en peligro de sufrir una pérdida seria, notificación del caso en su contra y oportunidad para enfrentarlo. Tampoco se ha encontrado una mejor manera para generar el sentimiento tan importante para un gobierno popular, que se ha hecho justicia'." (Traducción nuestra.)

La *orden de acumulación* del tribunal de instancia *fue decretada en el pleito de impugnación de Granados Navedo contra Acevedo Pérez, y no en la acción de "mandamus y daños y perjuicios" de la señora González Suárez.* Su otra orden —la de *consolidación*— sin la objeción de las partes, no fue con ese propósito ni puede tener otro alcance. Ante este Foro apelativo no ha comparecido la señora González

Suárez. *La mayoría, mediante una mezcolanza, añade a su causa de acción separada e independiente mil ochocientos cuarenta y cuatro (1,844) nuevas partes, inyectándole así unas consecuencias inimaginables nacidas de una simple orden de consolidacióin.* Y como la *acumulación* ha sido hecha a sus espaldas, no ha podido siquiera objetarla.

La *cuarta*, el vocablo en plural "afines", al decir mayoritario (pág. 609), no es sinónimo de legalidad. Aunque el derecho básico reclamado por la señora González Suárez es contra la *Comisión Estatal* —para compeler la adjudicación de su voto y poder gozar de cierta afinidad con el de aquellos otros cientos de electores que la Comisión Estatal anuló— el pleito tendría que someterse forzosamente como de *clase* por los *tres (3) grupos de electores marginados* que existen, a saber: aquellos que votaron bajo el sistema de añadidos a mano, los que pusieron sus iniciales en las papeletas y los pertenecientes a las papeletas arrestadas. Bajo la alternativa de ser *un* solo pleito de clase, habría que dividir en *subclases* estos grupos. A su vez, nos tropezamos con el escollo procesal —ya fuera un solo pleito de clase o tres (3) distintos— que también habría que dividir como *subclases* tres (3) categorías en las que *no hay identidad de intereses*: los electores que endosaron en las urnas a Granados Navedo, los que votaron por Acevedo Pérez y aquellos otros que emitieron sus votos a favor de la candidata del P.I.P.

La necesidad de esta subclasificación se comprende ya que, evidentemente, hay *intereses partidistas e ideológicos antagónicos* que tendrían que ser atendidos por diferentes abogados. Como indicó la opinión mayoritaria en *Cuadrado Carrión v. Romero Barceló*, supra, pág. 457:

> Cuando ocurren conflictos irreconciliables entre la representación legal y la clase, las reglas ofrecen varios recursos procesales: subclasificación, intervención, redefinición o limitación de la clase, etc. En especial, el enfoque sobre la subclasificación requiere que los tribunales participen activamente

en la supervisión de los pleitos de clase. Éstos deben ir más allá de meramente responder a las subclasificaciones propuestas por los demandantes; deben también tomar la iniciativa y elaborar las subclases adecuadas. Los abogados de los demandantes a veces no tienen incentivo para proponer la certificación de subclases. Una división de la clase usualmente implica una división del control sobre el litigio y una división de los honorarios de abogado. Además, el abogado de los demandantes puede simplemente no tomar en consideración la posibilidad de presentar un esquema de subclasificación. En tal circunstancia, el tribunal puede adelantarse y definir las subclases.

Parafraseando de nuestra *opinión concurrente* allí emitida, "[f]inalmente, no está presente en el caso de autos el factor referente a la *'ausencia de conflicto'*. *General Telephone Co. of Southwest* v. *Falcon*, 457 U.S. 147, 157 n. 13 (1982). Si en algo queda vulnerada la Regla 20 de Procedimiento Civil, *supra*, es en cuanto a este requisito. Pecaríamos de ingenuos si fuéramos a sostener que los reclamantes pertenecientes al *P.P.D.* y sus competentes abogados van a tramitar agresiva y vigorosamente estas reclamaciones a nombre de [los electores] identificados con el *P.N.P.*, cuando precisamente la causa del alegado discrimen brota de esas discrepancias ideológicas". (Énfasis suplido y en el original.) *Cuadrado Carrión v. Romero Barceló*, supra, pág. 469. *Y sin ulterior elaboración, añadimos ahora ni viceversa.*

La *quinta,* siempre subsistirá la necesidad de cumplir con la Regla 20.3(b) de Procedimiento Civil, 32 L.P.R.A. Ap. III, esto es, el tribunal de instancia tendría que proveer "la mejor notificación posible dentro de las circunstancias, incluyendo *notificación individual a todos los miembros que puedan ser identificados mediante esfuerzo razonable,* excepto cuando por ser *tan oneroso* dificulte la tramitación del pleito en cuyo caso el tribunal dispondrá la forma de hacer tal notificación". (Énfasis suplido.)

No puede seriamente sostenerse que la violación del debido proceso de ley por la Comisión Estatal en diciembre de 1988 y el precioso tiempo perdido —incluso los diez (10) meses habidos desde las elecciones— son razones para configurar válidamente una situación de *"onerosidad"*. *No podemos seguir confundiendo los procesos.* El pleito de *impugnación* es separado e independiente, cuya suerte final no puede hacerse depender del *mandamus y daños y perjuicios* de la señora González Suárez como tampoco de cualquier otro pleito que activase uno o varios electores. *Johnson v. Manhattan Ry. Co.*, supra.

*Insistimos, bajo cualesquiera esquemas, que el primer paso es el emplazamiento y la notificación personal de todos los cientos de electores, tomando como punto de partida las direcciones que aparecen en los archivos de la Comisión Estatal.* Sobre ese organismo recae esa obligación. Ningún tribunal tiene facultad para, a priori, relevarle de la misma y exponer a esos electores a una *doble* infracción *constitucional sustantiva y procesal.*

La *sexta*, es evidente que un pleito de clase no garantiza la finalidad deseada bajo la doctrina de *cosa juzgada e impedimento colateral de sentencia*, pues no ataría aquellos electores que solicitaren ser *excluidos*. En este sentido, la opinión mayoritaria y su mandato *nada adelanta*. Pasa por alto que los reclamantes ante la corte federal, para todos los fines jurídicos, ya *declinaron* intervenir en el pleito de impugnación entre Granados Navedo y Acevedo Pérez, y obviamente se han negado a iniciar pleitos separados ante nuestros tribunales. Su emplazamiento personal en el caso de González Suárez —en virtud del dudoso procedimiento sui géneris establecido— no implica que necesariamente estarán vinculados de forma legal por el decreto final.

Y *finalmente*, ¿cómo puede la mayoría sostener que los reclamantes en el foro federal deben ser emplazados *personalmente* y, sin embargo, a la vez decidir que a todos los

otros electores marginados sólo se les notifique por *correo certificado? En el mundo de la realidad de los seres humanos resulta ser una nota irónica que a los primeros —que conocen que sus votos no fueron adjudicados— se les notifique personalmente, mientras que a los segundos —que lo ignoran— se les niegue la observancia del requisito constitucional de debido proceso de ley.*

## XIV

*Potencial conflicto entre jurisdicciones*

La orden del tribunal de instancia de 14 de agosto no sólo obligaba injustamente a Granados Navedo a emplazar a los reclamantes en el foro federal, sino que tenía el potencial de crear un conflicto jurisdiccional. Esta inquietud —que no es novel ni especulativa— no queda superada con la opinión mayoritaria. Refresquemos la memoria.

El 29 de diciembre de 1988 la corte federal se abstuvo de ejercer su jurisdicción pendiente de la determinación de las cuestiones planteadas en el Tribunal Superior. *Granados-Navedo v. Acevedo*, 703 F. Supp. 170 (D. P.R. 1988).

En la vista oral del Tribunal en pleno celebrada el 29 de marzo de 1989, en *Granados v. Rodríguez Estrada I*, supra, se suscitó el diálogo siguiente:

HON. JUEZ NAVEIRA DE RODON:

Pero ese planteamiento si son partes indispensables no prospera. Si son parte indispensable hay que incluirlos porque si no bajo la norma de indispensabilidad es que un pleito no puede continuar sin ellos.

LCDO. SALDAÑA:

Bueno, yo no sé, Vuestro Honor. Esa cuestión en verdad no se planteó en esa forma. *Se se hubiese planteado hubiese surgido un conflicto de jurisdicciones porque la Corte Federal no hubiese permitido que la Corte Estatal obligara a esa gente a someterse a la jurisdicción del Tribunal Estatal.* Ese, Vues-

tro Honor, es *mi criterio* y yo sé por experiencia lo celoso que es el Tribunal Federal con su jurisdicción. De manera que *me atrevo a decir que si el Tribunal Superior hubiese adoptado las normas de conducta que Su Señoría señala hubiese surgido inmediatamente un conflicto entre* [*el*] *Tribunal Federal y el Tribunal de Puerto Rico.* Inclusive, el Tribunal Federal hubiese dicho, *pues yo voy a seguir con mi acción.* Porque el Tribunal Federal todo lo que ha hecho es suspender su acción. *O sea, que estas personas tienen pleno derecho una vez que se termine el pleito en el Tribunal Superior y en el Tribunal Supremo a regresar al Tribunal Federal.* Claro, otra cosa es qué va a pasar si regresan, si el Tribunal Federal va a ejercitar jurisdicción después que se resuelvan estas cuestiones que están pendiente[s]. *Pero, cerrarle el camino por anticipado yo creo que el Tribunal Federal no lo hubiese permitido*, Vuestro Honor.

HON. JUEZ HERNANDEZ DENTON:

Lcdo. Saldaña, de hecho en estos momentos hay varios casos caminando casi simultáneamente en ambos foros, federal y estatal, relacionados con reclamaciones de derechos civiles, y en Estados Unidos hay abundante literatura sobre eso, donde el planteamiento de *re*[*s*] *judicata* surge en parte dependiendo de *cuál es el primer foro que resuelve.* A lo que lleva es que de sostenerse de que son partes *indispensables* y de resolverse esto en el foro local antes de que en el foro federal, ¿no tendría esto efecto de *re*[*s*] *judicata* en el foro federal?

LCDO. SALDAÑA:

Pues posiblemente, Vuestro Honor, pero no sabemos qué hubiese hecho el Tribunal Federal antes de que recaiga una sentencia final en el Tribunal Superior. O sea, en *el Tribunal Federal ya adquirió jurisdicción porque el pleito de los llamados electores se radicó allá antes o poco antes de radicarse el pleito en la Corte Superior.* Entonces el Tribunal Federal es muy celoso de su jurisdicción. . . .

HON. JUEZ ORTIZ:

Y los tribunales locales también.

HON. JUEZ HERNANDEZ DENTON:

Y lo que podría hacer el Tribunal Federal *es continuar con su caso.*

LCDO. SALDAÑA:

*Claro.*

HON. JUEZ HERNANDEZ DENTON:

Y nosotros aquí en el foro local también continuar con el caso.

LCDO. SALDAÑA:

Sí, pero el Tribunal Federal había suspendido su procedimiento en el caso para darnos la oportunidad de venir acá. *De manera que en cualquier momento el Tribunal Federal puede reactivar su caso.* (Énfasis suplido.) T.E. Supremo, págs. 142–144.

Posteriormente, el 27 de julio de 1989, la corte federal reafirmó su criterio de abstenerse a base del estimado de la representación legal de Acevedo Pérez, de que el pleito de impugnación sería resuelto en o antes de cinco (5) meses.

De la Transcripción de Evidencia de 7 de agosto en el pleito de impugnación surge que el licenciado Rey informó al tribunal de instancia que ellos habían solicitado a la corte federal que ordenara a los allí reclamantes a comparecer como demandantes al Tribunal Superior. T.E. Superior, pág. 112. Desconocemos el resultado de esa petición.

La posición de los demandantes en la corte federal fue reiterada mediante *moción informativa* fechada el 23 de agosto. En lo pertinente —sin someterse a la jurisdicción— expusieron al Tribunal Superior:

Los Demandantes en los Casos Civiles Núms. 88-2023, 2024 y 2025 al presente radicados ante la Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico, expresamente se reservan el derecho a que sus derechos bajo la Cons-

titución de los Estados Unidos de América sean adjudicados por dicha Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico, [a] tenor con lo resuelto en el caso de *England v.* [*Medical Examiners*], 375 U.S. 411 (1964). Los aquí comparecientes no desean ni interesan litigar sus derechos bajo la Constitución de los Estados Unidos de América ante este Honorable Tribunal, como tampoco desean ni interesan que este Honorable Tribunal adjudique derechos bajo la Constitución de los Estados Unidos de América. Tan sólo solicitan que este Honorable Tribunal adjudique sus derechos bajo las leyes de Puerto Rico, *según alegados por el Sr. Granados Navedo en la presente acción civil, a la luz* de sus derechos bajo la Constitución de los Estados Unidos de América [y] a tenor con lo resuelto en los casos de *Windsor* [e] *England,* supra. (Énfasis suplido.)

Esa comparecencia no puede tener otro significado que un claro rechazo a ser incluidos como *parte.* El nuevo trámite pautado no sólo es improcedente, erróneo en derecho e inconstitucional, sino que puede causar una demora irrazonable que sobrepase las expectativas de la representación legal de Acevedo Pérez —estimada en cuatro (4) o cinco (5) meses— en la cual la corte federal hace dos (2) meses fundamentó su abstención. *El conflicto jurisdiccional sigue latente.*

## XV

*Conclusiones*

En síntesis, la orden del Tribunal Superior que compelía a Granados Navedo a emplazar a los reclamantes que acudieron al foro federal —y que han declinado ser parte demandante en el pleito de impugnación— fue claramente errónea. *Constituyó un craso abuso de discreción que específicamente le imponía una carga económica a Granados Navedo —en contraste con Acevedo Pérez— con visos de penalidad.*

*La opinión mayoritaria, por una vertiente errónea, mutila indirectamente el esquema procesal del pleito especial*

*de impugnación; paraliza, complica y atrasa su solución, y replantea un potencial conflicto jurisdiccional con la corte federal. Crea un desbalance y entremezcla conceptos sustantivos relativos a las causas de acción con los principios de economía procesal, como la acumulación de partes y la consolidación y sus efectos. Desde su incepción, el diseño es inconstitucional. Y toda esta confusión porque todavía nos negamos a rectificar las infracciones habidas en la Comisión Estatal en cuanto a mil ochocientos cuarenta y cinco (1,845) electores.*

A tono con los fundamentos expuestos en nuestro disenso en *Granados v. Rodríguez Estrada I*, supra, en la medida en que hoy la mayoría del Tribunal *reconoce finalmente que la Comisión Estatal violó el debido proceso de ley* de esos electores, resulta *imperativo* que sin dilación alguna decretemos la nulidad de la *certificación* expedida *precipitada y erróneamente a favor de Acevedo Pérez* y ordenemos *una nueva elección en el Municipio de San Juan.* ¿Cuánto más habremos de esperar? ¿Por qué seguir complicando el pleito y retrasando ese remedio? *Todavía estamos a tiempo para fijar correctamente las coordenadas que en el plano electoral y constitucional el recurso nos presenta.*

Hemos visto que el trámite de incorporar a esos electores al pleito de impugnación fue equivocado. También que es errónea la decisión mayoritaria de acumularlos *discrecionalmente* a la acción de *mandamus y daños y perjuicios* de la señora González Suárez. *Por osmosis, la mayoría desnaturaliza la esencia de esa acción y, además, consagra una flagrante violación constitucional al debido proceso de ley.* ¿Cómo, a diez (10) meses de las elecciones, todavía puede sostenerse la *certificación* de la Comisión Estatal? ¿Cómo pretender subsanar esa grave infracción, *iniciando y creando ahora de la nada, por fiat judicial,* un proceso que goza de las características de un pleito de *clase* —en el de *mandamus y daños y perjuicios* de la señora González Suárez—

sin que se le haya brindado la oportunidad de exponer su posición, no existan alegaciones a tal efecto ni se hayan cumplido con los trámites mínimos previos que requiere una *certificación de pleito de clase*? Más aún, ¿cómo incurrir otra vez —pero ahora en y por este Foro judicial— en una infracción *mayor* de debido proceso de ley constitucional al decidir que bastan unas notificaciones por correo certificado, como si estuviéramos ante un simple cobro de dinero de menor cuantía? ¿No es suficiente que los electores fueran previamente marginados por la Comisión Estatal? El remedio, aparte de ser improvisado, inapropiado, incompleto e incorrecto, es *INJUSTAMENTE TARDÍO E INCONSTITU-CIONAL.*

## XVI

*Epílogo*

Este disenso fue redactado y circulado pocos días después de la mayoría haber acordado una resolución para proveer *no ha lugar* al recurso y, de ese modo, confirmar la orden recurrida sin opinión del Tribunal. Como reacción, se produjeron otras ponencias expositivas de criterios concurrentes y disidentes. Eventualmente, cuajó la opinión mayoritaria suscrita por el Juez Asociado Señor Hernández Denton. Ello ha requerido unas modificaciones para dirigirnos particularmente a las posiciones —en esencia indivisibles— consignadas en esa opinión y en la concurrente y de conformidad de la Juez Asociada Señora Naveira de Rodón.

*Aunque la mayoría de este Foro apelativo resuelva discrecionalmente que Puerto Rico es un continente, geográficamente seguimos siendo isla.* Así ha sucedido en el caso de autos. El sustrato de la opinión mayoritaria y de la concurrente es que "la acumulación ordenada constituye un *ejercicio válido de la discreción* del Tribunal Superior bajo la Regla 16.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III . . .".

(Énfasis suplido.) Opinión mayoritaria, pág. 600. El mandato de hoy —fundamentado también en el uso ilimitado de la discreción de cuatro (4) miembros del Tribunal— *ensancha esa facultad judicial a unos horizontes inimaginables.* Para ello no se exponen argumentos sólidos que refuten los fundamentos que, con esmero, hemos elaborado en abono de su *total revocación.*

*Por su naturaleza no reglada, el ejercicio de la discreción es la prerrogativa judicial más poderosa y peligrosa. Siempre reclama una profunda reflexión íntima de conciencia.* "[N]ecesariamente ha de nutrirse de un juicio racional apoyado en la razonabilidad y fundamentado en un sentido llano de justicia; *no es función al antojo o voluntad de uno, sin tasa ni limitación alguna.* Como fuente integral del proceso de decisión que contribuye a dar sentido a la ley y a concretar en la realidad derechos individuales y colectivos, el uso por excelencia de un poder discrecional, intenta establecer un balance moral entre los polos opuestos en que se debaten algunas de las controversias humanas: el bien y el mal; la juridicidad y la violencia; *la legalidad aparente y la ventaja indebida; lo prudente y lo irrazonable; la paridad y la desigualdad*; lo espiritual y lo material; *lo racional y lo pasional*; y, la opresión y la libertad." (Énfasis suplido.) *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750, 770 (1977), opinión concurrente.

En buena juridicidad y metodología, no basta utilizar el razonamiento circular de que se trata de una *sencilla cuestión procesal discrecional.* A veces, la sencillez analítica judicial puede muy bien resultar en un falaz manto encubridor de injusticias en asuntos elaborados y complejos. El juez no ha de fiarse sólo en las apariencias. El inocente trozo de hielo que se asoma en altamar puede en realidad disimular un peligroso témpano capaz de precipitarnos al naufragio.

Si nos conformamos en reducir la controversia jurídica que hoy enfrentamos a la simple dicotomía de si procede o

no, *discrecionalmente*, la aplicación de la Regla 16.2 de Procedimiento Civil, *supra*, mal cumplimos nuestra tarea adjudicativa. *Ello es equiparable con la monda y lironda tarea de contestar, mecánica e imponderadamente, un examen de cierto y falso de derecho procesal-constitucional.*

No es persuasivo el argumento genérico de que el Tribunal, por voz del Juez Asociado Señor Ortiz, no decidió lo que sin ambivalencias éste adjudicó en la opinión mayoritaria del pasado 22 de junio de 1989, frente al señalamiento específico que la Juez Asociada Señora Naveira de Rodón destacó en su *opinión concurrente y de conformidad. Rectificar errores a tiempo es atributo imprescindible en el recto descargo de nuestro ministerio judicial. A ello tenemos perfecto derecho cualesquiera de los integrantes de este Foro apelativo. Sin embargo, no aceptamos que se eleve a categoría de virtud la inconsistencia judicial.*

Este Tribunal está obligado a mucho más. No sólo tiene el deber de resolver diligentemente los asuntos que se someten a su consideración —sencillos o complejos— sino transitar con pie firme los senderos de la justicia. La determinación de si erró el tribunal de instancia al aplicar la Regla 16.2 de Procedimiento Civil, *supra*, no puede tomarse livianamente. Por el contrario, precisa de un examen a fondo de factores de distinta índole, tales como el espíritu que inspiró la regla, las circunstancias de su uso en el pasado, las peculiaridades de este caso *y, sobre todo, las repercusiones que tendrá su aplicación*. Se impone una actitud de alerta, previsora y visionaria, que trascienda el momento inmediato. Sólo así cumplimos de manera inteligente y responsable el ejercicio que nos encomienda la Constitución.

Los fundamentos expuestos nos obligan nuevamente a disentir. En la soledad de nuestra conciencia, todo este confuso incidente procesal y errática adjudicación en instancia y en este Foro nos ha recordado el pasaje de la inmortal obra del Manco de Lepanto, Miguel de Cervantes Saavedra, en que el

fiel escudero Sancho Panza le advierte a Don Quijote: "Que . . . no son gigantes, sino molinos. . . ."(5) Por los demás, el factor tiempo nos ha impedido expresarnos sobre otros aspectos fundamentales recogidos en los disensos de los Jueces Asociados Señores Rebollo López y Ortiz. *Para ello, mientras constitucionalmente subsista el presente estado de indefensión electoral e indefinición judicial, siempre habrá otra oportunidad para reiterar una nueva elección.*

Cuando la Asamblea Legislativa vislumbró el juicio *de novo* como mecanismo de revisión de las decisiones post electorales de la Comisión Estatal, facultó a los tribunales no sólo a enjuiciar la corrección y juridicidad de las determinaciones de ese organismo administrativo, sino a diseñar los remedios adecuados para salvaguardar en última instancia el derecho al voto. *Por esa razón, según la propia Ley Electoral de Puerto Rico, de no poder los tribunales desentrañar la madeja de errores o irregularidades electorales y estar impedidos de emitir una decisión razonable, inteligente y confiable de quién fue el verdadero ganador, podrán mandatar la celebración de una nueva elección.*

La sabiduría, equivalencia conceptual lógica y justiciera de ese esquema, es evidente. Así, vuelven a ser precisamente los mismos electores, en ese peculiar *juicio "de novo" que constituye una nueva elección,* los que finalmente deciden la suerte de los candidatos políticos. *La voluntad ciudadana regresa, vía los tribunales, a su fuente de origen.* Se cumple de este modo el viejo y acendrado axioma democrático de que el pueblo, como *soberano,* en principio y fin es la única *"fuente del poder público". Preámbulo,* Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 251. (Énfasis suplido y en el original.) *Granados v. Rodríguez Estrada I,* supra, pág. 283, opinión disidente.

---

(5) M. de Cervantes Saavedra, *El ingenioso hidalgo Don Quijote de la Mancha,* 3ra ed., Méjico, Ed. W.M. Jackson, 1968, pág. 71.

—O—

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

DISENTIMOS. El ejercicio responsable de nuestro cargo nos impide considerar la sala de justicia que preside el Hon. Juez Carlos E. Polo en el Centro Judicial de San Juan como si se tratara de la Sala Experimental de Teatro Carlos Marichal existente en el Centro de Bellas Artes de San Juan. Las obras de teatro que se presentan en esta última de ordinario son el producto de la fantasía e imaginación de sus autores, y dichas obras no tienen otra consecuencia que la de entretener y agradar al público que allí asiste a disfrutar de las mismas.

En la *sala de justicia* que preside el Juez Polo, *por el contrario*, los asuntos y controversias que allí se ventilan son reales y las decisiones que en la misma se emiten tienen profundas y graves consecuencias sobre nuestra ciudadanía. *Esa sala de justicia definitivamente no es lugar para experimentar con nuevos y jurídicamente erróneos procedimientos, producto los mismos de la improvisación e imaginación, y la ausencia de profundidad jurídica de una mayoría de los integrantes de este Tribunal.*

## I

En la Opinión concurrente y disidente que suscribiéramos *el pasado 22 de junio de 1989* en el caso de la impugnación por parte del Sr. José Granados Navedo de la errónea certificación que como Alcalde de San Juan expidiera la Comisión Estatal de Elecciones a favor del Lcdo. Héctor Luis Acevedo sostuvimos que, *dados los hechos particulares del caso*, el *único* remedio judicial viable y apropiado era ordenar la descertificación del licenciado Acevedo como alcalde y la celebración de una nueva elección en la Ciudad Capital de Puerto Rico, ya fuera ésta general o parcial.

En aquel entonces una mayoría de los integrantes del Tribunal, erróneamente a nuestro juicio, ordenó la devolución del caso al Tribunal Superior de Puerto Rico, Sala de San Juan. El presente recurso constituye prueba fehaciente de que *la odisea* que actualmente viven los ciudadanos de San Juan no tiene visos de finalizar.

*La situación se ha convertido en una verdaderamente patética.* En su afán, cuestionable y equivocado, por determinar *judicialmente* el ganador de esa elección, tanto el Tribunal Superior de Puerto Rico, Sala de San Juan, como este Tribunal *han venido desde los comienzos del caso dando tumbos judiciales a ciegas, los cuales no sólo han sido erróneos, sino inconsistentes entre sí.* Ello, desafortunadamente, causa la impresión *de que nuestro sistema de justicia se ha convertido en una veleta*; esto es, un sistema de justicia que va de un lado a otro *dependiendo de la dirección del viento que le azota.*(1)

La errónea decisión que hoy se emite —con el disenso de los Jueces Asociados Señores Negrón García y Ortiz, y del Juez que suscribe— *tiene el efecto principalísimo y nocivo de retrasar aún más, y por un período de tiempo que realmente resulta impredecible, la solución final y correcta de este asunto.* De hecho, a todos los fines prácticos, *la decisión emitida conlleva la paralización indefinida del mismo.* Los residentes de la principal ciudad de Puerto Rico realmente no se merecen continuar viviendo bajo esta incógnita. Ellos tienen el derecho a saber, *prontamente y de una vez y por todas*, quién verdaderamente es el alcalde de su ciudad. Ello resulta ser imperativo por cuanto el final de esta litigación será el comienzo de la gestión —segura y serena por parte de

---

(1) *Veleta*: "Pieza de metal, ordinariamente en forma de saeta, que se coloca en lo alto de un edificio, de modo que pueda girar alrededor de un eje vertical impulsada por el viento, y que sirve para señalar la dirección del mismo." *Diccionario de la Lengua Española*, 20ma ed., Madrid, Ed. Espasa-Calpe, 1984, T. II, pág. 1372.

este funcionario municipal— encaminada a resolver los problemas que aquejan a la referida Ciudad.

*El sistema judicial de Puerto Rico le ha fallado malamente a la Ciudad Capital de Puerto Rico.* Ante la realidad inescapable de que los procedimientos ante nuestros tribunales se extenderán por tiempo indefinido, pronosticamos con pesar que, desafortunadamente para el buen nombre de nuestro sistema de justicia, posiblemente será otro foro judicial el que finalmente vindicará los derechos de los ciudadanos de San Juan.

Hemos tomado la decisión de emitir una Opinión disidente por separado debido a que la Opinión mayoritaria del Tribunal, suscrita la misma por el Juez Asociado Señor Hernández Denton, y la "Opinión" concurrente emitida por la Juez Asociada Señora Naveira de Rodón, aun cuando completamente erróneas, tienen la cuestionable virtud de *encubrir* la realidad procesal de la situación que plantea el recurso ante nuestra consideración. Procedemos a demostrarlo.

## II

Aun cuando no compartimos totalmente la posición del psicólogo norteamericano William James, principal propulsor del método filosófico conocido como pragmatismo —según el cual "el único criterio válido para juzgar de la verdad de toda doctrina científica, moral o religiosa, se ha de fundar en sus efectos prácticos"—[2] no albergamos duda alguna de que si el máximo foro judicial de un país interesa alcanzar el ideal de dispensar justicia de calidad, los integrantes de dicho tribunal tienen que adquirir conciencia del hecho, entre otros, *de que sus decisiones tienen que estar permeadas por cierto grado de pragmatismo.*

---

[2] *Diccionario de la Lengua Española, op. cit.,* pág. 1094.

Dicho foro judicial, en otras palabras, no se puede dar el lujo de elaborar y promulgar normas teóricas en el vacío. Necesariamente se requiere que, antes de que ese tribunal apelativo se exprese sobre una controversia legal ante su consideración o establezca una norma de derecho que ha de regir en el futuro una situación en particular, los miembros del mismo ponderen y evalúen, en la discusión que mandatoriamente precede a la emisión de la decisión, todos los hechos y elementos envueltos en el caso y, sobre todo, las implicaciones y consecuencias —inmediatas y futuras— que tendrá la decisión a emitirse.

Debe mantenerse en mente que el más alto foro judicial de un país no es un laboratorio legal donde se llevan a cabo experimentos judiciales, o un centro de estudios donde se discuten las diferentes posibles teorías legales y sus integrantes toman posiciones jurídicas teóricas, en abstracto y sin consecuencias, sobre un punto legal en particular. El hacer caso omiso de los hechos específicos y reales de la situación ante la consideración del tribunal y, repetimos y enfatizamos, de las consecuencias que la decisión acarrea, *convierte a ese tribunal apelativo en una institución teórica estéril*, esto es, un foro judicial que no rinde fruto beneficioso alguno para el país que pretende, y dice, servir.

### III

Aparte del hecho indiscutible de que la posición que hoy asume la mayoría del Tribunal respecto al punto aquí en controversia es contraria a, e inconsistente con, la posición que dicha mayoría sostuviera en la Opinión y Sentencia de fecha 22 de junio de 1989,[3] *la decisión que hoy emite el Tribunal, desde un punto de vista práctico legal, es ciertamente erró-*

---

[3] La mejor prueba de la inconsistencia en que se incurre lo constituye el hecho de que el Juez ponente en la opinión que se emitiera el pasado 22 de junio de 1989, Hon. Peter Ortiz, *disiente en el día de hoy.*

*nea y hasta absurda.* Al sostener, con ciertas modificaciones, la *actuación tardía* del Tribunal Superior de Puerto Rico, Sala de San Juan —ordenando la compulsoria acumulación, como partes demandadas, de los electores a quienes la Comisión Estatal de Elecciones, sin darle oportunidad de ser oídos, les anuló el voto— *la mayoría incomprensiblemente no realiza, o entiende, que la consecuencia legal inevitable de su decisión es dejar sin efecto prácticamente todos los procedimientos judiciales que se han llevado a cabo hasta la fecha ante el tribunal de instancia, por el sencillo y obvio fundamento de que estas "nuevas partes demandadas" tienen, en tal capacidad, ciertos y determinados derechos que les garantiza el debido procedimiento de ley que hace mandatorio que el tribunal de instancia comience de nuevo los procedimientos.* Ello irremediablemente tendrá el efecto, inaceptable e innecesario, *de dilatar irrazonablemente, y hasta paralizar, la decisión judicial final sobre el caso de la impugnación por parte del Sr. José Granados Navedo de la certificación como Alcalde de San Juan del Lcdo. Héctor Luis Acevedo.*

Debemos mantener presente, como correctamente señala el Juez Asociado Señor Negrón García en su voto disidente, pág. 654, que la "diferenciación entre partes y testigos es esencial por razón de los [diferentes] efectos procesales y evidenciarios" (énfasis suprimido) que ello tiene. Compartimos su preocupación de que la acción tomada por el tribunal de instancia, refrendada por el Tribunal en el día de hoy, tendrá el efecto de retrasar, de manera indefinida e irrazonablemente prolongada, la solución final del caso.

Dicha *válida* preocupación es objeto de somera consideración en la Opinión mayoritaria del Tribunal suscrita por el Juez Asociado Señor Hernández Denton. La misma es descartada, o despachada, en dicha ponencia por medio de las siguientes expresiones:

> . . . el Tribunal Superior —al amparo de la Regla 71 de Procedimiento Civil, 32 L.P.R.A. Ap. III, y su poder inherente de reglamentar los procedimientos en su sala— debe creativamente pautar las reglas procesales que permitan la resolución más rápida posible de esta controversia. . . .

. . . . . . . .

> Si bien es cierto que un atraso significativo en el trámite de este caso puede provocar la continuación del pleito paralizado en el foro federal, *no creemos que la acumulación de estos electores vaya a tener ese resultado. Aunque ciertamente la acumulación conlleva trabajo adicional, no creemos que desate el cuadro procesal desolador que tanto preocupa a algunos de nuestros compañeros en sus disensos. En todo caso, corresponde inicialmente al foro de instancia tomar las medidas pertinentes para resolver cualquier problema de esa naturaleza que pueda surgir.* (Énfasis suplido, en el original y escolio omitido.) Opinión mayoritaria, págs. 609–614.

*Resulta verdaderamente sorprendente la falta de visión y conocimiento de la realidad práctica-procesal que demuestran los integrantes de la mayoría del Tribunal respecto a este asunto.* Si bien es correcto que un tribunal tiene la facultad de *razonablemente* reglamentar los procedimientos en su sala y de "limitar" los derechos que a las partes les garantiza las Reglas de Procedimiento Civil, las de Evidencia y las demás leyes aplicables, *dicho foro no tiene autoridad en ley para eliminar dichos derechos completamente.* No podemos olvidarnos, después de todo, *del derecho al debido procedimiento de ley que ampara y protege los derechos de las partes en un proceso.*

No debe perderse de vista, en adición, que en la determinación de si esa facultad de reglamentar los procedimientos ante su consideración ha sido o no ejercitada en forma razonable por un tribunal *cobra importancia el derecho que está en controversia ante ese foro judicial.* En el presente caso, al tribunal ordenar la acumulación como partes de estos electores, ha puesto en entredicho o riesgo, nada más y nada

menos, *que el derecho constitucional fundamental al sufragio de estos ciudadanos.* En palabras sencillas: una vez se les ha traído, como partes, al pleito, lo cual pone en riesgo su derecho constitucional al sufragio, *el tribunal viene en la obligación de garantizarle al máximo su derecho a un debido procedimiento de ley.*

Ningún tribunal de justicia, so color de su autoridad inherente para reglamentar los procedimientos, puede convertir los mismos en una farsa (*sham*) donde se nieguen las garantías procesales a que las partes tienen derecho.

### IV

Examinemos brevemente la situación procesal-práctica a la que se enfrentará el tribunal de instancia con motivo de la decisión hoy emitida, la cual situación, repetimos, pasa por alto el Tribunal de manera sorprendente en el día de hoy.

En primer lugar, *nos encontramos ante un potencial de mil ochocientas cuarenta y cuatro (1,844) nuevas partes en el pleito*(4) —ya en calidad de demandantes o como demandados— con ideologías, intereses y situaciones de hechos disímiles. Cada uno de ellos tiene el derecho a comparecer al pleito representado por el abogado de su personal predilección; *esto es, cada nueva parte con un abogado distinto.* Dicha situación, *como es del conocimiento de cualquier abogado que haya practicado la profesión*, es una que *por sí sola* tiene el efecto de retrasar y complicar los procedimientos que se llevan a cabo a nivel de instancia.

Luego de que cada una de esas partes sea emplazada o notificada —en la forma jurídicamente correcta que disponen las Reglas de Procedimiento Civil de 1979 y la jurisprudencia interpretativa de las mismas— comenzará a correr el

---

(4) La suma total de 1,844 nuevas partes se desglosa de la siguiente forma: 1,280 electores añadidos a mano, 207 electores cuyas papeletas fueron "arrestadas" y 357 electores cuyas papeletas contienen iniciales.

término previsto por las Reglas de Procedimiento Civil para que dichas partes formulen sus correspondientes alegaciones. En vista de lo complicado del caso y *la voluminosa prueba documental existente en el mismo*, no debe extrañar a nadie, ni causar sorpresa, el hecho de que *dicho término tenga que ser prorrogado* por el foro de instancia *a solicitud justificada* de muchas de esas partes en lo que examinan dicha prueba para poder radicar una *alegación responsable*.

No obstante el hecho de que *originalmente* el tribunal de instancia estaba lidiando con un procedimiento especial —de carácter sumario— de impugnación del resultado de una elección, la acción de éste de acumular, al amparo de las disposiciones de la Regla 16.2 de las Reglas de Procedimiento Civil, 32 L.P.R.A. Ap. III, a estas nuevas partes en el pleito *convierte el mismo en un proceso civil ordinario* y, en consecuencia, hace que las partes en el mismo sean acreedores a una serie de derechos garantizados por el debido proceso de ley. Entre otros, y a manera de ejemplo, tenemos que dichas partes tienen derecho a un período de descubrimiento de prueba antes de entrar a juicio. Ello tendrá la consecuencia de convertir el caso en uno inmanejable. Basta pensar en los problemas que suscitará el señalamiento de una simple deposición, esto es, conseguir que *todos* los abogados de *todas* las partes en el pleito puedan coincidir en una fecha en específico, o los problemas que se puedan suscitar respecto a la contestación de un solo interrogatorio que se haya sometido, etc.

Lo anteriormente señalado a vuelo de pájaro —aun cuando suficiente por sí solo para demostrar lo inapropiado e improcedente de la decisión hoy emitida— *realmente no constituye índice suficiente del caos y crisis que causará a nivel de instancia la decisión que hoy emite la mayoría.*

Debe recordarse —ya dejando atrás los derechos procesales de las partes en la etapa previa al juicio— que una parte, a diferencia de un testigo, tiene, *entre otros*, el dere-

cho *a estar presente* durante todas las etapas de la vista en su fondo del caso; el derecho *a presentar la prueba* a su favor que estime pertinente y *a objetar la prueba* que intenten presentar las otras partes, y el derecho *a confrontarse y a contrainterrogar* a todos los testigos que sean presentados por las restantes partes.

*¿Qué significado y consecuencias tiene lo anteriormente señalado en el presente caso?*

Recordemos que, al día de hoy, ya se han celebrado a nivel de instancia *varios días de vista.* Según las minutas que recogen los procedimientos acaecidos durante esos días ante el tribunal de instancia, las dos partes originales del pleito, esto es, José Granados Navedo y Héctor Luis Acevedo, *estipularon la admisibilidad* en evidencia de una *voluminosa* prueba documental. *La adición de estas nuevas partes significa que la admisión de esa prueba documental ha quedado, ipso facto, sin efecto y en suspenso.* Todas las nuevas partes, esto es, *cada uno de los electores incorporados como partes en el caso,* tienen el derecho a examinar *todos y cada uno* de esos documentos con el propósito de determinar, primero, si los mismos tienen o no relación con su causa de acción, y segundo, la posición que van a asumir respecto a dichos documentos; esto es, si objetan o no su admisibilidad y si deben presentar prueba que fortalezca o refute la misma.

Específicamente en relación con los casos de papeletas que contienen iniciales —*las cuales comprenden trescientos cincuenta y siete (357) electores*— las referidas minutas revelan que ya tanto Granados Navedo como Acevedo presentaron *prueba testifical* —consistente la misma en el testimonio oral de los distintos funcionarios de colegio de los dos partidos e, incluso, de algunos de estos electores— en relación con el punto legal en controversia respecto a estas "papeletas inicialadas"; esto es, si las iniciales que aparecen en las mismas fueron o no el producto de instrucciones erróneas o confusas por parte de los funcionarios de los colegios de

votación. El testimonio prestado por estos testigos afecta de *manera directa* el derecho de estos trescientos cincuenta y siete electores —incluyendo aquellos de éstos que ya declararon en calidad de testigos— a que se cuente su voto. La adición, como partes en el pleito, de estos trescientos cincuenta y siete electores, significa que todo el procedimiento llevado a cabo ante instancia en cuanto a este aspecto *queda anulado* por razón de que cada una de estas nuevas partes les asiste el derecho a *confrontarse* con estos testigos, esto es, *a estar presente mientras éstos declaran y a contrainterrogarlos.*

Aun cuando podríamos continuar adelante y referirnos a una serie más de consecuencias procesales que tiene la decisión hoy emitida por la mayoría del Tribunal, las cuales demuestran lo erróneo de la misma, somos del criterio que ello es innecesario. La *improcedencia jurídica y práctica* de la decisión emitida por el Tribunal es evidente; su falta de sensibilidad, en relación con las consecuencias que sobre nuestra ciudadanía acarrea la decisión emitida, resulta ser lamentable.

V

La mayoría del Tribunal *intenta* justificar la decisión que emite expresando que la misma ahora le brinda la oportunidad a estos electores de defender su voto. Debe quedar claro que no albergamos duda alguna en nuestra mente de que la Comisión Estatal de Elecciones violó en forma crasa los derechos de estos mil ochocientos cuarenta y cuatro (1,844) electores al anular, o negarse a adjudicar, los votos de los mismos sin proveerles oportunidad alguna a dichos electores de defender su derecho a votar en las pasadas elecciones generales. *Así específicamente lo señalamos en la opinión concurrente y disidente que emitiéramos el 22 de junio de 1989.* Expresamos en esa ocasión:

Por otro lado, incurriendo en *una inconsistencia que resulta imposible de aceptar* y utilizando, en justificación de la misma, un lenguaje —"de cuando dije no dije y dije pero no dije lo que dije"— que hace que recordemos los famosos monólogos de Cantinflas, *el Tribunal ahora resuelve que cuando en P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, supra, *establecimos que los votos a ser emitidos por los electores "añadidos a mano" eran "votos recusados" realmente no establecimos ni resolvimos eso.* No obstante los esfuerzos que se hacen en la opinión mayoritaria que hoy se emite con el propósito de negarlo, lo cierto es que en el antes citado caso de *P.N.P. v. Rodríguez Estrada Pres. C.E.E.*, claramente establecimos que *el procedimiento en cuanto a estos votos se regía por el que establece el Art. 5.031 de la vigente Ley Electoral de Puerto Rico*, 16 L.P.R.A. sec. 3234, cuya disposición legal, específica y particularmente, precisamente prescribe el procedimiento a seguirse en la *recusación* de un voto.

Realmente resulta sorprendente la actuación del Tribunal. A un lego en derecho no se le puede exigir responsabilidad, y sujetarlo a unas consecuencias, por el uso de un término legal en particular por cuanto dicha persona realmente no tiene, en la mayor parte de las ocasiones, conciencia del significado jurídico del término que utiliza. La situación es diferente, sin embargo, cuando el que se expresa es el organismo judicial de mayor jerarquía en nuestra jurisdicción: este Tribunal. Se supone que sus integrantes conozcan el significado, connotaciones y consecuencias legales de los términos jurídicos que utilizan en sus decisiones. El pasado 20 de octubre de 1988, mediante una opinión, este Tribunal calificó de "voto recusado" el voto a ser emitido en las elecciones generales a ser celebradas el 8 de noviembre de 1988 por los llamados electores "añadidos a mano" en el contexto de la vigente Ley Electoral de Puerto Rico. Hoy, sorpresivamente, se reniega de esa actuación judicial.

*¿Cuál es la importancia de que el voto emitido por un elector "añadido a mano" en las elecciones generales celebradas el pasado 8 de noviembre de 1988 sea considerado como un "voto recusado"?* Como veremos, la misma es de importancia fundamental no sólo para el elector que emitió el voto, sino para el candidato impugnador del resultado de la elección para un cargo en particular.

Si se califica el mismo como un "voto recusado", conforme la decisión que este Tribunal emitiera en *P.P.D. v. Admor. Gen. de Elecciones*, 111 D.P.R. 199, 232 (1981), *el voto no puede ser anulado sin que antes el Estado le provea al elector una "amplia oportunidad de defender su voto", consistente la misma en que el elector deberá ser citado para la celebración de una vista ante la Comisión Estatal de Elecciones donde tendrá derecho a presentar prueba en apoyo de la validez de su voto.* Ello significa, naturalmente, no sólo que el trámite, y los gastos, de localizar y citar a todos los electores "añadidos a mano" serán de cuenta del Estado —y no del candidato— *sino que la Comisión Estatal de Elecciones, en caso de que dichos votos puedan variar el resultado de la elección, no puede emitir certificación oficial alguna declarando ganador a un candidato hasta tanto se diluciden en las vistas correspondientes la validez de los votos así recusados.*

De este Tribunal haber ratificado hoy lo que efectivamente decidió el 20 de octubre de 1988 —esto es, que los votos emitidos por los electores "añadidos a mano" son votos "recusados"— *ello hubiera significado que la certificación expedida por el Presidente de la Comisión Estatal de Elecciones declarando ganador en San Juan al licenciado Acevedo Pérez es una prematura y sin validez alguna por cuanto dicha Comisión no le brindó la oportunidad a esos electores de defender su voto. no adjudicado.* (Énfasis suplido y en el original.) *Granados v. Rodríguez Estrada I*, 124 D.P.R. 1, 96–98 (1989), opinión concurrente y disidente.

Desafortunadamente para esos electores, y para Puerto Rico, en aquel entonces la mayoría del Tribunal hizo caso omiso a nuestro señalamiento. En aquel instante, a pesar de haber sido advertido de ello, no le causó mucha preocupación a esa mayoría el hecho de que la Comisión Estatal de Elecciones le había violado los derechos a esos electores. Teniendo la oportunidad para hacerlo, no ordenaron ni que el asunto fuera devuelto a la Comisión Estatal de Elecciones ni que dichos electores fueran acumulados como partes. Entendió, en ese momento, la mayoría que ese trámite era improcedente e innecesario. De entonces haber escuchado nues-

tros reclamos, de así haber actuado la mayoría, no se hubiera perdido el tiempo valioso que ha transcurrido desde ese mòmento y no hubiera llevado a cabo el tribunal de instancia unos procedimientos que le tomó celebrar varias semanas —*con la consiguiente erogación innecesaria de fondos públicos*— que ahora tiene que dejar sin efecto por inservibles.

Sorprendentemente, y en relación con estos mil ochocientos cuarenta y cuatro electores, el Juez suscribiente de la Opinión mayoritaria, pág. 607, se pregunta "¿por qué no acumularlos ahora como partes . . . y permitirles reclamar sus prerrogativas?". *La contestación es realmente sencilla. En nuestro ordenamiento jurídico no puede haber cabida para esta clase de ambivalencia e hipocresía judicial.*

El remedio *ahora* endosado por la mayoría del Tribunal resulta ser tardío y en perjuicio de todos los residentes de la ciudad de San Juan. *No hay que ser muy perspicaz para poderse dar uno cuenta que la consecuencia obvia e inevitable de la decisión inconsistente hoy emitida por el Tribunal lo es la de retrasar por tiempo indefinido la solución final del caso de la Alcaldía de San Juan y la de mantener al licenciado Acevedo en dicha alcaldía.* Ello es lamentable. No existe razón legal alguna para *ahora* dilatar aún más la situación que afecta de manera grave el mejor funcionamiento de la principal ciudad de Puerto Rico, sobre todo, cuando hace más de dos meses se despreció la oportunidad de hacerlo.

Por otro lado, el procedimiento sui géneris que *hoy* en desesperación implanta el Tribunal —con la alegada finalidad de "evitar la proliferación de acciones, lograr la economía procesal y evitar la indeseable probabilidad de que surjan fallos incompatibles relacionados con un mismo incidente", (énfasis suprimido) opinión mayoritaria, pág. 608, contiene unas fallas, violativas del debido proceso de ley, de tal naturaleza que hace al mismo susceptible de ser atacado con éxito en el futuro por cualquier elector que, habiendo sido "emplazado" en la forma sui géneris que dispone el Tri-

bunal, no comparezca al pleito.(5) *Ello significa que el proce-dimiento hoy pautado por el Tribunal, con el alegado pro-pósito de evitar la multiplicidad de pleitos en el futuro, no tiene valor jurídico alguno.* La decisión hoy emitida, al igual que la del pasado 22 de junio de 1989, *constituye una pér-dida adicional de tiempo valioso.*

## VI

Como hemos podido notar, el presente recurso definitiva-mente plantea algo más que "una sencilla cuestión procesal discrecional . . .". Opinión concurrente y de conformidad, pág. 616. La decisión que emite el Tribunal en el caso de epígrafe tiene graves y serias repercusiones sobre uno de los derechos más fundamentales que nuestra Constitución le concede y garantiza a los ciudadanos de este País, cual es el derecho al sufragio y el derecho a que el voto legalmente emitido por un elector sea validado como tal. *La referida decisión, en adición, viola la intención relativa a materia electoral de la Asamblea Legislativa, la cual creó un proce-dimiento especial, de carácter sumario, con el loable propó-sito de que los pleitos de impugnación de la elección de un candidato a un puesto electivo, certificado como tal por la Comisión Estatal de Elecciones, se lleven a cabo con pronti-tud y certeza.*(6)

En consecuencia, la desafortunada afirmación a los efec-tos de que el presente recurso sólo plantea una sencilla cues-

---

(5) Nos remitimos a las expresiones que sobre este aspecto expone en detalle el Juez Asociado Señor Negrón García en su disenso.

(6) Debe mantenerse presente que la decisión del Tribunal de ordenar la acumulación de estos electores como partes en el caso de *mandamus*, radicado por la Sra. Francisca Luzgarda González, *afecta de manera directa el caso de impugnación del señor Granados Navedo.* Ello así por cuanto el caso de la se-ñora González *está consolidado* con el caso de impugnación radicado por el señor Granados Navedo. Así lo admite la mayoría del Tribunal al expresar que el foro de instancia "tendrá que *determinar simultáneamente* la validez de la certifica-ción y adjudicar la reclamación de los electores excluidos". (Énfasis suplido.) Opinión mayoritaria, págs. 600–601.

tión procesal únicamente puede ser producto o de una miopía judicial, causada la misma por la falta de conocimiento y experiencia sobre un área del derecho como lo es la litigación; o el resultado de un análisis llano, superficial y simplista, el cual no llega a rasgar, y percibir, la profundidad de la cuestión legal planteada; o, por último, algo dicho en tono de broma. Nos abstenemos de especular sobre ello. Sí sabemos que los ciudadanos de San Juan son acreedores a una actuación, y consideración, judicial de más calidad.

La hueca arrogancia con que se pretende despachar las serias cuestiones legales planteadas, las cuales tienen la consecuencia de afectar de manera fundamental nuestro sistema democrático de gobierno, ciertamente no debería de tener cabida en nuestro sistema judicial. Realmente carece de importancia el hecho de si el compañero Juez Asociado Señor Negrón García y el Juez suscribiente estamos o no equivocados en la interpretación que hacemos de la errónea Opinión mayoritaria que emitiera el Tribunal el pasado 22 de junio de 1989. Sobre este punto nos remitimos a las expresiones pertinentes entonces vertidas por el Tribunal en dicha Opinión mayoritaria.[7] Al buen entendedor con pocas palabras basta.

---

[7] Insiste la mayoría en que el Tribunal no descartó, en la Opinión mayoritaria que ellos mismos emitieron el 22 de junio de 1989, el procedimiento que hoy erróneamente referenda; esto es, el de brindarle la oportunidad judicial a estos mil y pico de electores, a quienes la Comisión Estatal de Elecciones les anuló el voto sin citarlos y oírlos, de defender su voto no adjudicado *mediante el mecanismo procesal de ser acumulados como partes*. Procede, en consecuencia, citar los pasajes pertinentes a dicha materia en la referida opinión:

"El tribunal [de instancia] le negó capacidad al señor Granados Navedo para reclamar derechos de electores al resolver que solamente los ciudadanos que emitieron votos no adjudicados pueden recurrir a los tribunales a reclamar la vindicación de sus derechos. Además, razonó el magistrado que como los electores que eran parte en el litigio pendiente en el foro federal rehusaron ser partes en este pleito, el candidato no los podía representar.

"*El enfoque del tribunal es erróneo*. Lo que el impugnador solicita es que se le reconozca su derecho a que se le adjudique los votos de estos electores a su favor. *Es sólo para esos fines que el tribunal tiene que pasar juicio sobre si los*

Dicha controversia, enfatizamos, no es lo verdaderamente importante. Lo fundamental en el presente recurso lo

---

*electores individuales fueron indebidamente excluidos o no.* Eso fue precisamente el mecanismo que aprobamos en *P.P.D. v. Admor. Gen. de Elecciones,* 111 D.P.R. 199 (1981). Allí, a los fines de adjudicar los derechos de los candidatos, fuimos caso por caso a examinar la situación particular de cada elector.

. . . . . . . .

"*El tribunal erró al no reconocerle capacidad al candidato señor Granados Navedo para presentar el testimonio de sus electores y al no admitir la prueba documental que iba dirigida a demostrar que estos cuarenta y ocho (48) electores que votaron a favor del señor Granados Navedo fueron impropiamente excluidos.* Estos electores aparentemente son parte del grupo de mil doscientos (1,200) electores inactivos que el señor Bauzá solicitó que se reinvestigara. . . .

. . . . . . . .

"V

"Se plantea si en la investigación y determinación del derecho a votar de los electores añadidos a mano hay que seguir el procedimiento adversativo establecido por la ley y por la jurisprudencia sobre recusación de un elector. Veamos.

. . . . . . . .

"La controversia ante nos es si dichas garantías procesales se debieron haber ofrecido a nivel de la Comisión Estatal a los electores que votaron bajo el procedimiento especial. . . .

. . . . . . . .

"No hay que devolver el caso a la Comisión para que inicie un procedimiento de notificación, vista y decisión en los mil doscientos (1,200) casos individuales. *Los derechos se dilucidarán en el tribunal donde las partes deben establecer, por la preponderancia de la prueba, la capacidad de los electores para votar y que las decisiones de no adjudicar estos votos fueron erróneas.*" (Énfasis suplido y escolio omitido.) *Granados v. Rodríguez Estrada I,* 124 D.P.R. 1, 31 (1989).

Como podemos notar, el Tribunal, advertido de la situación, rehusó tan siquiera considerar que dichos mil y pico de electores fueran acumulados como partes en el pleito. Al resolver *que no había que devolver el caso a la Comisión Estatal de Elecciones* con el propósito de que dicho organismo administrativo iniciara un procedimiento de notificación y vista respecto a dichos electores, *y al dictaminar que las partes* —esto es, José Granados Navedo y Héctor Luis Acevedo— *tenían la facultad y el derecho a* "establecer, por la preponderancia de la prueba, la capacidad de los electores para votar y que las decisiones de no adjudicar estos votos fueron erróneas" (*Granados v. Rodríguez Estrada I,* supra, pág. 31), ¿descartó o no el Tribunal la "sugerencia" de la Juez Naveira de Rodón de que se trajeran, como partes, estos electores al pleito al amparo de las disposiciones de la Regla 16.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III? ¿Para qué, razonó *sub silentio* la mayoría, acumularlos como partes si los dos candidatos tienen la facultad de reclamar que se cuente a su favor el voto emitido por ellos? Cuenta la historia que Jalisco, tampoco, "nunca perdió" una discusión.

constituye, repetimos, las graves y serias consecuencias que tendrá la decisión mayoritaria que hoy se emite sobre el procedimiento pendiente en el presente caso a nivel de instancia y sobre el derecho al sufragio de los electores que hoy se decide acumular como partes.

Igualmente carece de importancia el hecho de si el lenguaje utilizado en los disensos es uno fuerte y vigoroso. El lenguaje enérgico y vibrante con el cual se denuncia la comisión de una grave injusticia nunca puede ser considerado como ofensivo. *Las armas con que cuenta el juez para defender la justicia, cuales son la palabra y la pluma, tienen que ser utilizadas en forma franca, robusta y vigorosa.* La única "ofensa" envuelta en el presente caso la constituye la ponencia mayoritaria emitida, la cual violenta e injuria nuestro sistema democrático de gobierno. *La verdad puede resultar dulce o amarga, pero nunca ni injusta ni ofensiva.*

## VII

La situación de la violación, por parte de la Comisión Estatal de Elecciones, de los derechos de estos mil ochocientos cuarenta y cuatro (1,844) electores en una elección que se decidió por tan sólo veintinueve (29) votos —la ocurrencia de cuya violación de derechos, *por primera vez*, indirectamente acepta en el día de hoy la mayoría del Tribunal— *constituye evidencia adicional de que la única solución viable y apropiada en el presente caso lo es el decretar una nueva elección en San Juan, ya sea ésta general, ya sea parcial.*

La celebración de la nueva elección resulta ser imperativa si nuestro propósito es que triunfe la verdad y la razón, y nuestro objetivo el que la ciudadanía no pierda la fe en nuestro sistema de justicia. Como expresáramos anteriormente, la consecuencia obvia e inevitable de la decisión mayoritaria hoy emitida resulta ser la prolongación innecesaria e irrazo-

nable de esta controversia a nivel judicial. Ello permitirá que el litigante más poderoso prevalezca sobre el otro, no necesariamente debido a que a éste le asista la razón, sino porque esté en mejor posición de poder resistir esa prolongada y costosa litigación.

Resulta ser verdaderamente lamentable que este Tribunal desperdicie esta nueva oportunidad que se le brinda de ordenar esa nueva elección y así terminar con *el calvario* a que tiene sometida a toda la ciudadanía puertorriqueña, en especial a la de San Juan. Más que lamentable, *en realidad ello resulta ser trágico para el buen nombre de nuestro sistema judicial.*

—O—

Opinión disidente emitida por el Juez Asociado Señor Ortiz.

Hoy este Tribunal ha dado final a la legítima expectativa de los candidatos Granados Navedo y Acevedo Pérez, y a sus partidarios, de que se decida pronta y efectivamente la controversia sobre el resultado legal, verídico y justo de las pasadas elecciones para Alcalde de nuestra Ciudad Capital.

Ello es así porque al revocar nuevamente al tribunal de instancia se ha desnaturalizado y complicado el proceso de tal manera que será virtualmente imposible poder resolverlo, si es que así puede hacerse, dentro de este cuatrienio.

Todo esto se hubiera evitado si el tribunal de instancia y este Tribunal se hubieran limitado a cumplir con el mandato que emitiéramos en *Granados v. Rodríguez Estrada I*, 124 D.P.R. 1 (1989).

No vemos cómo podemos vislumbrar un resultado distinto. El Tribunal hace un injerto de figuras procesales ajenas al procedimiento especial de impugnación. Se incorporan la Regla 71 de Procedimiento Civil, 32 L.P.R.A. Ap. III, y las *Guías propuestas para dirigir la fase del descubri-*

*miento de prueba en casos complejos* de mayo de 1988;[1] se adoptan procedimientos especialísimos para emplazar y notificar a partes con interés;[2] se eliminan o acortan los términos para comparecer y acogerse al procedimiento de descubrimiento de prueba. La decisión permite o propicia limitar o variar el derecho de las partes acumuladas a una participación íntegra y efectiva en la vista en su fondo.[3] Hemos creado una incertidumbre sobre si éstas son partes demandantes, demandadas, terceros demandados o un híbrido, lo que afectará la determinación en cuanto al orden de presentación y al peso de la prueba. ¿Quién establece y quién niega, por ejemplo, el derecho al voto? ¿Los electores acumulados como partes? ¿Los candidatos? ¿Los Comisionados Electorales? ¿La Comisión Estatal de Elecciones? Hemos cambiado drásticamente la posición procesal de la Comisión Estatal de Elecciones y de su Presidente.[4] Además, hay una imprecisión sobre el derecho constitucional de los electores acumulados a una efectiva asistencia de abogado,[5] sobre

---

[1] Sin que le demos directrices específicas al tribunal de instancia sobre cuáles son aplicables.

[2] La expresión citada de *Rodríguez v. Nasrallah*, 118 D.P.R. 93 (1986), no autoriza esta variación. Lo importante es que se debe dar cumplimiento estricto a las disposiciones estatutarias para adquirir jurisdicción sobre las personas. J.A. Cuevas Segarra, *Práctica Procesal Puertorriqueña: Procedimiento Civil*, San Juan, Pubs. J.T.S., 1983, Vol. II, Cap. II, págs. 32 y 40. Su adulteración es una flagrante violación al trato justo. *Pagán v. Rivera Burgos*, 113 D.P.R. 750 (1983). En este caso, las circunstancias individuales de los electores que se pretenden acumular no autorizan que se utilicen otros medios para emplazar.

[3] Partimos de la premisa evidente de que, al recibir el mandato, el magistrado deberá dejar sin efecto lo actuado y reiniciar el proceso a menos que las partes, los originales y los acumulados, estipulen lo contrario.

[4] De partes nominales, se han convertido en terceros-demandantes con la obligación de emplazar y notificar a unos terceros, cuya identidad puede depender de cómo el demandante enmiende su demanda.

[5] No sabemos cómo se afectará el sistema de notificación de órdenes, escritos de las partes y comunicación entre el juez y los abogados que se ha utilizado hasta el presente. ¿Se obligará a los abogados de los electores individuales a comprar o a arrendar equipos de fax, de comunicación telefónica para llamadas

quién sufragará las costas y honorarios de abogado de esos electores en caso de prevalecer y, peor aún, sobre cuál es su responsabilidad para el pago de costas y de honorarios bajo la Regla 44 de Procedimiento Civil, 32 L.P.R.A. Ap. III, en el caso contrario de que no prevalezcan en su reclamo de que la Comisión Estatal de Elecciones anuló su derecho al sufragio.

Esto sólo es parte del cuadro de complicaciones innecesarias. Ante la amalgama de partes y remedios, no puede afirmarse que "lo que está hoy ante el Tribunal es una sencilla cuestión procesal discrecional que, aunque presente alguna complejidad en su implantación, no deja de ser sólo una cuestión técnica procesal". Opinión concurrente y de conformidad, pág. 616. La propia opinión del Tribunal reconoce que el caso se ha tornado tan complejo que se requiere la utilización de la Regla 71 de Procedimiento Civil, *supra*, de las guías aplicables a casos complejos y de la inventiva del magistrado de instancia para poder hacerlo manejable.

El Tribunal no se ha limitado a desnaturalizar el proceso de impugnación, en el cual las únicas partes son los candidatos afectados —*Granados v. Rodríguez Estrada I*, supra— sino que ha creado un monstruo procesal incapaz de ser regulado. Se incurre en un error igual de grave al no emitir directrices específicas, viables y conducentes a un proceso rápido y efectivo para llegar a un resultado compatible con la preocupación de todos, a saber, que se cumpla con el mandato del pueblo.(6)

---

de conferencia, computadoras, etc.? En caso afirmativo, ¿quién paga esos gastos? Si el elector es indigente, ¿pierde su derecho a ser parte al no poder participar efectivamente en el proceso? Tampoco sabemos si al ser utilizados como testigos de Granados Navedo, de Acevedo Pérez o de la Comisión Estatal de Elecciones serán considerados como testigos de dichas partes, testigos hostiles a dicha parte o testigos de las partes contrarias.

(6) Esta ausencia de guías, directrices y órdenes irremediablemente ocasionará una serie de recursos adicionales para revisar las órdenes que vendrá obligado a emitir el tribunal. Es probable que por falta de directrices adecuadas sigamos revocando al ilustrado magistrado.

Ante estos y otros problemas elaborados en otras opiniones disidentes,[7] aunque estamos de acuerdo con la decisión del Tribunal de revocar la decisión recurrida, disentimos de los fundamentos y de los resultados que se adoptan hoy.

El suscribiente limitaría la razón de ser para expedir el auto y dejaría sin efecto la orden recurrida. El tribunal a quo incidió al adoptar el mecanismo de la Regla 16.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III, y al ordenar la notificación a los electores afectados. El presente caso es una impugnación del resultado de una elección. Las acciones independientes y separadas que tienen disponibles los electores son para que se les reconozca su capacidad para votar y que se les adjudique su voto.[8] El Tribunal puede conceder un remedio completo a quienes estén legitimados, según la ley, para participar en el litigio.

Legitimar la participación de terceros mediante el mecanismo de la acumulación de partes no sólo violenta las disposiciones substantivas y procesales de la ley especial que go-

---

(7) Tales como el reconocer innecesariamente por primera vez que la Comisión Estatal de Elecciones violó los derechos electorales de los electores que se acumularán en este pleito, al no notificarles que sus votos habían sido anulados. Es obvio que, aunque se afirme lo contrario, este es el único fundamento para exigirle a la Comisión Estatal de Elecciones, o sea, al Estado, emplazar y sufragar los gastos de notificación a estos electores. Véase, sobre este aspecto, la opinión de 22 de junio de 1989, donde resolvimos que:

"No hay que devolver el caso a la Comisión Estatal para que inicie un procedimiento de notificación, vista y decisión en los mil doscientos (1,200) casos individuales. Los derechos se dilucidarán en el tribunal donde las partes deben establecer, por la preponderancia de la prueba, la capacidad de los electores para votar y que las decisiones de no adjudicar estos votos fueron erróneas." *Granados v. Rodríguez Estrada I*, 124 D.P.R. 1, 31 (1989).

(8) Que incluye a los electores que favorecieron a la señora Corrada del Río. Éstos no tienen un propósito común con los candidatos Granados Navedo y Acevedo Pérez. A tenor con la decisión de hoy, éstos también serán acumulados como partes.

bierna el caso, sino que es un modo de abrir, en cuanto a incidentes procesales se refiere, la caja de Pandora.(9)

---

(9) A los fines de este disenso es innecesario discutir si el uso de la Regla 16.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III, es incongruente con lo resuelto el 22 de junio de 1989. Basta expresar que el remedio es improcedente e innecesario. Por lo demás, reiteramos y ratificamos todos y cada uno de los fundamentos en apoyo de la decisión original.